## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEPHEN E. KELLER, Individually and On Behalf of All Others Similarly Situated, | Civil Action No. |
| Plaintiff, | |
| v. | |
| FIRST MARBLEHEAD CORPORATION, INC., JACK KOPNISKY, DONALD R. PECK, JOHN HUPALO, PETER TARR and STEPHEN ANBINDER | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAW** |
| Defendants. | **JURY TRIAL DEMANDED** |

## FEDERAL SECURITIES CLASS ACTION COMPLAINT

Plaintiff, Stephen E. Keller individually and on behalf of all other persons similarly situated, by the undersigned attorneys, for its Class Action Complaint, alleges upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through its attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements, Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding First Marblehead Corporation Inc. ("First Marblehead," "FMD" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the internet.

## NATURE OF THE ACTION

1.      Plaintiff brings this action as a class action on behalf of itself and all other persons who purchased securities of First Marblehead Corporation during the period August 10, 2006 through April 7, 2008 (the "Class Period") and who were damaged thereby, seeking to recover

damages caused by defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     First Marblehead Corporation, which is headquartered in Boston, Massachusetts, is a company that engages in various services relating to the underwriting, packaging and securitization of student loans.

3.     The Education Resources Institute ("TERI"), a private 501(c)(3) non-profit organization, operated from First Marblehead's office space, is engaged in, among other things, guaranteeing student loans originated by First Marblehead.

4.     In its press releases, SEC filings and other public statements disseminated during the Class Period, Defendants made materially false and misleading statements, and/or omitted material facts necessary to make those statements not misleading, concerning the performance and quality of First Marblehead's securitizations, its ability to perform additional securitizations, TERI's ability to adequately guarantee FMD's student loans and the Company's financial results and its ongoing operations.

5.     Throughout the Class Period, and prior to the start of the Class Period, default rates for student loans taken out to pay for "for profit" colleges were rising at rates much higher than other student loans. First Marblehead misrepresented the level of default rates in its portfolio and its effect on its ability to securitize additional student loan underwritings. In addition, Defendants knew, or reckless disregarded that TERI was under-reserved and unable to adequately insure the student loans underwritten by First Marblehead.

6.     Even though it knew or was reckless in not knowing about the worsening performance of its student loans, securitizations and TERI, the Company continued to tout its ability to complete additional securitizations.

7.      The Company also represented that it would consult with credit rating agencies periodically before TERI made any reductions to the amount of escrow funds maintained to guarantee the student loans underlying FMD securitizations. However, the Company allowed TERI to reduce the amount of escrow funds on multiple occasions without consulting with the rating agencies. This eventually resulted in Moody's Investor Services ("Moody's"), a credit rating agency, placing TERI under review for a possible downgrade and TERI's eventual bankruptcy.

8.      Defendants' representations about the performance of the Company's student loan securitizations, First Marblehead's prospects for completing additional securitizations and TERI's ability to maintain its credit rating were false and misleading and had the effect of artificially inflating the Company's share price throughout the Class Period.

9.      The truth concerning First Marblehead's ability to complete additional securitizations, issues surrounding the increases in default rates and TERI's lack of adequate loss reserves was partially revealed after the close of the market on December 3, and the morning of December 4, 2007. FMD's stock price plunged almost 37% from its close on December 3, 2007 to its close on December 7, 2007, when it announced it would not securitize any loans in its 2008 fiscal second quarter.

10.     The truth concerning TERI's absolute inability to meet its loan guarantee obligations was finally revealed after the close of markets on April 7, 2008, when it was reported that TERI filed for bankruptcy protection in Boston, Massachusetts. Accordingly, First Marblehead may incur losses from any loan defaults. As a result of TERI's bankruptcy filing, FMD stock price again plummeted 36.88% from its close on April 7, 2008 to its close on April 8, 2008

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b), and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  First Marblehead maintains businesses in this District and many of the acts and practices complained of herein occurred in substantial part in this District.  In addition, the Company's principal executive offices are in this District.

14.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

15.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of First Marblehead Corporation at artificially inflated prices during the Class Period and has been damaged thereby.

16.     FMD is incorporated as a business corporation under the laws of the state of Delaware and its principal place of business is located at 800 Boylston Street on the 34th Floor in Boston, Massachusetts. FMD provides a range of services relating to the outsourcing, underwriting and securitization of private student loans. It assists national and regional financial institutions and educational institutions, as well as businesses, education loan marketers and

other enterprises with the design, implementation and securitization of student loan programs. The Company is engaged in program design and marketing coordination, borrower inquiry and application, loan origination and disbursement, loan securitization, and loan servicing. On November 30, 2006, the Company completed the acquisition of Union Federal Savings Bank, a community savings bank located in North Providence, Rhode Island.

17.     The Company conducts its business through its eight direct or indirect subsidiaries, First Marblehead Education Resources Inc., GATE Holdings, Inc., The National Collegiate Funding LLC, First Marblehead Data Services, Inc., First Marblehead Securities Corporation I and II, TERI Marketing Services, Inc., Union Federal Savings Bank and UFSB Private Loan SPV, LLC. The Company's common stock is listed on the New York Stock Exchange ("NYSE") under the symbol "FMD".

18.     Jack Kopnisky has been FMD's President and Chief Operating Officer since September 6, 2005 and Chief Executive Officer since September 27, 2005.

19.     Donald R. Peck was FMD's Executive Vice President and Chief Financial Officer beginning April 2003, Treasurer beginning July 2003 and Secretary beginning November 2004. He resigned all of these positions on November 1, 2006.

20.     John Hupalo, has served as FMD's Executive Vice President and Group Head, Capital Markets since March 2003.

21.     Peter Tarr has served as FMD's General Counsel since July 2005 and as Chairman of the Board of Directors since October 2005. Mr. Tarr served as Vice Chairman of the Board of Directors from August 2005 until his election as Chairman.

22.     Stephen Anbinder is a co-founder and Director of FMD and served as Vice Chairman of the board of directors from May 2002 until June 2006. Mr. Anbinder previously

served as FMD's President, from December 1995 to May 2002, and Treasurer, from May 2002 to June 2003.

23.     Defendants Kopnisky, Peck, Hupalo, Tarr and Anbinder are collectively referred to as the "Individual Defendants."

24.     As officers and controlling persons of a publicly-held company, registered with the SEC and traded on the NYSE, the Individual Defendants each had a duty to disseminate accurate and truthful information with respect to the Company's financial condition, liabilities, interests, earnings and present and future business prospects, and to correct any previously issued statements that were erroneous.

25.     The Individual Defendants, because of their positions as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public filings, press releases and other Company statements as detailed herein and are personally liable for the misrepresentations and omissions contained therein.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who acquired FMD common stock from August 10, 2006 through April 7, 2008, and who were damaged thereby (the "Class").  Excluded from the Class are the defendants, the Company's officers and directors, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any other entity in which any of the defendants has a controlling interest or of which the Company is a parent or subsidiary.

27.     The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company had more than 93.5 million shares of its common stock outstanding, which were actively traded on the NYSE. While the exact number of Class Members is unknown at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of members of the Class who traded Company common stock during the Class Period.

28.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether defendants violated federal securities laws based upon the facts alleged herein;
- Whether defendants acted knowingly or recklessly in making materially misleading statements and/or omissions during the Class Period;
- Whether the market prices of the Company's securities during the Class Period were artificially inflated because of defendants' conduct complained of herein; and
- Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

29.     Plaintiff's claims are typical of the claims of the members of the Class as Plaintiff and members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal laws as complained of herein.

30.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

31.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of this Class is impracticable.

Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

32.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants failed to disclose material facts during the Class Period;
- FMD's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;
- as a regulated issuer, FMD filed periodic public reports with the SEC and the NYSE;
- FMD regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
- FMD was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;
- the misleading statements and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased their Company stock between the time Defendants failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted facts.

33.     Based upon the foregoing, Plaintiff and members of the Class are entitled to a presumption of reliance upon the integrity of the market price for the Company's securities.

<center>**SUBSTANTIVE ALLEGATIONS**</center>

**A.    About First Marblehead Corporation and its Key Relationships**

34.    Defendant First Marblehead purports to be an industry leader in providing services for private, non-governmental, education lending in the United States.[1] The Company works with banks and other loan providers by marketing lending services to students, processing loan applications, completing loan documentation, obtaining insurance on loans, packaging loans together, securitizing groups of loans, selling the newly created student loan securities and administering the securitizations.

35.    First Marblehead relies on several revenue streams including: structural advisory fees, which are fees earned in connection with structuring securitizations on behalf of its clients; residuals, which are junior debt interests in the securitizations it structures; processing fees from TERI, which are reimbursements of direct costs incurred with providing outsourced services to TERI; and administrative and other fees.

36.    On September 12, 2006, the Company filed its Form 10-K for the fiscal year ending June 30, 2006 ("2006 Form 10-K"), which stated in pertinent part:

> <u>Our level of profitability depends on our ability to earn structural advisory fees and residuals from facilitating securitizations of private label and GATE loans.</u> We may in the future enter into arrangements with private label lenders under which we provide outsourcing services but do not have the exclusive right to securitize the loans that they originate. We also receive fees as the administrator of the trusts that have purchased the private label and GATE loans, and in this capacity monitor the performance of the loan servicers. (<u>emphasis added</u>)

37.    FMD's 2006 Form 10-K was signed and certified by Jack Kopnisky and Donald Peck and signed by Peter Tarr and Stephen Anbinder. In the 10-K, FMD acknowledged that an increase in default rates and/or a downgrade of its credit rating would have a material adverse

---

[1] http://www.firstmarblehead.com/alternative-education-loans/index.html

<center>9</center>

affect on its business and operations.

> ***A number of factors, some of which are beyond our control, may adversely affect our securitization activities and thereby adversely affect our results of operations.***
>
> Our financial performance and future growth depend in part on our continued success in structuring securitizations. Several factors may affect both our ability to structure securitizations and the revenue we generate for providing our structural advisory and other services, including the following:
>
> - degradation of the credit quality or performance of the loan portfolios of the trusts we structure, which could reduce or eliminate investor demand for future securitizations that we facilitate..;
>
> - any material downgrading or withdrawal of ratings given to securities previously issued in securitizations that we structured, or any occurrence of an event of default with respect to such securities, which could reduce demand for additional securitizations that we structure.

38.     Factors that FMD discloses as materially affecting its financial results are: the demand for private education financing; the competition for providing private education financing; the education financing preferences of students and their families; applicable laws and regulations, which may affect the terms upon which our clients agree to make private student loans and the cost and complexity of our loan facilitation operations; the private student loan securitization market, including the costs or availability of financing; the general interest rate environment, including its effect on our discount rates; borrower default rates; and prepayment rates on private student loans, including prepayments through loan consolidation.

39.     The First Marblehead Corporation considers five assumptions when assessing the performance of its securitizations: discount rates, prepayment rates, trends in interest rates, default rates and recovery rates.

40.     FMD has several key relationships that it relies upon for continued business growth and success. One of these companies is TERI, which provides guarantees on student loans pursuant to which TERI agrees to reimburse lenders for all unpaid principal and interest on defaulted student loans, in exchange for a fee based on the loan type and risk profile of the

borrower.

41.     FMD has intimate knowledge of and assists TERI with its loan guarantee business. FMD purchased TERI's operating assets in 2001, and at a minimum performs various guarantee business functions on behalf of TERI and may manage all aspect of that business. According to various materials FMD has made available to the public, it will "manage TERI portfolio risk profile and recommend guarantee fee structure," provide "default management services," perform "default prevention, default processing and administrative services," and "guarantee claims management and administrative services.[2]"

42.     In FMD's 2006 Form 10-K, the Company, in one instance, describes its relationship with TERI as follows:

> In 2001, we entered into a strategic relationship with TERI, intended to enhance significantly our risk management and loan processing capabilities. We acquired TERI's historical database and loan processing operations, but not its investment assets or guarantee liabilities. In addition, 161 members of TERI's staff became our employees. TERI remains, however, an independent, private not-for-profit organization with its own management and board of directors…

> …In connection with the transaction, we also entered into a series of agreements with respect to loan processing services, database updates and the securitization of TERI-guaranteed loans. These include a master servicing agreement and a database purchase and supplementation agreement with TERI. Pursuant to the master servicing agreement, TERI engages us to provide loan origination, pre-claims, claims and default management services.

43.     Pursuant to its agreements with FMD and other parties to the student loans it guarantees, TERI is required to maintain an escrow or "Pledged Account" to secure TERI's obligation to purchase defaulted student loans. TERI is permitted to keep a portion of guaranty fees as an administrative fee rather than place them in the Pledged Account.

---

[2] Master Service Agreement

44.     Pursuant to one of the agreements between FMD and TERI, TERI is permitted to reduce the amount of funds in the Pledged Account below a set level (this level was redacted from the public filings), and "FMC agrees to consult with the Rating Agencies from time to time regarding reduction of such percentage below [**] and to cause such reduction to be included in the terms of future Securitization Transactions to the extent that it can be effected without adverse effect upon either the credit rating or the financial terms of such transactions."

45.     Accordingly, excessive reduction in the amount of funds deposited into the Pledged Accounts would adversely affect TERI's credit rating or the financial terms of its securitization transactions.

46.     FMD also has key relationships with lender banks, which provide financing for FMD's student loan activities. One of these relationships is with Bank of America.

47.     In its 2006 Form 10-K, FMD discusses the possible effect of a TERI downgrade on its relationships with lender banks:

> **Our business could be adversely affected if TERI's ratings are downgraded.**
> In its role as guarantor in the private education lending market, TERI agrees to reimburse lenders for unpaid principal and interest on defaulted loans. TERI is the exclusive provider of borrower default guarantees for our clients' private label loans. As of June 30, 2006, TERI had a Baa3 counterparty rating from Moody's Investors Service, which is the lowest investment grade rating, and an insurer financial strength rating of A+ from Fitch Ratings. If these ratings are lowered, our clients may not wish to enter into guarantee arrangements with TERI. In addition, we may receive lower structural advisory fees because the costs of obtaining financial guarantee insurance for the asset-backed securitizations that we structure could increase. Finally, the inability of TERI as student loan guarantor to meet its guaranty obligations could reduce the amount of principal or interest paid to the holders of asset-backed securities, which could adversely affect our residual interests in securitization trusts or harm our ability to structure securitizations in the future. In each such case, our business would be adversely affected.

48.     At least as early as March 31, 2006, First Marblehead knew or was reckless in not knowing that total student loan delinquency rates within its securitizations had increased more

49. At least as early as March 31, 2006, First Marblehead knew or was reckless in not knowing that its cumulative default rate net of claims cancelled for its securitizations had increased between three and thirty times over the past year for each of the securitizations for which there was a full year of data.

<div align="center">

**Materially False and Misleading Statements
Issued During the Class Period**

</div>

50. On August 10, 2006, FMD hosted a conference call where Donald R. Peck, reiterated that the securitizations were performing well:

> We do anticipate that there will be some volatility and residual valuations from quarter to quarter, potentially up or down, as the timing of prepayments, defaults, and recoveries varies from how they are modeled for a particular quarter. <u>The trusts continue, generally, to perform consistent with our expectations, as they have all year, and we have not altered our assumptions regarding future prepayments, defaults, and recoveries</u>. As with all of our assumptions, we will continue to monitor trust performance, and we will make appropriate adjustments as circumstances warrant. (<u>emphasis added</u>)

51. According to FMD's September 12, 2006 Form 10-K:

> Except for the change to the discount rate applied to additional structural advisory fees to account for the change in the market rate of 10-year U.S. Treasury Notes, <u>we did not materially change any loan performance assumptions regarding default rates</u>, recovery rates or discount rates in valuing projected trust cash flows during fiscal 2006 or fiscal 2005.

> During the second quarter of fiscal 2006, we increased our estimate of the fair value of structural advisory fees by approximately $0.5 million and increased our estimate of the fair value of residuals receivables by approximately $3.1 million as a result of refinements to our prepayment rate assumptions and use of an enhanced cash flow model. During the fourth quarter of fiscal 2006, loans in the securitization trusts experienced higher prepayment rates than we had estimated would occur during this period of time, which reduced the positive net accretion that comes from updating the carrying value of our structural advisory fees and residuals receivables for the passage of time. We do not believe it is necessary at this time to alter our assumptions regarding future prepayments that we use to

estimate the fair value of these receivables. We continue to monitor the performance of trust assets against our expectations, and will make such adjustments to our estimates as we believe are necessary to value properly our receivables balance at each balance sheet date. (underline)emphasis added(/underline)

52.   In its 2006 Form 10-K, FMD acknowledged that it had agreed to allow TERI to reduce the funds deposited into the Pledged Account:

In October 2005, we entered into a supplement to the master loan guaranty agreement. Under the terms of the 2005 supplement, for securitizations of TERI-guaranteed loans during fiscal 2006, TERI's administrative fee of 150 basis points increased, and the amount deposited by TERI into the pledged account decreased, by 90 basis points. In addition, TERI's residual interest in the trusts created at the time of the securitizations was correspondingly reduced to account for the 90 basis point reduction in the pledged account. As a result, the administrative fee for securitizations of TERI-guaranteed loans in fiscal 2006 was 240 basis points multiplied by the principal balance of the loans originated and securitized. For securitizations completed during fiscal 2006, TERI's ownership of the residual value of the TERI-guaranteed loans securitized ranged from 12 to 15 percent.

In August 2006, we entered into a supplement to the master loan guaranty agreement that provides as follows:

For each securitization closing between August 1, 2006 and June 30, 2007, TERI will be entitled to elect to adjust the amount of its administrative fee, and adjust the amount deposited into the pledged account, within specified parameters. As a result, the amount of the administrative fee applicable to securitizations closing between August 1, 2006 and June 30, 2007 may range from 150 basis points to 240 basis points, at TERI's election. We have agreed to attempt in good faith to structure our securitization transactions to accommodate TERI's election.

53.   Implicit in FMD's agreement to allow TERI to reduce the funds deposited into the Pledged Account, was the Company's prior agreement to consult with ratings agencies regarding such reductions and to avoid any adverse effect upon either the credit rating or the financial terms of the transaction.

54.   During a conference call FMD hosted on October 26, 2006, the following exchange occurred:

<**Q**> On the forbearance data, can you just let us know how that's tracking relative to your expectations and how – what is the duration of a loan that's in forbearance before it either becomes a delinquency or is secured?

**<A – Jack Kopnisky>:** Well, I can. What we see generally is there are two opportunities there in the 20 year period to seek a forbearance. And each forbearance period lasts up to six months. In detail, what we see is that – the forbearance is not as required for delinquency and indeed many students generally take up forbearance right after they get out of college and pass through their grace period, they need some more time to get their feet under them and indeed they become very good payers after they come out of forbearance.

**<Q>:** And how are these numbers tracking relative to your expectations and price?

**<A – Jack Kopnisky>:** It's spot on.

55. During a conference call hosted by FMD on January 25, 2007, the following exchange occurred:

**<Q >:** The default rate on that or the gross default rate is up to 531, which I assume is compare or your overall is 9% for the entire life of the loan. Like is that basically in line with your assumptions at this point even though the pool is basically only two years old?

**<A – John Hupalo>:** Let me -- I will make a general statement and that applies to that particular trust. When we have gone back and looked at each one of the five drivers including the default rates, we have found that they are in line with what our expectation is for this point in their development. I think your point though about any particular trust it's really important. There are some variations trust-to-trust with regards to some performance, either prepayment performance or credit performance or recovery performance, whatever it might be. And we do monitor that carefully to run it against what our expectation is. (emphasis added)

56. On April 26, 2007, the Company issued a press release announcing its financial results for its third quarter of fiscal year 2007 with an accompanying Form 8-K (April 26, 2007 Form 8-K). Notably, in its announcement, the Company announced changes in its expectations (assumptions) only regarding prepayment rates, but not default or forbearance rates:

The operating results also reflect adjustments to certain of the assumptions used by the company in estimating the value of its service receivables. Based on the current interest rate environment and securitization market, the company adjusted its prepayment and discount rate assumptions. The net effect of these adjustments reduced service receivables as well as the quarter's securitization revenues by a total of $16 million, or $.11 per diluted share.

57.     The April 26, 2007 Form 8-K was signed by John Hupalo.

58.     During a conference call on April 26, 2007, Jack L. Kopnisky, President, Chief

Operating Officer and Chief Executive Officer acknowledged that FMD had changed its

assumptions on only two elements, prepayments rate and discount rate:

> Since our IPO in 2003 investors have heard First Marblehead consistently speak
> about the package of five key assumptions, which we outline on the next slide.
> They are default performance, discount rate, interest rates, prepayment
> performance and recovery performance. We have talked about them as a package
> because we firmly believe that this is the most appropriate way for investors to
> gain insight into how the company determines the fair value for our service
> receivables. It would be a mistake and potentially misleading to isolate one
> assumption without considering the correlations and the effects across all the
> other assumptions.
>
> To arrive at a fair value we consistently consider a number of factors including
> but not limited to trends in the underlying loan portfolio; macroeconomic
> conditions; the immediate past, current and projected interest rate environment;
> the effect of the passage of time; and attributes unique to student loans. These
> attributes when combined with the 20-year repayment terms that include
> forbearance and deferment periods drive any decision to modify our assumption
> package. Using this methodology we determined it appropriate to increase the
> prepayment assumption from 7% to 8% and to modify the discount rate
> calculation used to value our residuals.

59.     After the close of the markets on August 8, 2007, FMD issued a press release

relating to its fourth quarter of fiscal year 2007 and filed a Form 8-K on August 9, 2007, that

stated in relevant part:

> Total revenues for the fiscal year ended June 30, 2007 were $881 million, up
> 55% from $569 million for the same period last year.  Net income increased
> 57% for the fiscal year to $371 million, or $3.92 per diluted share.
>
> "Fiscal 2007 was the strongest year in First Marblehead's history.  Our focus on
> adding value to our clients has resulted in exceptional revenue, earnings, and EPS
> growth," said Jack L. Kopnisky, First Marblehead's President and Chief
> Executive Officer. "We processed a record 1.4 million loan applications resulting
> in $4.3 billion in student loans facilitated.   Our business continues to grow as we
> remain focused on developing financial solutions to help students achieve their
> dreams."

For the fourth quarter of fiscal 2007, total revenues were $200 million, up 33% from $150 million for the same period last year. Operating income for the fourth quarter was $132 million, an increase of 31% over the same period last year. For the fourth quarter, net income was $78 million or $0.83 per diluted share.

The volume of loans facilitated during the fourth quarter of fiscal 2007 that are available for securitization increased 39% over the same period last year to $792 million. The rolling twelve-month volume of loans available for securitization increased 33% to $3.9 billion for the twelve months ended June 30, 2007. (emphasis added)

60.     The August 9, 2007 Form 8-K was signed by John Hupalo

61.     On August 8, 2007, FMD hosted an earnings conference call during which John

Hupalo, Senior EVP and CFO stated in relevant part:

The assumptions we use for the other four valuation drivers, defaults, recoveries, interest rates, and the discount rate, also remain appropriate. In aggregate, the portfolio continues to perform well. In light of the turmoil in the residential mortgage market, this is a good time to reemphasize that our clients and our business is not focused on down credit, sub prime borrowers the way some of the mortgage lenders structured their businesses. They specifically created businesses to serve credit challenged customers. We did not. The trust loans, we remind everyone, are guarantee[d] against default [by an] investment-grade guarantor, the Education Resources Institute. More than 80% of our portfolio is cosigned. The typical cosigner's credit profile is very strong. They are 50 years old, have been on active credit file for 22 years, so they have been through a variety and number of economic cycles. 85% of them own their own homes. The credit characteristics of the pool remain strong. (emphasis added)

62.     During the August 8, 2007 conference call, Jack Kopnisky, President, Chief

Operating Officer and Chief Executive Officer, discussed the Company's increased focus on the

direct to consumer channel:

Our fourth quarter volume growth was exceptional with loans available for securitization increasing 39% over the same period last year. During the quarter, loans available for securitization through the direct to consumer channel increased 49% while school channel loan volume decreased by 3% over the same period last year. Over the past 12 months, our loan volumes available for securitization have shown increases of 44% and 10% in direct to consumer and school channel volume, respectively.

In the year ended June 30th, the mix of direct to consumer to school channel available for securitization was 79% to 21%. We continued to see increasing consumer demand as borrowers seek a range of options in a direct relationship. However, the school channel remains an important and viable growth channel, where we will continue to allocate meaningful resources. As of the end of June, we had $832 million of loans available for securitization that had not yet been securitized. For the year, we securitized $3.75 billion of private student loans. The blended yield was over 18% with approximately $457 million coming in the form of upfront cash at the time of closing. Investor demand in our securitization program has been diverse and strong. Also, during the quarter, our Board increased the quarterly cash dividend to $0.25 per share from $0.15, an increase of 67%. This was the fourth consecutive quarterly increase and represents a 94% increase in full-year dividends for fiscal year 2007, $0.62 per share compared to $0.32 per share on a split adjusted basis.

63. On August 28, 2007, the Company filed its Form 10-K for the fiscal year ending June 30, 2007 ("2007 Form 10-K"), which discussed reductions in the amount of funds deposited by TERI into the Pledged Account:

> TERI received an administrative fee of 175 basis points for the securitization transaction the Company completed in the first quarter of fiscal 2007, 221 basis points for the securitization transaction the Company completed in the second quarter of fiscal 2007, 215 basis points for the securitization transaction the Company completed for the third quarter of fiscal 2007 and 212 basis points for the securitization transaction the Company completed in the fourth quarter of fiscal 2007. The Company expects to allow TERI to elect to adjust the amount of its administrative fee, and adjust the amount deposited into the pledged account, within specified parameters for the securitization transaction the Company plans to complete in the first quarter of fiscal 2008.

64. In its 2007 Form 10-K, FMD also discusses the possible effect of a TERI downgrade on its relationships with lender banks:

> **Our business could be adversely affected if TERI's ratings are downgraded.**
> In its role as guarantor in the private education lending market, TERI agrees to reimburse lenders for unpaid principal and interest on defaulted loans. TERI is the exclusive provider of borrower default guarantees for our clients' private label loans. As of June 30, 2007, TERI had a Baa3 counterparty rating from Moody's Investors Service, which is the lowest investment grade rating, and an insurer financial strength rating of A+ from Fitch Ratings which was reaffirmed on April 2, 2007. TERI also held a rating of A from Dominion Bond Rating Service as of June 30, 2007. If TERI's ratings were downgraded, our clients may not wish to enter into guarantee arrangements with TERI, our upfront structural advisory

fee yields could decline, or market conditions could dictate that we obtain additional credit enhancement for the asset-backed securitizations that we structure, the cost of which could result in lower revenues. <u>In addition, the inability of TERI as student loan guarantor to meet its guaranty obligations could reduce the amount of principal or interest paid to the holders of asset-backed securities, which could adversely affect our residual interests in securitization trusts or harm our ability to structure securitizations in the future. Finally, if TERI's ratings were downgraded below the ratings TERI held in January 2003, or if a rating agency were to place a negative watch on TERI, our agreement with Bank of America relating to the purchase of direct-to-consumer loans could be terminated.</u> In January 2003, TERI had a Baa3 counterparty rating from Moody's Investors Service and an insurer financial strength rating of A from Fitch Ratings. If TERI experiences a material adverse financial change such as a reduction of its credit rating below investment grade, Bank of America could suspend the processing of new application for school channel loans. In each such case, our business would be adversely affected. (<u>emphasis added</u>)

65.     The 2007 Form 10-K was signed and certified by Jack Kopnisky and John Hupalo. It was also signed by Stephen Anbinder.

66.     Implicit in FMD's agreement to allow TERI to reduce the funds deposited into the Pledged Account, was the Company's prior agreement to consult with ratings agencies regarding such reductions and to avoid any adverse effect upon either the credit rating or the financial terms of the transaction.

67.     On October 24, 2007, FMD hosted an earnings conference call during which John Hupalo, Senior EVP and CFO reflected upon how FMD portfolio's performance was as expected and that FMD would be executing a new securitization in December:

> <u>In aggregate, the portfolio continues to perform generally within the range of our expectations, and we continue to carefully monitor prepayments, defaults and recoveries</u>. Although still elevated, prepayments have generally been trending favorably.

68.     Also during the October 24, 2007 conference call, Mr. Hupalo stated in relevant part:

> As we look forward to our next securitization, I'll repeat my comments from August. As we do at this stage of each transaction, we are currently considering a

number of structures for our December transaction. Unless there are dramatic improvements in the markets over the next month, it is most likely that the December structure will look a lot like the very successful September transaction.

69.     Mr. Hupalo also made the following statement during the October 24, 2007 conference call, without revealing the Company's role in assisting TERI with its guarantee business:

> Just for those who are not as familiar, the loans that we securitize are all guaranteed by TERI. And the mechanism, obviously has not changed over the years, such that we have a cash pledge fund for each one of the segregated trusts. And then we rely on TERI's guarantee beyond that.
>
> To your point though, we have been monitoring very closely the portfolio performance. As I said earlier, it remains within our expectation. And we're really monitoring some of the lower credit tiers with special attention. We talked in the past about our collection activities and what we're trying to do for default aversion programs. And that is beginning collection activity or supplemental collection activity at the 60 rather than the 90. And we're evaluating opportunities to begin some of the collection activity earlier for certain of the borrower populations. So we are looking at that.
>
> And then your point with regard to credit criteria, we are in the process of looking at adjusting certain credit criteria, just as we do periodically during the course of any credit cycle.

70.     On October 25, 2007, Fitch Ratings downgraded TERI's "Insurer Financial Strength" from A+ to A and changed its outlook from Stable to Negative. However, it was not enough of a downgrade to jeopardize FMD's relationship with Bank of America.

71.     Also on October 25, 2007, FMD issued a press release entitled, First Marblehead Announces First Quarter Fiscal 2008 Results: Net Income up 20% and Loans Available for Securitization Increase 46% for the Quarter:

> We are off to a great start to the fiscal year as a result of record volumes in the first quarter.  This fiscal quarter's volume of private student loans facilitated and available for securitization exceeded all such volume for fiscal 2005," said Jack L. Kopnisky, First Marblehead's Chief Executive Officer and President. "Even in the midst of one of the most volatile credit cycles, we completed our largest securitization to date, providing market leadership and helping to increase the

availability of private student loan financing.

72.    With the October 25, 2007 press release, FMD filed a Form 8-K on October 25, 2007 that was signed by John Hupalo.

73.    The Defendants' statements, identified in paragraphs 50 – 52, 54 – 56, 58, 59, 61 – 64, 67 – 69 and 71 were each materially false and misleading when made, because, among other things:

- Defendants misrepresented the credit quality of the Company's portfolio, the Company's ability to manage the risk of its portfolio and the performance of the Company's securitizations, because rather than performing as expected, the Company's portfolio was experiencing consistently increasing default rates beyond those expected by the Company or able to be absorbed by the FMD securitizations or TERI;

- Defendants misrepresented the likelihood of the Company completing a securitization in the second quarter of its fiscal year 2008;

- Defendants concealed the Company's inability to manage the risk of TERI's portfolio, its failure to consult with rating agencies, TERI's inability to adequately guarantee FMD related loans and FMD's true role in managing TERI's affairs;

- Defendants failed to maintain adequate internal systems, procedures and controls such that the Company's officers and directors continued to represent that the Company's portfolio was performing as expected and would perform a securitization in the second quarter of 2008, allowed TERI to reduce the funds available to cover defaulted loans and failed to communicate sufficiently with

ratings agencies concerning the default risk of TERI's portfolio.

**The Truth Begins To Emerge**

74.     On November 26, 2007, Friedman Billings Ramsey analyst Matt Snowling downgraded FMD to underperform and decreased FMD's price target, stating "given the lack of unrestricted cash held by the guarantor, we believe the rating agencies and capital markets will eventually begin requiring First Marblehead to provide more collateral in future securitizations, impacting cash earnings." In reaction to this news, the Company's shares decreased in value $2.90 per share or 9.6%, to close on November 26, 2007 at $27.10 per share, on moderate trading (1.49 times the average volume of the previous seven days).

75.     On December 4, 2007, Moody's placed 16 FMD notes on review for possible downgrade, stating "In particular, loans originated through the direct-to-consumer channel appear to default at a significantly higher rate compared to loans originated through school financial aid officers." In reaction to this news, the Company's shares decreased in value $3.32 per share or 11.7% to close on December 4, 2007 at $24.98.

76.     In response to the Moody's review, after the close of markets on December 4, 2007, Sandler O'Neill issued a report regarding FMD and said the "likelihood of First Marblehead completing a securitization in December is severely diminished" and "Deterioration in credit performance of the loans in the trust could result in significantly lower upfront structural advisory fees in future securitizations." In reaction to this news, the Company's shares dropped $5.05 per share or 20.2% to close on December 5, 2007 at $19.93, on heavy trading (3.43 times the average volume of the previous seven days).

77.     On December 7, 2007, FMD announced it would not undertake a securitization for its second quarter of fiscal 2008. The stock closed at $17.85 per share.

78.     After the close of markets on April 7, 2008, news reports revealed that TERI filed for Chapter 11 bankruptcy protection in Boston Massachusetts. Friedman Billings Ramsey analyst Matt Snowling issued a research note before the market opened on April 8, 2008, that concluded that the bankruptcy filing means Boston-based First Marblehead may incur losses from any defaults and the filing "now shifts credit risk back'" to First Marblehead. In reaction to this news, the Company's shares dropped $2.84 per share or 36.88% to close on April 8, 2008 at $4.86, on very heavy trading.

## ADDITIONAL *SCIENTER* ALLEGATIONS

79.     Defendants acted with *scienter* in that they knew that the statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced to the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding the Company, their control over and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

80.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described could not have been perpetrated over a substantial period of time, as described herein, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants. The Individual Defendants were motivated to materially misrepresent the true nature of the Company's business, operations, and financial

affairs to the public and regulators in order to keep the Company's share price artificially high.

81.     Defendants' misrepresentations related to First Marblehead's most important revenue stream – securitizations, were motivated at least in part, by a hope that the increasing delinquencies and cumulative default rates would right themselves and avoid the necessity of changing Company expectations or require a costly disclosure that could have negative implications on the Company's stock price and on its ability to perform additional securitizations.

82.     Defendants Kopinsky, Tarr and Hupalo were motivated to make the above referenced misrepresentations, at least in part, by their desire to obtain additional compensation. On August 20, 2007, the Company filed a Current Report on form 8-K, detailing the salaries, performance awards and restricted stock options due to certain key employees, including *inter alia*, Defendants Kopnisky, Tarr and Hupalo. The award totaled $2,500,000, $2,500,000 and $1,000,000 respectively and was "keyed to the Corporation's income from operations for Fiscal 2007." The Current Report read in relevant part. :

> *Fiscal 2007 Annual Incentive Awards.* Within the first 90 days of Fiscal 2007, the Subcommittee selected the key employees eligible to receive annual incentive awards under the Incentive Plan for Fiscal 2007 and allocated a maximum incentive pool percentage under the Incentive Plan to each such employee. <u>The incentive pool under the Incentive Plan for Fiscal 2007 was keyed to the Corporation's income from operations for Fiscal 2007.</u> In making annual incentive awards for Fiscal 2007, the Subcommittee had discretion to adjust the previous incentive pool allocations downward but not upward and exercised its discretion to lower the incentive pool allocations downward. Annual incentive awards are intended to qualify as "performance-based" compensation under Section 162(m) of the Internal Revenue Code of 1986, as amended ("Section 162(m)"). The Subcommittee is composed entirely of "outside directors" within the meaning of Section 162(m). (<u>emphasis added</u>)

## THE SAFE HARBOR PROVISION IS INAPPLICABLE

83.     The statutory safe harbor under the Private Securities Litigation Reform Act of

1995, which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of First Marblehead who knew that those statements were false, misleading, or omitted necessary information when they were made.

## LOSS CAUSATION / ECONOMIC LOSS

84. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's common stock price and operated as a fraud or deceit on acquirers of the Company's common stock by continually overstating the quality of the Company's portfolio, the Company's past success and ongoing ability to adequately manage its risky portfolio and the likelihood the Company would successfully engage in future securitizations. As detailed above, when the truth about the Company's portfolio and its ability to manage risk was revealed, the Company's common stock declined as the prior artificial inflation came out of its common stock price. This decline in First

Marblehead Corporation's common stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was cause by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by the Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's common stock price and the subsequent significant decline in the value of the Company's common stock when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

85. At all times relevant, the defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. These statements were materially false and misleading because they failed to disclose a true and accurate picture of First Marblehead's business, operations, and financial condition, as alleged herein. Throughout the Class Period, defendants publicly issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing First Marblehead's share price to be artificially inflated. Plaintiff and other Class members purchased First Marblehead securities at these artificially inflated prices and caused them the damages complained of herein.

## COUNT I

## <u>VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5</u>

86. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

87. This Count is asserted against all defendants and is based upon Section 10(b) of

the 1934 Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder.

88.     During the Class Period, defendants, singly and in concert, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and course of business which operated as fraud and deceit upon Plaintiff and the other members of the Class, and failed to disclose material information in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and the other members of the Class. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiff and the other members of the Class to purchase the First Marblehead Corporation's common stock during the Class Period at artificially inflated prices.

89.     Throughout the Class Period, the First Marblehead Corporation acted through the Individual Defendants, whom it portrayed and represented to the financial press and public as its valid representatives. The willfulness, motive, knowledge, and recklessness of the Individual Defendants are therefore imputed to the First Marblehead Corporation, which is primarily liable for the securities law violations of the Individual Defendants.

90.     As a result of the failure to disclose material facts, the information defendants disseminated to the investing public was materially false and misleading as set forth above, and the market price of the First Marblehead Corporation's common stock was artificially inflated during the Class Period. In ignorance of the duty to disclose the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said defendants, Plaintiff and other members of the Class relied, to their detriment, on the integrity of the market price of the Company's common stock in purchasing shares of the First Marblehead Corporation.  Had Plaintiff and the other members of the Class known the

truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

91.     Plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

92.     By reason of the foregoing, defendants directly violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) failed to disclose material information; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class in connection with their purchases of the First Marblehead Corporation's common stock during the Class Period.

## COUNT II

## <u>VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT</u>

93.     Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

94.     The Individual Defendants, by virtue of their positions, stock ownership and/or specific acts described above, were, at the time of the wrongs alleged herein, controlling persons within the meaning of Section 20(a) of the Exchange Act.

95.     The Individual Defendants have the power and influence and exercised the same to cause the First Marblehead Corporation to engage in the illegal conduct and practices complained of herein.

96.     By reason of the conduct alleged in Count I of the Complaint, the Individual Defendants are liable jointly and severally and to the same extent as the Company for the aforesaid wrongful conduct, and are liable to Plaintiff and to the other members of the Class for

the substantial damages which they suffered in connection with their purchases of the First Marblehead Corporation's common stock during the Class Period

**WHEREFORE,** Plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

(a)     Determining that this action to be a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of defendants, together with interest thereon;

(c)     Awarding Plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts;

(d)     Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder; and

(e)     Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


DATED: April 10, 2008

<div style="margin-left:40%">

**BERMAN, DEVALERIO, PEASE,
   TABACCO, BURT & PUCILLO**

By: ___/s/ Jeffrey C. Block_____
    Jeffrey C. Block (BBO #600747)
    Leslie Stern (BBO #631201)
    Nathaniel Orenstein (BBO #664513)
    One Liberty Square
    Boston, MA 02109
    Telephone: (617) 542-8300
    Facsimile: (617) 542-1194

        and


    Laurence D. Paskowitz
    Roy L. Jacobs
    **PASKOWITZ & ASSOCIATES**
    60 East 42nd St.
    46th Floor
    New York, New York 10165
    Telephone:212-685-0969
    Facsimile: 212-682-3544
    classattorney@aol.com

</div>