**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE THE FIRST MARBLEHEAD | ) | LEAD CASE NO. 08-10612-JLT |
| CORPORATION SECURITIES | ) | Judge Joseph L. Tauro |
| LITIGATION | ) | |
| _____ | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND AND ALLEGATIONS OF THE COMPLAINT................................3

    A.    FMD's Business Model ..........................................................................3

    B.    The Education Resources Institute, Inc. ...............................................5

    C.    SEC Disclosures Concerning the Trusts' Loan Assets ..........................6

1.    Credit Quality (and Changes in Credit Quality) ...................................................7

2.    Deferrals, Delinquencies and Default Rates .......................................................8

    D.    The Credit Crisis, Gridlock in the Private Student Loan Market, and
          Consequent Decline in FMD Share Price .............................................11

ARGUMENT ......................................................................................................................14

I.    PLAINTIFFS DO NOT PLEAD FACTUAL ALLEGATIONS SUFFICIENT TO
    IDENTIFY A FALSE STATEMENT OR SUPPORT A COGENT INFERENCE
    OF SCIENTER. ......................................................................................................14

    A.    The Complaint Does Not Explain Why Particular Statements Are
          Actionable .............................................................................................15

    B.    The Complaint Does Not Include Enough Facts to Satisfy Rule 8, Rule
          9(b) or the Reform Act.........................................................................16

1.    Plaintiffs' Allegation that FMD Concealed Declining Credit Quality of Trust
    Borrowers Is Unsupportable. ..............................................................................17

             a)    First Marblehead Disclosed Changes in Credit Standards
                  and All FICO Scores for Securitized Loans. ..............................17

             b)    Plaintiffs Do Not Adequately Allege Scienter..............................18

             c)    Plaintiffs' Reliance on Anonymous Sources Who Had No
                  Responsibility for Credit Quality Should Be Rejected. ...............19

2.    FMD's Deferral, Default and Delinquency Disclosures are Inactionable. .........22

             a)    Plaintiffs Allege No Basis to Conclude That Class Period
                  Changes to Credit Quality Caused Materially Increased
                  Default Rates or the TERI Bankruptcy.........................................23

             b)    Plaintiffs' Default Rate Allegations Do Not State A Claim. .........25

3.  Plaintiffs' TERI Allegations Fail. ...................................................................28

        a)  First Marblehead Disclosed the Risks Associated with Its
            Reliance on TERI. ...........................................................................28

        b)  Plaintiffs' Confidential Witness Allegations Do Not Give
            Rise to a Cogent Inference of Scienter .........................................30

4.  Plaintiffs Do Not Plead Factual Allegations Sufficient to Support their Claim that
    FMD Knew During the Class Period that TERI Could Not Guarantee FMD-
    Structured Loans ...................................................................................................31

5.  Plaintiffs' Financial Statement Allegations Do Not State A Claim. ...................33

6.  Plaintiffs' Internal Controls Allegations Are Inactionable. ...............................35

7.  Alleged Mismanagement Does Not State a Claim. ............................................36

II.  PLAINTIFFS' SCIENTER ALLEGATIONS FAIL .........................................37

    A.  Allegations Regarding Defendants' Senior Positions Do Not Suffice to
        Plead Scienter............................................................................................37

    B.  Plaintiffs Fail to Allege Facts from Which to Infer Motive to Engage in
        Fraud ..........................................................................................................38

1.  FMD's Credit Rating ..........................................................................................38

2.  Incentive Compensation......................................................................................38

3.  Trading by Insiders .............................................................................................39

        a)  Most Defendants Sold None of Their First Marblehead
            Stock. ...............................................................................................39

        b)  Stock Sales by the Individual Defendants Were Not
            Suspicious. .......................................................................................40

        c)  Sales by Three Non-Defendants Are Irrelevant.............................43

III.  PLAINTIFFS DO NOT ADEQUATELY ALLEGE LOSS CAUSATION.....................43

IV.  PLAINTIFFS' §20(a) CLAIM FAILS ................................................................38

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ACA Fin. Guaranty Corp v. Advest, Inc.*,
  512 F.3d 46, 67-68 (1st Cir. 2008)..................................................................48

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)............................................................................4

*Abrams v. Baker Hughes Inc.*, 292 F.3d 424 (5th Cir. 2002) ......................................39, 40

*Acito v. IMCERA Group*, 47 F.3d 47 (2d Cir. 1995) ................................................ 38, 39

*In re Acterna Corp. Securities Litigation*,
  378 F. Supp. 2d 561 (D. Md. 2005)..................................................................14

*In re Advanta Corp. Securities Litigation*, 180 F.3d 525 (3d Cir. 1999)....................40, 48

*In re Allied Capital Corp. Securities Litigation*,
  2003 U.S.Dist. LEXIS 6962 (S.D.N.Y. Apr. 22, 2003)..............................................35

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,
  2008 U.S.Dist. LEXIS 89598 (N.D. Tex. Nov. 4, 2008)................................45, 46, 47

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ..................................................14

*In re Blockbuster Inc. Securities Litigation*,
  2004 U.S.Dist. LEXIS 7173 (N.D. Tex. Apr. 26, 2004) ................................21, 31, 43

*In re Boston Scientific Corp. Securities Litigation*,
  490 F. Supp. 2d 142 (D. Mass. 2007) ......................................................................18

*In re Boston Technology, Inc. Securities Litigation*,
  8 F. Supp. 2d 43 (D. Mass. 1998)..............................................................................34

*In re Brooks Automation Inc. Securities Litigation*,
  2007 U.S.Dist. LEXIS 88045 (D. Mass. Nov. 6, 2007) ..............................................19

*Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999).........................................4

*In re Buca Inc. Securities Litigation*,
  2006 U.S.Dist. LEXIS 75224 (D. Minn. Oct. 16, 2006) ............................................47

*In re Buca Inc. Securities Litigation*,
  2007 WL 2509716 (D. Minn. Aug. 30, 2007))...........................................................36

*Burstein v. Applied Extrusion Technologies,*
    150 F.R.D. 433 (D. Mass. 1993) ............................................................................36

*In re Cabletron Systems, Inc.*, 311 F.3d 11 (1st Cir. 2002) ............................19, 20, 23, 31

*Cal. Public Employees' Retirement System v. Chubb Corp,*
    394 F.3d 126 (3d Cir. 2004).......................................................20, 21, 22, 24, 26, 31

*Catogas v. Cyberonics, Inc.,*
    2008 U.S.App. LEXIS 19258 (5th Cir. Sept. 8, 2008) .................................................47

*Colby v. Hologic, Inc.*, 817 F. Supp. 204 (D. Mass. 1993)...............................................19

*In re Cornerstone Propane Partners, L.P. Securities Litigation,*
    355 F. Supp. 2d 1069 (N.D. Cal. 2005) .......................................................................16

*In re Credit Suisse-AOL Securities Litigation,*
    465 F. Supp. 2d 34 (D. Mass. 2006) ............................................................................43

*In re Credit Suisse First Boston Corp. Analyst Reports Securities Litigation,*
    2005 U.S.Dist. LEXIS 6345 (D. Mass. Mar. 31, 2005)................................................35

*In re Dell Inc., Securities Litigation*, No. A-06-CA-726-SS,
    2008 U.S.Dist. LEXIS 86054 (W.D. Tex. Oct. 6, 2006) .............................................46

*Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978)...................................................................2

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005)  ....................................43, 46

*In re Eaton Vance Corp. Securities Litigation,*
    206 F. Supp. 2d 142 (D. Mass. 2002) ..........................................................................35

*In re FBR Inc. Securities Litigation,*
    544 F. Supp. 2d 346 (S.D.N.Y. 2008) .........................................................................36

*Fatakia v. Hanna*, 716 F. Supp. 235 (E.D. La. 1989).........................................................2

*Ferber v. Travelers Corp.*, 785 F. Supp. 1101 (D. Conn. 1991) .......................................39

*First Nationwide Bank v. Gelt Funding Corp.,*
    27 F.3d 763 (2d Cir. 1994)......................................................................................2, 44

*In re First Union Corp. Securities Litigation,*
    128 F. Supp. 2d 871 (W.D.N.C. 2001) ..................................................................40, 43

iv

*In re Focus Enhancements, Inc. Securities Litigation*,
   309 F. Supp. 2d 134 (D. Mass. 2001) ...................................................................39, 41

*In re Galileo Corp. Shareholders Litigation*,
   127 F. Supp. 2d (D. Mass. 2001) ...........................................................35, 37

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) .........................................47

*In re Gilead Sciences Securities Litigation*,
   536 F.3d 1049 (9th Cir. 2008) ...................................................................43

*Glover v. DeLuca*,
   2006 U.S.Dist. LEXIS 76093 (W.D. Pa. Sept. 29, 2006)...........................................46

*Gold v. Morrice*,
   2008 U.S.Dist. LEXIS 43466 (C.D. Cal. Jan. 31, 2008) ...........................................16

*In re Great Atlantic & Pacific Tea Co., Inc. Sec. Litig.*,
   103 Fed. App'x 465 (3d Cir. 2004)...........................................................38

*Greebel v. FTP Software, Inc.*,
   194 F.3d 185 (1st Cir. 1999).....................................................22, 35, 39, 42

*Guerra v. Teradyne, Inc.*,
   2004 U.S.Dist. LEXIS 28548 (D. Mass. Jan. 16, 2004)...........................................38

*In re Guidant Corp. Securities Litigation*,
   536 F. Supp. 2d 913 (S.D. Ind. 2008).........................................................16

*In re Guidant Corp. Securities Litigation*,
   2004 U.S.Dist. LEXIS 22809 (S.D. Ind. Nov. 8, 2004) .......................................18, 19

*Higginbotham v. Baxter International, Inc.*,
   495 F.3d 753 (7th Cir. 2007) .....................................................39, 40, 42

*In re Ibis Technology Securities Litigation*,
   422 F. Supp. 2d 294 (D. Mass. 2006).........................................................34

*In re Initial Public Offering Securities Litigation*,
   383 F. Supp. 2d 566 (S.D.N.Y. 2005)........................................................45, 47

*In re Intelligroup Securities Litigation*,
   527 F. Supp. 2d 262 (D.N.J. 2007) .........................................................31, 47

*In re JP Morgan Chase Securities Litigation*,

363 F. Supp. 2d 595 (S.D.N.Y. 2005)..................................................................35, 36

*Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983) .........................................34

*In re K-Telegraph International Securities Litigation*,
300 F.3d 881 (8th Cir. 2002) ....................................................................................38

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) ...............................................2

*LeBlanc v. Salem*, 196 F.3d 1 (1st Cir. 1999) .......................................................................4

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005).............................................46

*Lirette v. Shiva Corp.*, 27 F. Supp. 2d 268 (D. Mass. 1998)...............................................19

*Little Gem Life Sciences LLC v. Orphan Medical, Inc.*,
2007 WL 541677 (D. Minn. Feb. 16, 2007) .............................................................34

*In re Loewen Group Inc. Securities Litigation*,
2004 WL 1853137 (E.D. Pa. Aug. 18, 2004) ...........................................................20

*In re MSC Industries Direct Co.*,
283 F. Supp. 2d 838 (E.D.N.Y. 2003) ................................................................21, 31

*Maldonado v. Dominguez*, 137 F.3d 1 (1st Cir. 1998) ......................................................37

*Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117 (D. Conn. 2007).................................21, 40

*McCasland v. FormFactor Inc.*,
2008 U.S.Dist. LEXIS 60544 (N.D. Cal. July 25, 2008)...........................................16

*In re Merrill Lynch & Co. Research Reports Securities Litigation*,
289 F. Supp. 2d 416 (S.D.N.Y. 2003)..........................................................................2

*In re Merrill Lynch & Co. Research Reports Securities Litigation*,
2008 U.S.Dist. LEXIS 44344 (S.D.N.Y. June 4, 2008) .............................................18

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ...................................................................................46

*Mississippi Public Employees' Retirement System v. Boston Scientific Corp.*,
523 F.3d 75 (1st Cir. 2008)..........................................................................37, 38, 39

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
537 F.3d 35 (1st Cir. 2008).......................................................................15, 20, 39, 48

*In re National Century Finance Enterprises, Investment Litigation*,
    504 F. Supp. 2d 287 (S.D. Ohio 2007) ........................................................40

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir.), *cert. denied*,
    531 U.S. 1012 (2000)......................................................................19, 20, 38

*In re 2007 Novastar Financial, Inc. Securities Litigation*,
    2008 WL 2354367 (W.D. Mo. June 4, 2008) ............................................16

*In re Number Nine Tech. Corp. Securities Litigation*,
    51 F. Supp .2d 1 (D. Mass. 1999) ........................................................18, 30

*In re Petco Animal Supplies Inc. Securities Litigation*,
    2005 WL 5957816 (S.D. Cal. Aug. 1, 2005) ..............................................20

*Ottmann v. Hanger Orthopedic Group, Inc.*,
    353 F.3d 338 (4th Cir. 2003) ......................................................................38

*PR Diamonds, Inc. v. Chandler*, 364 F.3d 671 (6th Cir. 2004) ........................37

*In re Parametric Technology Corp. Securities Litigation*,
    300 F. Supp. 2d 206 (D. Mass. 2001) ........................................................34

*In re Party City Securities Litigation*,
    147 F. Supp. 2d 282 (D.N.J. 2001) ............................................................41

*Patel v. Parnes*, 253 F.R.D. 531 (C.D. Cal. 2008) ....................................15, 16

*In re Peritus Software Services, Inc.*,
    52 F. Supp. 2d 211 (D. Mass. 1999) ....................................................42, 48

*Plevy v. Haggerty*, 38 F. Supp. 2d 816 (C.D. Cal. 1998)..................................43

*In re Polaroid Corp. Securities Litigation*,
    134 F. Supp. 2d 176 (D. Mass. 2001) ........................................................35

*In re Polymedica Corp. Securities Litigation*,
    453 F. Supp. 2d 260 (D. Mass. 2006) ........................................................48

*Procacci v. Drexel Burnham Lambert, Inc.*,
    1989 .WL 121984 (E.D. Pa. Oct. 16, 1989)..................................................2

*Rodriguez-Ortiz v. Margo Caribe, Inc.*,
    490 F.3d 92 (1st Cir. 2007)........................................................................32

*Romani v. Shearson Lehman Hutton*,

929 F.2d 875 (1st Cir, 1991) ................................................................30

*Ryan v. Flowserve Corp.*, 245 F.R.D. 560 (N.D. Tex. 2007) ..........................45

*Santa Fe Industries v. Green*, 430 U.S. 462 (1977)......................................36

*In re Sawtek, Inc. Securities Litigation,*
2005 U.S.Dist. LEXIS 39223 (M.D. Fla. Oct. 6, 2005) ..............................14

*Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000) ..........................35

*Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir. 1996) ...................18, 30, 36, 39

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) ........................2

*In re Smith Gardner Securities Litigation,*
214 F. Supp. 2d 1291(S.D. Fla. 2002) ...................................................20

*In re Sonus Networks Securities Litigation,*
2006 U.S.Dist. LEXIS 28272 (D. Mass. May 10, 2006) .......................21, 37

*In re Spectrum Brands, Inc. Securities Litigation,*
461 F. Supp. 2d 1297 (N.D. Ga. 2006) ..................................................41

*Stepak v. Aetna Life and Casualty Co.,*
1994 U.S.Dist. LEXIS 15559 (D. Conn. Aug. 26, 1994) ..........................26

*In re Stone & Webster, Inc., Securities Litigation,*
253 F. Supp. 2d 102 (D. Mass. 2003) ................................................4, 48

*Suez Equity-Investors, L.P. v. Toronto Dominion Bank,*
250 F.3d 87 (2d Cir. 2001)..................................................................43

*In re Syntex Corp. Securities Litigation,*
855 F. Supp. 1086 (N.D. Cal. 1994) .....................................................40

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.,*
531 F.3d 190 (2d Cir. 2008)..................................................................2

*Tellabs, Inc. v. Makor Issues & Rights Ltd.,*
127 S. Ct. 2499 (2007).................................................................15, 40

*Tuchman v. DSC Communications Corp.,*
14 F.3d 1061 (5th Cir. 1994) ...............................................................39

*In re Vantive Corp. Securities Litigation,*

283 F.3d 1079 (9th Cir. 2002) ....................................................................41

*In re Vertex Pharms., Inc., Seurities Litigation*,
357 F. Supp. 2d 343 (D. Mass. 2005) .....................................22, 24, 26, 31

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991)........................................35

*In re Visual Networks, Inc. Securities Litigation*,
217 F. Supp. 2d 662 (D. Md. 2002) ........................................................43

*Wilson v. MicroFinancial, Inc.*,
2006 U.S.Dist. LEXIS 38827 (D. Mass. June 13, 2006) .................................22, 35, 41

*Zack v. Allied Waste Industries*, '
2005 WL 3501414 (D. Ariz. Dec. 15, 2005) .......................................30, 31

*Zucco Partners, LLC v. Digimarc Corp.*,
2009 U.S.App. LEXIS 583 (9th Cir. Jan. 12, 2009)....................................19

## FEDERAL STATUTES & REGULATIONS

15 U.S.C. § 78u-4(b)....................................................................14, 42

15 U.S.C. § 78u-4(f)(10) ...............................................................34

15 U.S.C. § 78u-5(c)(1)(A) .............................................................33

15 U.S.C. § 78u-5(i)(1) ................................................................33

17 C.F.R. §§ 229.1100-1123.............................................................4

## RULES

Federal Rule of Civil Procedure 9(b)...................................................14

Federal Rule of Civil Procedure 8(a) ..................................................16

# INTRODUCTION

The First Marblehead Corporation ("FMD") is a Boston-based company that provides private student loan-related services, including to lenders and borrowers. During the alleged Class Period, FMD derived income almost exclusively from private student loan "securitizations." In each of these securitizations, lenders sold private student loans to a trust formed by FMD, and the trust financed the purchase by selling to investors debt securities backed by the loans. By design, the trust uses the principal and interest on the student loans to make the payments on the debt securities.

The overarching theory of fraud alleged by Plaintiffs in the Amended Class Action Complaint ("Complaint" or "CAC") is that, during the Class Period, FMD secretly lowered credit quality standards for these student loans, causing an undisclosed spike in default rates, credit rating downgrades, and eventually, the bankruptcy of the guarantor of the student loans. *See* CAC ¶¶ 61-74, 83-85, 181. According to the Complaint, these events prevented additional securitizations and, when revealed, caused FMD's share price to plummet. This implausible theory does not state a claim for four simple reasons.

*First*, nearly everything that Plaintiffs allege not to have been disclosed was, in fact, disclosed; and everything that Plaintiffs assert was misleading was not, in the context of the public disclosures, misleading. The Complaint reflects a profound misunderstanding of FMD's business, and ignores detailed information about FMD, the securitizations, and the securitized loans that was publicly disclosed and filed with the Securities and Exchange Commission ("SEC").

*Second*, Plaintiffs' loss causation theory makes no sense. FMD plainly could not structure securitizations unless lenders made private student loans in sufficient quantities for them to be securitized, and unless the *market* for the debt securities sold by the trusts was

functioning. The global credit crisis – the severity of which was foreseen by almost no one – decimated the private student loan business and made it nearly impossible to sell these debt securities (or, indeed, asset-backed debt securities of any kind). Ignoring what is now obvious, Plaintiffs pretend that the cause of the decline in FMD's share price was not the crushing tidal wave of market forces, but a fraud revealed by a series of announcements made well after the tidal wave hit.

*Third*, Plaintiffs improperly rely on hindsight and flawed logic to conclude that Defendants knowingly committed fraud. They assume without basis that what the market now knows about FMD's prospects was known to Defendants before the economy imploded. For example, it is only now clear that a significant majority of all private student lenders would exit the business as a result of the economic downturn, and that for more than 16 months (and counting) after the last securitization was completed, no other securitization would occur.[1] Such reliance on hindsight does not state a claim. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190 (2d Cir. 2008) (dismissing such claims following 2000-2001 recession); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) (dismissing such claims following savings-and-loan crisis); *Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978) (dismissing fraud-by-hindsight complaints following mid-1970's recession); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 420-421 (S.D.N.Y. 2003) (dismissing such claims following collapse of Internet bubble).

---

[1]     *See, e.g.*, Declaration of Ryan P. Phair, Ex. 24 (describing impact of global credit crisis on student loan market); Ex. 25 (describing impact of global credit crisis on market for asset-backed securities, including those tied to student loans). The Court may take judicial notice on a motion to dismiss of these market events. *See In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 421 n.6 (S.D.N.Y. 2003) (judicial notice of "the [I]nternet bubble and its subsequent crash"); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 770 (2d Cir. 1994) (real estate market turndown); *Kramer v. Time Warner*, 937 F.2d 767, 773 (2d Cir. 1991) (junk bond market collapse); *Procacci v. Drexel Burnham Lambert, Inc.*, 1989 U.S. Dist. LEXIS 12208, 1989 WL 121984, at *2, n. 3 (E.D.Pa. Oct. 16, 1989) (stock market crash of October 1987); *Fatakia v. Hanna*, 716 F. Supp. 235, 236 n. 1 (E.D.La. 1989) (same). Subsequent citations to the exhibits to the Phair Declaration are in the form of "Ex. [Number]."

Plaintiffs' alternative scienter theory (alleged unusual trading in FMD shares by just three of the individual defendants) nonsensically assumes that most of the Defendants participated in a scheme to defraud without even trying to take any advantage of it. Indeed, a substantial majority of the individual Defendants did not even sell FMD stock during the Class Period, and the trading of the others was not suspicious. Thus, Plaintiffs do not plead even a colorable theory of motive to commit fraud.

*Fourth*, Plaintiffs fail to plead their claim with any degree of particularity. Plaintiffs do not identify what part of the 42 pages of quoted text they challenge was inaccurate. They do not explain how the generic reasons they claim made all 42 pages false apply to any challenged statement. They also do not support their generic challenge to these statements with particularized facts or facts supplied by credible witnesses, and allege no factual basis to infer that any Defendant knew that any statement was false when made. Thus, the Complaint should be dismissed.

**BACKGROUND AND ALLEGATIONS OF THE COMPLAINT**

The Complaint ignores all of the SEC filings made by the securitization trusts during the Class Period, and most of FMD's own SEC filings. The disclosures in both sets of filings, along with the information actually included and incorporated in the Complaint, demonstrate that Plaintiffs do not understand FMD's business and that Defendants, far from being malefactors, were overwhelmed by the global credit crisis.

**A.    *FMD's Business Model***

FMD and its affiliates provide a range of services with respect to private student loans, including with respect to securitizations of such loans.[2] CAC ¶¶ 2, 34, 38-39; Ex. 3 at FMD 24-

---

[2]    Each of these services is described in detail in FMD's public filings. *See, e.g.*, Ex. 3 at FMD 24-35. Private student loans are student loans made by private sector lenders without government guarantees. *See* Ex. 3 at FMD 24.

37.[3]  In each of these securitizations, a trust formed by FMD bought private student loans and financed the purchase by issuing debt securities backed by the loans.[4]  *See, e.g.*, Ex. 3 at 26-27, Ex. 18 at FMD 346-47, 472-73.  Principal and interest from the student loans were then used to repay the debt securities issued by the trust.  *See* Ex. 3 at FMD 27.

Most of FMD's revenues and nearly all of its income were generated from structuring securitizations.  CAC ¶ 39; Ex. 3 at FMD 28, 34, 45.  FMD received fees paid at the time of each securitization, and also received rights to future payments.  The accounting rules required FMD to recognize revenue with respect to these rights at the time of each securitization.  To do so, the rules required FMD to calculate the present value of the projected future payments.  *See* Ex. 3 at FMD 69-70, 79-81, 107.

---

[3]  The 2006 Annual Report on Form 10-K was FMD's first periodic report filed with the SEC during the Class Period, and is incorporated by reference in the CAC.  *See* CAC ¶ 34; Ex. 3.  On a motion to dismiss, "courts *must* consider … documents incorporated by reference, and matters of which the court may take judicial notice." *Tellabs,* 127 S.Ct. at 2509 (emphasis added).  Judicial notice of required SEC filings is proper.  *See ATSI Comms. Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (court may consider "legally required public disclosure documents filed with the SEC"); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999) (same); *In re Stone & Webster, Inc.*, Sec. Litig., 253 F. Supp. 2d 102, 128 n. 11 (2003) (same).  *See also LeBlanc v. Salem*, 196 F.3d 1, 6 n.2 (1st Cir. 1999) (citing *Bryant* favorably for "taking judicial notice of SEC filings in deciding a Rule 12(b)(6) motion to dismiss").

[4]  These trusts generally sell their debt securities in public offerings registered with the SEC pursuant to Regulation AB.  *See* 17 C.F.R. §§ 229.1100-1123.  To do so, the trusts filed shelf registration statements, prospectuses, and prospectus supplements.  The Phair Declaration lists the trusts that did so during the Class Period (the "Trusts"), and the exhibits to the affidavit include: (i) the final Supplemental Prospectus and Prospectus of the National Collegiate Student Loan Trust 2006-3 (the first trust formed during the Class Period); and (ii) relevant portions of other Trusts' Supplemental Prospectuses.  *See* Exs. 18-23  In each offering, the prospectus included basic information and the supplement included more detailed information.  Together, the two documents in their final form served as the final prospectus for the offering.  The Trusts had similar names (The National Collegiate Student Loan Trust) and a different year and number identifier.  For example, Trust 2006-3 was the third trust used for this purpose in 2006.

While the Trusts remained registered under the Securities Exchange Act, Regulation AB required them to file with the SEC reports on Forms 10-D and 10-K.  See Asset-Backed Securities, 70 Fed. Reg. 1506, 1561-1569 (Jan. 7, 2005), Securities Act Release No. 33-8518 at § III.D, Exchange Act Release No. 50,905 at § III.D (Dec. 22, 2004) (discussion of Form 10-D, periodic distribution reports by asset-backed issuers).  Pursuant to these regulations, the Trusts incorporated by reference into the final Supplemental Prospectus information regarding delinquencies, cumulative losses and prepayments of the loans owned by the Trusts at specified times in the Prospectus Supplements (and also filed monthly investor reports setting forth the default rates experienced by the Trusts).  See, e.g., Ex. 18 at FMD 359-69, Ex. 19 at FMD 534-44, Ex. 20 at FMD 551-61, Ex. 21 at FMD 568-78, Ex. 22 at 585-95, Ex. 23 at FMD 603-14.  This information is referred to as "static" pool data because it is information about a loan pool's status at a moment in time.

FMD provided detailed disclosure about the model used to predict the value of these future payments, including a table (a "sensitivity analysis") reflecting how FMD's reported revenues would change based on variations in its assumptions. Ex. 3 at FMD 69, 71-74. FMD's auditors (KPMG LLP) evaluated FMD's use of the model, and opined that the financial statements prepared using the model fairly presented FMD's financial position.[5] *See*, *e.g.*, Ex. 3 at FMD 69-70, 98.

FMD gave explicit warnings about the risks associated with using such a model to recognize revenue, including:

> In connection with our recognition of revenue from securitization transactions, if the estimates we make, and the assumptions on which we rely, in preparing our financial statements prove inaccurate, our actual results may vary from those reflected in our financial statements.

Ex. 3 at FMD 46. The risk factors relevant to FMD's use of the model are set forth in Appendix A, § 1.

## B.    *The Education Resources Institute, Inc.*

The Education Resources Institute, Inc. ("TERI") is an independent, private not-for-profit organization. *See* Ex. 3 at FMD 35. TERI "guaranteed" student loans purchased by the Trusts, agreeing to reimburse the Trusts for unpaid amounts resulting from loan defaults. *See* Ex. 3 at FMD 125. In return, TERI received substantial fees, most of which were pledged to secure TERI's guaranty obligations and held by a third-party financial institution.[6] *See* Ex. 3 at FMD 29, 36, 125. During the Class Period, TERI negotiated repeatedly to enhance its fees for making

---

[5]    FMD disclosed that the estimates used to recognize this revenue were "critical accounting estimates." *See*, *e.g.*, Ex. 3 at FMD 46, 69-71. KPMG reported that its audit procedures included "assessing the accounting principles used and significant estimates made by management." *See*, *e.g.*, Ex. 3 at FMD 98.

[6]    The pledged account was one of the sources of credit enhancement (*i.e.*, a source of funds to mitigate the risk that a trust would default on its payment obligations to debt security holders) for a Trust. *See* Ex. 18 at FMD 329, 381-82. For example, TERI pledged $86.7 million of its fee to secure its guaranty obligation to the 2006-3 Trust. *See* Ex. 18 at FMD 332, 347, 371, 382.

these commitments. *See* Ex. 3 at FMD 36-37. The prospectuses for the Trusts' debt securities contain extensive financial information about TERI, including financial statements audited or reviewed by its own independent auditor, PricewaterhouseCoopers LLP. They detail the growth in the amount of loans TERI guaranteed, the loans' default experience, and amounts available to TERI to satisfy guaranty commitments (which doubled from fiscal 2004-2006 to about $600 million). *See*, *e.g.*, Ex. 18 at FMD 350-54, 416-60. Each prospectus warned that the amounts available to TERI could be insufficient "to cover the obligations of TERI over the term of the trust student loans." *See*, *e.g.*, Ex. 18 at FMD 353.[7]

TERI voluntarily filed for reorganization in bankruptcy on April 7, 2008. CAC ¶ 173. Although Plaintiffs do not claim that FMD had advance notice that TERI's bankruptcy petition would be filed, they assert without adequate factual basis that "it was clear" to FMD months earlier that TERI was experiencing insurmountable financial distress. CAC ¶ 84. In addition, Plaintiffs ignore the fact that the public record (throughout the Class Period) contained numerous warnings to investors about TERI, including risk factors entitled:

- **If our relationship with TERI terminates, our business could be adversely affected.**

- **Our business could be adversely affected if TERI's ratings are downgraded.**

*See*, *e.g.*, Ex. 3 at FMD 49-50. These detailed risk factors (and others), which describe the adverse consequences to FMD of problems with or at TERI, are set forth at Appendix A, § 2.

### C. *SEC Disclosures Concerning the Trusts' Loan Assets*

---

[7] The prospectuses also contain disclosures regarding change in net assets, total assets and loan loss reserves over time; the basis for TERI management's conclusion that loan loss reserves would be adequate; activity in loan loss reserves over time; TERI's reserve ratio over time; the obligations of TERI to certain lenders; the growth in volume of private loans guaranteed; and other related information. *See* Ex. 18 at FMD 353-53, Ex. 19 at FMD 531-33, Ex. 20 at FMD 548-50, Ex. 21 at FMD 565-67, Ex. 22 at FMD 582-84, Ex. 23 at FMD 599-602.

The loans owned by the Trusts were described in detail in various required SEC filings during the Class Period.[8]  *See, e.g.*, Ex. 18 at FMD 359-69 (incorporating 2006-3 static pool data).[9]

### 1. *Credit Quality (and Changes in Credit Quality)*

A Fair, Isaac & Company ("FICO") score is a means by which lenders assess the credit quality of an individual.  Plaintiffs assert without factual basis that FMD claimed to adhere to "an extremely rigid policy of screening out applicants with FICO scores lower than 700."  *See, e.g.*, CAC ¶ 36.  In fact, the SEC filings made clear that the Trusts owned many loans with FICO scores below 700.  They reported the number of loans with FICO scores between 600 and 800, and the FICO score of the vast majority of loans within ten points.[10]  *See e.g.,* Ex. 18 at FMD 361, 365-67.  They also disclosed the weighted average FICO score for each Trust (all over 700).  *See, e.g.*, Ex. 18 at FMD 360.[11]

Contrary to Plaintiffs' claims that there was a "secret" change, *see* CAC ¶¶ 61-65, 87, FMD also consistently disclosed (before and during the Class Period) changes in credit criteria.  In May 2006, FMD began to disclose newly expanded credit criteria:  "We recently began facilitating loans under a new program for borrowers who have … FICO scores within our

---

[8]     For example, the debt prospectuses disclose the total amount of loans securitized (principal balance and interest), number of borrowers, average loan size, number of loans, average principal balance, average interest rate, average interest rate for loans in repayment, and weighted average term to maturity (greater than 22 years).  *See* Ex. 18 at FMD 360, Ex. 19 at FMD 535, Ex. 20 at FMD 552, Ex. 21 at FMD 569, Ex. 22 at FMD 587, Ex. 23 at FMD 605.  These prospectuses were required to be filed in connection with these offerings.  *See, supra* at 4, n. 4.

[9]     *See also* Ex. 19 at FMD 534-44, Ex. 20 at FMD 551-61, Ex. 21 at FMD 568-78, Ex. 22 at FMD 586-95, Ex. 23 at FMD 603-614 (similar).

[10]    More specifically, the 2006-3 Trust disclosed the weighted average available FICO score for co-signed, not co-cosigned and all loans securitized (714, 706 and 712, respectively), and the available FICO score ranges in 10 point increments (from about 600-800) yielding the averages reported.  *See, e.g.*, Ex. 18 at FMD 360, 365-67.  As disclosed in the Trusts' final prospectuses, a FICO score was available to be reported at the time of securitization for the following percentages of each Trust's loans: (i) 88.4%, Trust 2006-3 (*see* Ex. 18 at FMD 365); (ii) 99.8%, Trust 2006-4 (*see* Ex. 19 at FMD 540); (iii) 99.7%, Trust 2007-1 (*see* Ex. 20 at FMD 557); (iv) 99.5%, Trust 2007-2 (*see* Ex. 21 at FMD 574); (v) 94.5%, Trust 2007-3 (*see* Ex. 22 at 592); and (vi) 94.5%, Trust 2007-4 (*see* Ex. 23 at FMD 610).  Each loan originator used the same underwriting criteria.  *See, e.g.*, Ex. 18 at FMD 348.

[11]    *See also* Ex. 19 at FMD 535, Ex. 20 at FMD 552, Ex. 21 at FMD 569, Ex. 22 at FMD 587, Ex. 23 at FMD 605.

current program parameters, but have information on their credit reports which indicate a higher risk of delinquency and default."[12]  *See* Ex. 3 at FMD 71; Ex. 6 at FMD 226.  FMD said:  "We expect the inclusion of these loans in future securitizations will result in slightly higher overall default rate assumptions for the trusts used to securitize these loans."  *See* Ex. 7 at FMD 234-35.

## 2.	*Deferrals, Delinquencies and Default Rates*

Most student loan borrowers elect to defer repayment of their TERI-guaranteed loans while enrolled in school.  During the Class Period, contrary to Plaintiffs' claims that FMD hid increasing default rates, FMD and the Trusts provided extensive detail about the deferment, delinquency and default status of the Trusts' loans in its SEC filings.  *See*, *e.g.*, Ex. 18 at FMD 363-64; Ex. 12 at FMD 280-303 (providing static pool data as of Dec. 31, 2007).[13]  Deferment statistics measure the extent to which borrowers had elected to defer repayment of their loans while enrolled in school.  *See* Ex. 18 at FMD 342.  Moreover, a TERI guaranteed loan was not considered to be in default until 150-180 days after nonpayment (and no payment on the TERI obligation was due until 60-90 days after default).  *See* Ex. 18 at FMD 381.

These disclosures not only show that FMD did not conceal default rates, but also rebut conclusively Plaintiffs' factually unsupported claim that Class Period loans having lower credit quality caused a significant spike in those rates.  For example, at the inception of the 2006-3 Trust: (i) 97.8% of the loans in the 2006-3 Trust were current; (ii) the repayment obligation on

---

[12]	Prior to the Class Period, in 2004, FMD disclosed that "approximately three percent of the loans securitized in NCSLT 2004 and four percent of the loans securitized in NCSLT 2003 represent a new product line offered beginning in fiscal 2003 by some of our private label clients.  This new product line includes co-signed loans for which the co-signer has a lower … FICO … score, between 625 and 644, than our other tiered products, which require a FICO score of 645 or above. … Although the inclusion of these new loans resulted in estimated overall default rates for NCSLT 2004 and NCSLT 2003 that are 68 basis points and 98 basis points higher, respectively, than what we estimated for NCMSLT, the average FICO score for loans in each of the trusts remained above 700." Ex. 1 at FMD 4.  As late as 2005, FMD disclosed (as it had for years earlier) that, "[i]n fiscal 2003, some of our private label clients introduced a new product line which includes co-signed loans for which the co-signer has a … FICO … score that is lower than the FICO score required for our other tiered products."  Ex. 2 at FMD 14.  The actual credit scores reported for Trust loans are consistent.  *See*, *e.g.,* Ex. 18 at FMD 365 (18 of 104,658 loans having FICO scores less than 620).

[13]	*See also* Ex. 18 at FMD 359-69, Ex. 19 at FMD 534-44, Ex. 20 at FMD 551-61, Ex. 21 at FMD 568-78, Ex. 22 at FMD 585-95, Ex. 23 at FMD 603-14 (incorporating static pool data providing quarterly information).

over 90% of them was deferred; and (iii) the weighted average months remaining in deferment was at least 26 months. *See* Ex. 18 at FMD 363-64. In other words, the weighted average 2006-3 Trust loan was deferred until seven months after the Class Period. The other Trusts contained loans that were similarly deferred, but those Trusts were formed later (so their loans were deferred longer).[14]

Late in the Class Period (as of December 31, 2007), an FMD SEC filing disclosed that: (i) of the $5.7 billion in TERI-guaranteed loans purchased by the Trusts during the Class Period, only $1.2 billion then required any type of repayment; (ii) $1.1 billion of that amount was current; and (iii) cumulative guaranty claims to TERI for defaulted loans held by the Trusts totaled only $17.9 million.[15] The total claims to TERI were less than 5% of the disclosed total amount of cash originally pledged by TERI with respect to these securitizations ($359.6 million).[16] These disclosures again rebut Plaintiffs' factually unsupported allegation that a spike in defaults on Class Period loans having lower credit quality overwhelmed TERI. *Compare*, *e.g.*, CAC ¶¶ 71, 74, 83, 85, 86 *with infra* at 24-25.

Investors also had access to extensive information about default rates, including the information Plaintiffs mistakenly claim was not disclosed. Indeed, during the Class Period, the

---

[14]     At Trust inception, the weighted average months in deferment of the loans in the following Trusts were disclosed to be: (i) 2006-4 (>27 months), *see* Ex. 19 at FMD 538; (ii) 2007-1 (>26), *see* Ex. 20 at FMD 555; (iii) 2007-2 (>22), *see* Ex. 21 at FMD 572; (v) 2007-3 (>27), *see* Ex. 22 at FMD 590; (vi) 2007-4 (>27), *see* Ex. 23 at FMD 608.

[15]     There are six Trusts (2006-3, 2006-4, 2007-1, 2007-2, 2007-3 and 2007-4), which collectively purchased student loans with an aggregate principal and accrued interest balance of $5.7 billion at closing. See Ex. 12 at FMD 281 ("Aggregate Pool Balance"). At December 31, 2007, for the Trusts: (i) aggregate principal and capitalized interest balance in the "Deferment, Principal Only" and "Repayment, Principal and Interest" categories was $1.2 billion (*id*. at FMD 281); (ii) the aggregate principal and capitalized interest balance in the "Current" category was $1.1 billion (*id*. at FMD 290); and (iii) the cumulative principal balance of loans for which a guarantee claim was submitted to TERI, less claims cancelled prior to guarantee payment, was $17.9 million (*id*. at FMD 294).

[16]     The 2006-3 amount initially pledged was $86.7 million. *See* Ex. 18 at FMD 332, 347. *See also* Ex. 19 at FMD 530 (2006-4 amount initially pledged was $45.2 million); Ex. 20 at FMD 547 (2007-1, $47.2 million); Ex. 21 at FMD 564 (2007-2, $47.7 million); Ex. 22 at FMD 581 (2007-3, $66.4 million); Ex. 23 at FMD 598 (2007-4, $66.4 million). These amounts do not include interest earned after the pledge.

actual cumulative default rate for each Trust was reported in the Trust's Form 10-D filings or could readily be calculated from the static pool data.[17]  *See, e.g.*, Exs. 27-32.  FMD also provided extensive disclosure about what it expected default rates might be over time.  Each of FMD's periodic reports disclosed that it used a net default rate assumption – "expected loan defaults net of recoveries" – to estimate the fair value of its expected future payments.  *See, e.g.*, Ex. 3 at FMD 71.  These reports also disclosed FMD's projected gross default and recovery rate assumptions, which were used to derive the net default rate assumption:[18]

| | Fiscal 2006 | | Fiscal 2007 | | | | | Fiscal 2008 | |
|---|---|---|---|---|---|---|---|---|---|
| **Report** | 10-Q | 10-K | 10-Q | 10-Q | 10-Q | 10-K | 10-Q | 10-Q | 10-Q |
| **Gross Default Rate:** | 8.77 | 8.95 | 9.16 | 9.29 | 10.3/8.9 | 9.38 | 9.68 | 14.76 | 14.77 |
| **Recovery Rate:** | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 48 | 48 |
| **As of:** | 3/31/06 | 6/30/06 | 9/30/06 | 12/31/06 | 3/31/07 | 6/30/07 | 9/30/07 | 12/31/07 | 3/31/07 |

These Class Period disclosures made clear that FMD's gross default rate assumption rose over time, and was always on the order of twice the net default rate assumption.  These disclosures also made clear that these default and recovery assumptions applied to all of the securitized TERI-guaranteed loans (including those securitized prior to the Class Period), and were long-term in nature (they applied over the Trusts' 20+ year life).  These disclosures, along with the disclosed current cumulative default rates for each Trust, made clear that FMD's long-

---

[17]    Using the static pool data, the cumulative default rate as a percentage of the original pool balance could be calculated by dividing "Cumulative Claims, Net of Cancellations" (included in the Cumulative Loss Data) by the "Aggregate Pool Balance" (included in the Original Pool Characteristics).  At December 31, 2007, such a calculation shows a cumulative default rate for Trust 2006-3 of 0.71%.  *See* Ex. 12 at FMD 281-84, 294-97 (static pool data).

[18]    *See* Ex. 6 at FMD 226.  FMD reported two values for the Form 10-Q dated May 10, 2007, due to a change in the structure of securitizations that occurred for the first time during that quarter.  *See* Ex. 9 at FMD 254.

term expectations could vary from what was currently being experienced.[19] *See, e.g.*, Ex. 3 at FMD 72-74.

The SEC filings included extensive risk factors relative to the disclosed default rate expectations, and the other subjective assumptions used in FMD's revenue model, including:

> If the actual performance of some or all of the securitization trusts varies from the key assumptions we use, the actual additional structural advisory fees and residuals that we receive from the trusts could be significantly less than reflected in our current financial statements, and we may incur a material negative adjustment to our earnings in the period in which our assumptions change. … In particular, economic, regulatory, competitive and other factors affecting prepayment, default and recovery rates on the underlying securitized loan portfolio … could cause or contribute to differences between the actual performance of the securitization trusts and our key assumptions.

Ex. 3 at FMD 46.

### D. *The Credit Crisis, Gridlock in the Private Student Loan Market, and Consequent Decline in FMD Share Price*

FMD's stock plummeted for reasons that obviously were unrelated to the five events that Plaintiffs claim were "partial disclosures" of a supposed fraud. Specifically, Plaintiffs rely on: (i) the November 26, 2007 announcement that a Wall Street analyst was downgrading FMD stock; (ii) the December 5, 2007 disclosure that Moody's was performing a credit rating review of certain Trust securities for possible downgrade; (iii) the December 7, 2007 announcement by FMD that it was cutting its dividend; (iv) the March 27, 2008 announcement of Moody's

---

[19]     For example, the Class Period SEC filings also provided data showing that the default and recovery rates actually experienced for loans underwritten in any year were expected to vary over time. Each of the Trust prospectus supplements disclosed TERI's "Net Cohort Default Rate," which was the net default rate for loans owned by all trusts that were made in a given year. For example, the 2006-3 Supplemental Prospectus shows a sharply lower net cohort default rate for 2006 (0.04%) compared to 2002 (2.83%), because new loans were more likely to be deferred (and therefore not subject to default). *See, e.g.*, Ex. 18 at FMD 354 (lower default rates for more recent cohorts "can largely be attributed to the fact that for each succeeding cohort year fewer loans guaranteed by TERI were in repayment"). At the same time, the disclosures described an increasing recovery rate over time, and explained that this is because it often took some time for TERI to collect on loan defaults. *See, e.g.*, Ex. 18 at FMD 354 ("loans which have defaulted in earlier periods tend to have higher recovery rates due to TERI's prolonged collection activities on defaulted loans").

downgrade of 18 (of over 130) classes of Trust securities; and (v) the TERI bankruptcy on April 8, 2008.[20]  *See* CAC ¶¶ 201-203.

As shown below, however, the decline in the price of FMD's stock during the Class Period was caused by the growing recognition by market participants of the breadth and depth of the worldwide credit crisis, and the impact that it would have on FMD's ability to structure securitizations and thereby derive future revenues.  For example, only hindsight has revealed that FMD would be unable to structure any securitization after September 2007.  Prior to the collapse of the securitization markets, however, FMD was able to structure 38 securitizations, including six securitizations totaling $5.7 billion in TERI-guaranteed loans during the Class Period.  *See* Ex. 5 at FMD 217.

Although it was not clear until September 2007 that this last securitization would close (and not clear until now that the September securitization would be the last), the likelihood that FMD would close another securitization, and thereby earn income, decreased over time. Plaintiffs offer no support for their implausible claim that what happened to FMD's share price over time was anything other than a response by investors to concerns that market conditions would prevent or impair further securitizations.  Naturally, FMD's share price declined as events unfolded, but this did not reveal a fraud.  To the contrary, FMD had expressly warned investors that its business model and financial results would be adversely affected if this occurred.  *See*, *e.g.*, Appendix A, § 3 ("We derive a significant portion of our revenue and substantially all of our income from structuring securitization transactions.");  *see also* Ex. 3 at FMD 45 (same).

More specifically, FMD's daily closing share price reached a high of $55.66 on January 9, 2007, but thereafter began steadily to decline.  It had already dropped more than 51% by the

---

[20] TERI actually filed for bankruptcy on April 7,2008.  *See* CAC ¶ 173.

date of what Plaintiffs allege was the *first* "partial corrective disclosure" of alleged fraud (a Wall Street analyst's downgrade of its rating of FMD's stock on November 26).[21]  It declined by 23% prior to the downgrade during the month of November alone.[22]  Between close of business on December 10, 2007 and March 26, 2008 – a period during which, according to Plaintiffs, *no* "fraud" was revealed (partially or otherwise) – the price of FMD stock *also declined by 52.41%.*[23]

Plaintiffs do not just ignore this consistent downward share price trajectory and the disclosures referenced in the Complaint that discuss market forces at work,[24] they utterly fail to plead factual allegations showing that their contrary theory is plausible.  Plaintiffs neither explain what (if any) facts previously known to FMD were revealed by the disclosures that supposedly (partially) corrected the alleged fraud, nor account for the fact that each of these disclosures obviously disclosed information that was new (and unknowable by FMD until that time).[25]

As set forth in the chart below, during the entire portion of the Class Period over which Plaintiffs claim the alleged fraud was revealed (*i.e.*, after November 26, 2007), the price movement of FMD stock closely paralleled that of other student loan providers as reflected in the

---

[21]  *See* Ex. 26; CAC ¶ 149.

[22]  *See* Ex. 26.

[23]  *See id.*

[24]  Plaintiffs, for example, do *not* allege that the following FMD disclosures concerning the impact of market conditions were partial disclosures of a supposed fraud: (i) on April 26, 2007, an FMD press release noted that adjustments due to the "current interest rate environment and securitization market" had reduced "receivables and securitization revenues" (CAC ¶ 160); (ii) on December 7, 2007, another FMD press release noted the "uneconomic terms in the current capital markets" (CAC ¶ 168); and (iii) on March 28, 2008, FMD disclosed it would have to change its business model given "the current negative consumer credit cycle and the capital markets credit dislocation" (CAC ¶ 168).

[25]  For example, even if the Wall Street analyst's decision to downgrade its opinion about FMD moved the market, Plaintiffs never allege a basis to conclude that this previously unknown decision does not explain the entire decline on that date.

Russell 3000 Finance Small Loan Index.[26]  This confirms that market conditions, not the

revelation of any fraud, caused Plaintiffs' loss.



**ARGUMENT**

**I.     PLAINTIFFS DO NOT PLEAD FACTUAL ALLEGATIONS SUFFICIENT TO
        IDENTIFY A FALSE STATEMENT OR SUPPORT A COGENT INFERENCE OF
        SCIENTER.**

The Complaint does not comply with Rules 8 and 9(b) of the Federal Rules of Civil

Procedure, or with the Private Securities Litigation Reform Act of 1995 ("Reform Act").  Rule 8

requires Plaintiffs to plead facts sufficient to make their alleged conclusions "plausible."  *Bell

Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2008).  Rule 9(b) and the Reform Act require that

Plaintiffs: (i) identify the statements challenged; (ii) explain why each challenged statement is

---

[26]     The Russell 3000 Finance Small Loan Index, computed daily by Bloomberg, tracks the performance of the stock of 9 student loan providers, including First Marblehead.  Market data may appropriately be included in the record on a motion to dismiss.  *See In re Acterna Sec. Litig.*, 378 F. Supp. 2d 561, 588 (D. Md. 2005) ("[T]he court can, and will, take judicial notice of the drop in the Dow Jones Index").  *Compare* CAC ¶ 202; *see also In re Sawtek, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 39223, at *42-*43 (M.D. Fla. Oct. 6, 2005) (comparing U.S. stock market decline, as measured by the Russell 3,000 Index, to decline in price of stock at issue); *supra* at 2, n. 1.  This chart takes into account FMD's 3:2 stock split on December 4, 2006.  *See* Ex. 8 at FMD 246.

materially false or misleading; (iii) provide a particular *factual* basis for their allegations of

falsity and *scienter*; and (iv) show that, based on all of the facts in the record, their proposed

inference of scienter is both cogent and at least as compelling as any benign inferences that may

be drawn.  Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b)(1); *Tellabs, Inc. v. Makor Issues & Rights,*

*Ltd.*, 127 S.Ct. 2499, 2510 (2007) ("A complaint will survive … only if a reasonable person

would deem the inference of  scienter cogent and at least as compelling as any opposing

inference one could draw from the facts alleged"); *N.J. Carpenters Pension & Annuity Funds v.*

*Biogen IDEC Inc.*, 537 F.3d 35, 44 (1st Cir. 2008) (*citing* to *Tellabs*).

### A.      *The Complaint Does Not Explain Why Particular Statements Are Actionable*

Consistent with Rules 8 and 9(b), the Reform Act requires Plaintiffs to specify "each

statement alleged to have been misleading, and the reason or reasons why the statement is

misleading."  15 U.S.C. § 78u-4(b)(1); Fed. R. Civ. P. 8 (requiring short, plain statement of the

claim).  Plaintiffs flaunt these basic rules.  Instead of challenging particular statements, they

present 42 pages of block quotations from public filings and other sources.  Plaintiffs seldom

highlight the language they consider to be actionable, and even when they do, the emphasis is of

little use.  *See*, *e.g.*, CAC ¶ 98 (highlighting several pages of text).  Then, rather than explaining

why each statement in the 42-page section is actionable, the CAC offers only a single paragraph

(¶ 181) that lists seven conclusory "reasons" why *every* preceding statement supposedly was

false or misleading.  Making matters worse, the list of reasons does not cross-reference the

factual allegations in the earlier portions of the CAC that supposedly support that reason.

As a result, the tasks of figuring out which statements Plaintiffs are complaining about in

the first place, of matching the "reasons for falsity" with particular statements, and of

determining which "facts" (if any) are meant to support which "reasons," are all left to the Court.

This "puzzle pleading" is reason enough for dismissal.  *See Patel v. Parnes*, 253 F.R.D. 531

(C.D. Cal. 2008) (dismissing complaint that "left it up to the defendants and the court to try to figure out exactly what the misleading statements were, and to match the statements up with the reasons they were false and misleading"); *Gold v. Morrice*, 2008 U.S. Dist. LEXIS 43466, at *13-14 (C.D. Cal. Jan. 31, 2008) (dismissing complaint against one of the nation's largest mortgage finance companies on this basis).

Complaints relying on puzzle pleading "abuse the principles of Rule 8 … because they are not plain – their evasive, non-committal style significantly increases the burdens to both the defendants and the court in evaluating a complaint's satisfaction of the PSLRA pleading requirements." *In re CornerStone Propane Partners, L.P. Sec. Litig.,* 355 F. Supp. 2d 1069 , 1081 (N.D. Cal. 2005). *See also McCasland v. FormFactor Inc.*, 2008 U.S. Dist. LEXIS 60544, at *21 (N.D. Cal. July 25, 2008). They provide "no clear sense of the time line of defendants' alleged knowledge, nor particularized allegations as to the reasons for any given statement's alleged falsity." *In re Cornerstone Propane Partners, L.P.*, 355 F.Supp.2d at 1081. Rather, they permit plaintiffs to do "precisely" what the Reform Act prohibits – avoid explaining why identified statements are false and instead "create an illusion of detail and insinuate the existence of fraud." *In re Novastar Financial, Inc. Sec. Lit.*, 2008 WL 2354367, at *2 (W.D. Mo. June 4, 2008). Thus, the Complaint should be dismissed. *See In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 926 (S.D. Ind. 2008).

**B.**     ***The Complaint Does Not Include Enough Facts to Satisfy Rule 8, Rule  9(b) or the Reform Act.***

Plaintiffs assert that during the Class Period FMD secretly lowered credit quality requirements for Trust loans (FICO scores for borrowers), causing an undisclosed spike in trust loan default rates, downgrades in Trust security ratings, and eventually, the TERI bankruptcy. *See* CAC ¶¶ 61-74, 83-85, 181. Every link in this attenuated chain is insufficiently supported

with facts.  Plaintiffs provide no factual basis to conclude that any challenged statement is actionable or that any Defendant knowingly or recklessly made a false statement.

### 1. *Plaintiffs' Allegation that FMD Concealed Declining Credit Quality of Trust Borrowers Is Unsupportable.*

Plaintiffs assert without basis that, commencing sometime (presumably within the Class Period) in 2006, Defendants "failed to disclose ... that First Marblehead had lowered its credit guidelines." CAC ¶¶ 64, 181.  They allege – without identifying who made such a statement or where it appears – that FMD's representations "indicated" that borrowers were "required to possess a FICO score above 700," and that FMD had not disclosed the supposedly "dramatic shift" permitting loans to borrowers with lower FICO scores.  CAC ¶¶ 62, 64.  These conclusory allegations fail for at least three reasons.

### a) First Marblehead Disclosed Changes in Credit Standards and All FICO Scores for Securitized Loans.

The SEC filings during the Class Period disclosed that borrowers were not required to have a FICO score above 700.  They accurately disclosed that borrowers had FICO scores much lower than 700 (including a few as low as 600); disclosed the FICO scores (within 10 points) of the vast majority of the Trust loans securitized during the Class Period; and disclosed that the weighted average FICO score for these loans exceeded 700.[27]  *See supra* at 7.  FMD also disclosed changes in underwriting criteria, both before and after the Class Period, including in 2006 (when Plaintiffs claim that undisclosed changes were made).  *Id.* at 7-8.  These SEC filings

---

[27] Consistent with these disclosures, FMD's Chairman testified to Congress that "the *typical* private loan borrower in the programs we administer is an undergraduate student with a 50-year-old parent cosigner with an *average* FICO score in excess of 700." CAC ¶ 129 (different emphasis supplied).  Plaintiffs quote seven words from an oral statement made in early 2007 by one of the individual Defendants to the effect that "the FICO scores of the borrowers of the Company's loans 'remain pretty consistent in that 710 to 720 range.'" CAC ¶ 114.  Given that FMD itself (the Company) did not make loans, it is unclear to what Plaintiffs actually refer.  Whatever the statement was intended to convey, however, this statement as pleaded is not a representation that the securitization trusts had no loans of borrowers having FICO scores less than 710 (or greater than 720).  To the contrary, the SEC filings contain clear disclosures that there were large numbers of loans above and below that range.  Thus, the statement was not misleading in the manner Plaintiffs imply.

expressly disclosed that throughout the Class Period FICO scores of 625 and above were permitted. *See id.* at 8, n. 12.

In addition to disclosing the actual credit quality of the securitized loans, and changes to credit guidelines in 2006 and before, FMD also disclosed that the changes permitted loans to borrowers who posed "a higher risk of delinquency and default" (and who were thus charged higher interest rates and fees to cover the higher risk). Ex. 7 at FMD 234. According to Plaintiffs' theory, a failure to disclose this information would have been misleading because it would have obscured this same risk. But because this information was publicly disclosed, and because FMD expressly warned investors about this risk, Plaintiffs cannot state a claim. *In re Boston Sci. Corp. Sec. Litig.*, 490 F. Supp. 2d 142, 154 (D. Mass. 2007) ("loss resulting from the materialization of a disclosed risk does not support a claim of securities fraud"); *In re Merrill Lynch & Co. Research Reports Secs. Litig.*, 2008 U.S. Dist. LEXIS 44344, at *22 (S.D.N.Y. June 4, 2008) (Plaintiff could not plead that Defendants fraudulently concealed a risk that had been disclosed in numerous reports); *In re Number Nine Tech. Corp. Secs. Litig.*, 51 F. Supp.2d 1, 21-22 (D. Mass. 1999) ("if a statement is couched in or accompanied by prominent cautionary language that clearly disclaims or discounts the drawing of a particular inference, any claim that the statement was materially misleading because it gave rise to that very inference may fail as a matter of law") (*quoting Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1213 (1st Cir. 1996)).

### b) Plaintiffs Do Not Adequately Allege Scienter.

Plaintiffs also lack a factual basis to conclude that anyone knew that FMD's disclosures concerning credit quality were false or misleading. What Plaintiffs claim was undisclosed was, in fact, disclosed. Thus, any inference that anyone at FMD knew that disclosures about credit quality were defective makes no sense, and must be rejected. *In re Guidant Sec. Litig.*, 2004

U.S. Dist. LEXIS 22809, at *39 (S.D. Ind. Nov. 4, 2008) (that defendant actually had disclosed supposedly undisclosed information strongly undermines any inference of scienter).

Even if the record did not reveal that the disclosures concerning credit quality were adequate, the Complaint utterly fails to plead a factual basis to infer that any defendant was aware of any inadequacy.[28]  *See, e.g.*, CAC ¶ 87 (alleging without source that guidelines were "secretly" lowered).  Conclusionary, unsourced allegations and hearsay do not give rise to a strong inference of scienter.  *See, e.g.*, *Zucco Partners, LLC v. Digimarc Corp.,* No. 06-35758, 2009 U.S. App. LEXIS 583, at *33 (9th Cir. Jan. 12, 2009) (hearsay statements from anonymous source do not prove scienter); *In re Brooks Automation Inc. Secs. Litig.,* Civ. A. No. 06-11068-RWZ, 2007 U.S. Dist. LEXIS 88045, at *45 (D. Mass. Nov. 6, 2007); *Lirette v. Shiva Corp.*, 27 F. Supp. 2d 268, 282 (D. Mass. 1998); *Colby v. Hologic, Inc.*, 817 F. Supp. 204, 212 (D. Mass. 1993).

### c)  Plaintiffs' Reliance on Anonymous Sources Who Had No Responsibility for Credit Quality Should Be Rejected.

The anonymous "sources" to whom Plaintiffs attribute a few allegations also are inadequate.  Such sources, and the information attributed to them, must be described with particularity.  *In re Cabletron Sys.*, 311 F.3d 11, 28-30 (1st Cir. 2002) (*citing Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).  Whether the information attributed to confidential witnesses

---

[28]  Plaintiffs' wholly unsourced allegations regarding First Marblehead's credit criteria include, *inter alia*: CAC ¶ 35 ("First Marblehead's borrower was a student with minimal income, minimal assets, and not much in the way of credit history.  Many of the borrowers turned to the Company after they had exhausted scholarships, grants and lower-cost federal loans ... The risk of default was high in these situations"); CAC ¶ 87 ("Defendants engaged in a concerted effort to increase loan volume and maximize profits ... [and] [i]n order to effectuate this plan, they secretly lowered their credit guidelines to encompass a far greater swath of loan applicants.  While Defendants were publicly touting the Company's substantial profits ... First Marblehead was crumbling ... [and] [e]ven as loan default rates started to skyrocket and it became readily apparent that TERI would fail, Defendants remained silent and continued to mislead the investing public"); CAC ¶ 37 ("Defendants repeatedly issued false and misleading statements regarding First Marblehead's credit criteria, revenue from securitizations, future growth prospects, default rate and TERI's viability … [and] omitted to disclose the details of their clandestine arrangements in order to maximize short term profits"); and CAC ¶ 62 ("Kopnisky advocated the implementation of several programs, including an 'Expanded Tier Program,' that catered to students with lower credit ratings"); CAC ¶¶ 75-76 ("First Marblehead's upper management was well aware of the negative trends associated with the Company's lower credit guidelines").

may properly be considered depends upon the "level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *N.J. Carpenters*, 537 F.3d at 51 (*citing Cabletron*, 311 F.3d at 29-30). Where factual allegations do not make it probable "that a person in the position occupied by the source would possess the information alleged," the alleged source's allegations must be rejected. *Cabletron*, 311 F.3d at 29 (*citing Novak*, 216 F.3d at 314).

The CAC fails these tests for at least three reasons. First, some of Plaintiffs' "sources" are not described at all. For example, Plaintiffs attribute to unnamed and undescribed "former employees" the assertion that FMD "lowered its historically strict guidelines," and assert that, "as one former employee put it, the Company basically began issuing loans to any applicant regardless of qualifications—the Company had essentially dropped all of its credit criteria." *Compare* CAC ¶ 3 *with* ¶ 71; *see In re Loewen Group Inc.*, 2004 WL 1853137 at *9 (E.D. Pa. Aug., 18, 2004) (ignoring sourced assertions where sources not adequately identified; mere reference to a former employee is not enough).[29] These undescribed sources also are inadequate because Plaintiffs make no effort to "allege the dates that these sources were employed," or in what capacity, or the dates that they acquired the information. *CalPERS v. Chubb*, 394 F.3d 126, 148-50 (3d Cir. 2004).

Second, no source cited in the Complaint is alleged to be a senior executive, or to have had any responsibilities with respect to credit quality, financial reporting, loan delinquencies or loan defaults. *See*, *e.g.*, CAC ¶¶ 63, 71. Rather, Plaintiffs rest their fraud claim primarily on the

---

[29]    *See also In re Petco Animal Supplies Inc. Sec. Litig.*, 2005 WL 5957816, at *22 (S.D. Cal. Aug. 1, 2005) (noting that because confidential witness was only employed "through the fall of 2004 … it is unclear if she would have had compete and reliable information about the company for 2004"); *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1301 (S.D. Fla. 2002) (rejecting former employee's statement where plaintiffs did not provide adequate basis for believing that employee would possess this information).

apparent speculation of four people who, as described, had no responsibility for any of these matters: (i) a "Senior Process Analyst," whose responsibilities are left to the imagination; (ii) a "Former VP of Applications," whose responsibilities were software related; (iii) a "CISO," who was responsible for "information security;" and (iv) a "Loan Manager," whose "most important" responsibilities were "track[ing] … the cancellation rate on loans;" *i.e.*, loans that were cancelled before they were securitized, a metric which Plaintiffs do not, and cannot, allege had anything to do with default rates. *See* CAC ¶¶ 63, 65, 67, 71, 83. Given the distance between what might have been these sources' responsibilities, and the information attributed to them, it is impossible to distinguish the information allegedly supplied from hearsay and speculation. This is not enough. *CalPERS,* 394 F.3d at 148 (plaintiffs' undetailed allegations left court to speculate whether "sources acquired the information they purportedly possess, or how any of these former employees had access to such information"); *In re Sonus Networks Secs. Litig.*, 2006 U.S. Dist. LEXIS 28272, at *76-77 (D. Mass. May 10, 2006) (disregarding source's statement where it was unclear whether source had "personal knowledge" of alleged fraudulent activity).[30]

Third, the information itself is plainly insufficient to support a claim of falsity or scienter. As explained above, the Senior Process Analyst's statement that historic credit criteria had changed is meaningless, because such changes were disclosed. *See supra* at 7-8 and n. 12. Moreover, stripped of pejorative adjectives, the allegation is wholly conclusory and sets forth no specifics about the alleged undisclosed "change." *Compare* CAC ¶ 63 (credit rules allegedly "'bent' and applicants were allowed to take out excessive loans with terms beyond . . . historic

---

[30] *See also Malin v. XL Capital Ltd.*, 499 F.Supp.2d 117, 142 (D. Conn 2007) (finding information from confidential witnesses inadequate to support an inference of scienter where such witnesses were "not alleged to have any familiarity with [facts relating to] the process of setting or estimating loss reserves"); *In re Blockbuster Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 7173, at *37 ("no facts [are] alleged from which one could conclude that the employees quoted were privy to" relevant information); *In re MSC Indus. Direct Co., Inc.*, 283 F.Supp.2d 838, 847 (E.D.N.Y. 2003) (disregarding confidential witnesses where there was no basis to believe former employees had any connection with the appropriate department or that their work responsibilities would provide them a basis for knowing the information at issue).

criteria").[31]  The allegations attributed to the CISO with respect to credit quality confirm that he had no responsibility in that regard, CAC ¶¶ 75-76 ("loan assumptions and default rates were monitored and analyzed" by others), and otherwise merely allege, as disclosed by FMD, that credit guidelines had been changed to increase loan volume.  Compare CAC ¶ 71 with *supra* at 7-8 and n. 12.

The allegation attributed to the so-called VP of Applications is no better than colorful rumor and, in any event, does not impute knowledge to any particular Defendant, as it must. Compare CAC ¶ 65 ("risk management department's alarm was overlooked by First Marblehead's management") with *CalPERS*, 394 F.3d 126 at 148 (relying on allegations of a former employee concerning company's business on a national scale left court to speculate whether employee had obtained the information "by firsthand knowledge or rumor"); *In re Vertex Pharms., Inc., Sec. Litig.*, 357 F. Supp. 2d 343, 353-4 (D. Mass. 2005) (allegations generally attributed to some or all employees, or based on generalized knowledge attributed to all employees, do not pass muster); *Wilson v. MicroFinancial, Inc.*, No. 03-11883-RGS, 2006 U.S. Dist. LEXIS 38827, at *16-17 (D. Mass. June 13, 2006) (disregarding witness statements where there was "next to nothing offered in the Amended Complaint by way of detail to corroborate" them).

## 2.  *FMD's Deferral, Default and Delinquency Disclosures are Inactionable.*

Plaintiffs identify no credible source or other factual basis for their claim that Class Period loans underwritten pursuant to modified credit guidelines subsequently caused loan default rates to "skyrocket" and the TERI bankruptcy.  *See* CAC ¶¶ 23, 71-76, 87.  In context,

---

[31]     Also attributed to this former employee is the claim that an unspecified number of borrowers with "bad" credit were allowed to borrow up to $12,000.  CAC ¶ 63.  This does not state a claim because Plaintiffs offer no factual context for the pejorative adjective, and no basis to evaluate the extent to which any such loans made a material difference.  *Compare Greebel*, 194 F.3d at 205 (rejecting revenue recognition allegations where there was no basis to conclude that alleged errors were material).

this claim is unsupportable. The same is true for Plaintiffs' assertion that, during the Class Period, FMD misrepresented its default rate expectations. *See* CAC ¶ 74. Moreover, given the extensive public disclosures on deferrals, defaults and delinquency included in FMD's SEC filings and public statements, no one at FMD could have known that FMD's disclosures on these subjects were false.

<blockquote>
a) **Plaintiffs Allege No Basis to Conclude That Class Period Changes to Credit Quality Caused Materially Increased Default Rates or the TERI Bankruptcy.**
</blockquote>

Plaintiffs rely on an inadequate anonymous source for their claim that changes in credit quality in 2006 caused a spike in defaults, and assert no factual basis for the notion that this caused the TERI bankruptcy.[32] Plaintiffs allege that the former CISO told them that FMD's "default rates were soaring because the Company drastically lowered its credit guidelines ..." CAC ¶ 71. Plaintiffs acknowledge, however, that the former CISO was not a member of senior management and had no responsibility for "loan assumptions and default rates." CAC ¶ 75. They do not allege that the CISO worked in the same building or city as those responsible for managing actuarial risk. Nor do they allege who (if anyone) told the CISO that this was true, or any basis to conclude that a person responsible for addressing information technology risk (*e.g.*, computer hackers) would know anything about this subject. Thus, this statement is

---

[32] Only the CISO is cited as a source for information relating increasing default rates to changes in credit quality or the TERI bankruptcy. *See* CAC ¶ 83. All that is attributed to him is that he was told in November that the Company "*was beginning* to see a trend in loan defaults as a result of" changes in credit guidelines; and that he "stated that as the guarantor on the First Marblehead loans, TERI was *put in the position of bankruptcy* by the rising default rates in the Company's loans." *Id.* (emphasis added). The latter proposition is indistinguishable from speculation. In relying on the former, Plaintiffs illogically equate the notion that a trend was beginning to be visible with something far more certain, and ignore that no one even allegedly told the CISO that the increase beginning to be seen was due to *undisclosed* changes in credit guidelines (as opposed to thost that were disclosed). None of the other anonymous sources are said to have provided information linking credit quality changes to default rates. *Compare* CAC ¶¶ 72-76. The only other allegation implying such causation (the first sentence of ¶ 75) is not attributed to a source.

indistinguishable from baseless rumor.[33]  *CalPERS*, 394 F.3d at 148 ("Plaintiffs' failure to make

these allegations is also significant because we are left to speculate whether the anonymous

sources obtained the information they purport to possess by firsthand knowledge or rumor"); *In*

*re Vertex Pharms., Inc., Sec. Litig.,* 357 F. Supp. 2d at 354 ("Mere rumors cannot reasonably

satisfy the requirement that the facts alleged provide an adequate basis for believing that the

defendants' statements were false") (internal quotation marks and citation omitted).

     Plaintiffs cite no support for the proposition that Class Period credit quality changes

caused the TERI bankruptcy.  For their supposition in this regard to be correct, there would have

had to have been enough bad loans made, enough time for them to go into default, and not

enough money in the pledged accounts to cover claims made to TERI on account of Class Period

defaults.  Not only do Plaintiffs fail to supply facts suggesting that this is even possible, but the

Class Period SEC filings show that it is not.  *First*, the weighted average FICO score for loans

securitized during the Class Period was above 700.  *See supra* at 7 and notes 10-11.  Thus, Class

Period changes did not profoundly affect credit quality.  *Second*, the Class Period is less than

twenty months long, but the weighted average deferral period for each Trust was more than two

years from when the securitizations occurred (and each of them occurred successively later in the

Class Period).  *See supra* at 9 n. 14.  While repayment was deferred, there could be no default.

Moreover, a TERI guaranteed loan was not considered to be in default until 180 days after

nonpayment (and no payment on the TERI obligation was due until 60-90 days after default).

*See* Ex. 18 at FMD 351.  Thus, there was not enough time within the Class Period for a

---

[33]     The CISO also is the attributed source for a substantially less inflammatory allegation: that "Defendant Baumer informed him that the Company was *beginning* to see a real *trend* in defaults as a result of the lowered credit guidelines."  CAC ¶ 83 (emphasis added).  Tellingly, Plaintiffs do not allege *how* the trend then supposedly being perceived would develop over time, *whether* the supposedly "lowered credit guidelines" in question were those lowered in 2006 (as opposed to the disclosed reductions in guidelines earlier), or *any* reason to believe that the trend was material to FMD, TERI or anyone else.  Plaintiffs also fail to plead any basis to believe that the supposed "trend" was ever concealed (or that it could have been given the extensive disclosure about defaults and default rates discussed below).

substantial default spike in Class Period loans to occur.  *Third*, there were substantial sums set

aside in pledged accounts to pay guaranty claims made to TERI.  *See supra* at 9 n. 16.  Claims

made for defaults on a Trust's loans were paid from the account pledged to the Trust.  *Id.* at 5 n.

6.  Thus, unless the pledged account was exhausted, TERI need not call on its other cash

resources.  Plaintiffs offer no reason to believe that these accounts were ever exhausted, and the

Class Period SEC filings disclosed that claims to TERI on account of Class Period loans were

less than 5% of the amount pledged.  *See id.* at 9.

Even if this were not so, given the copious disclosure about deferrals, defaults and

delinquencies that were available to investors during the Class Period, there can be no cogent or

plausible inference that FMD misled investors on these subjects, or that any Defendant knew that

it did.  FMD disclosed the actual amount of claims to TERI on account of defaults; the actual

amount of delinquencies; the "cohort" default rate for loans guaranteed by TERI in each year;

and the extent to which loan repayment obligations in each Trust were deferred.  FMD also

disclosed expected default and recovery rates for the entire pool of securitized loans.  These

disclosures gave everyone at FMD adequate reason to believe that investors were fairly apprised

of the extent of defaults.[34]  *See supra* at 9-11.

### b)  Plaintiffs' Default Rate Allegations Do Not State A Claim.

Plaintiffs also make various allegations concerning rising default rates.  Plaintiffs' failure

to explain which statements they believe were false or misleading on this account (and why) is

particularly frustrating.  Nevertheless, any challenge to FMD's default rate disclosures must fail

for two reasons.  First, FMD *actually* disclosed rising default rates and the risks associated with

---

[34]     Plaintiffs also assert that FMD did not disclose that "default rates . . . were 'significantly higher'" on loans
made directly to students (and their parents) "than on loans issued through financial aid offices."  CAC ¶ 182; *see
also* CAC ¶ 9(1) and 9(3).  This allegation is immaterial in light of FMD's disclosure of the cumulative default rate
for each Trust, and expected default rate for all of the TERI-guaranteed loans.  *See supra* at 9-11 and 10, n. 17.
Disclosure of the overall rates is more than sufficient to apprise investors of the pertinent facts, and disaggregating
the blended rate would have added nothing of consequence.

rising defaults. *See Stepak v. Aetna Life & Cas. Co.,* 1994 U.S. Dist. LEXIS 15559, at *50-51(D. Conn. 1994) (where defendant "did, in fact, disclose" information that plaintiffs claimed was undisclosed, "as a matter of law, the plaintiff cannot prove that the allegedly undisclosed information would have altered the 'total mix' of information available"); *supra* at 9-11.

Second, Plaintiffs cite no factual basis for their allegation that FMD made a materially false statement, or that anyone at FMD could have believed that investors did not have adequate information about short-term defaults and FMD's long term expectations in this regard.

Plaintiffs assert that the "Former Output Supervisor" said that FMD told employees in August 2007 that their "default rates and fraud rates" were increasing (CAC ¶ 72); that the former software VP said that FMD was concealing its actual default rates; and that the former computer security officer had said that by the beginning of 2008 FMD's default rates were 14-15%, and risk management employees were predicting "short-term" default rates as high as 18%. CAC ¶¶ 72-74. Plaintiffs add sizzle to this data – none of which is sourced to anyone who had responsibility for preparing or analyzing default rates – by asserting that FMD disclosed inconsistent "default rates" of 8%. *Id.* However, they fail to specify what they (or any of their sources) mean by their use of the term "default rate" (which was used in many ways), or where any 8% disclosure was made.[35]

As noted above, the SEC filings disclosed the size of default claims tendered to TERI for each Trust (from which a default rate for each Trust could be calculated); a cohort default rate (*i.e.*, default rate for loans guaranteed by TERI in a particular year); and projected default rate

---

[35]    Plaintiffs also cite a "Former Business Development Relationship Manager" for the proposition that there was "growing awareness among employees in the Company that First Marblehead's forecasting models were no longer able to accurately predict default or cancellation rates." CAC ¶ 73. Such rumors are no basis for a fraud claim. *CalPERS,* 394 F.3d at 155 (confidential witness allegations concerned matters allegedly "well known within" defendant, "[r]umors circulated within the Company," and "open[] discuss[ions]" by operations employees); *In re Vertex Pharms., Inc., Sec. Litig.,* 357 F. Supp. 2d at 353-54 (rejecting vague and undated allegations from confidential witnesses supported by "some scientists at Vertex," "those privy to the analysis of the data" and "a common feeling among co-workers").

assumptions (for all loans securitized in all Trusts holding TERI-guaranteed loans). *See supra* at 9-11. The expected net default rate assumption (discussed in some analyst calls) was explicitly disclosed to be an expected gross default rate assumption adjusted for expected recoveries. *See id.* at 10. These assumptions were not short term in nature, but rather addressed all of the securitization trusts over their remaining lives (in many cases greater than twenty years). Accordingly, investors had the basis to evaluate – on a current and long-term basis, respectively – the extent of defaults (and delinquencies) and FMD's expectations about defaults.

In the context of these disclosures, it is clear that Plaintiffs (and their "sources") have not done their homework. For example, the fact that default rates went up late in 2007 and early in 2008 would have been obvious to anyone who read FMD's Forms 10-Q. *See supra* at 10. Indeed, FMD disclosed the fact that the gross expected default rate increased from 9.68 to 14.76% for the period ending December 31, 2007. In its first periodic filing after that date, FMD said:

> In response to *an acceleration in default activity* coupled with deterioration in overall consumer credit quality, [the Company] increased the assumed *net* default rate from 5.81% to 7.68% on average for the portfolio … [and] increased [its] assumed average *gross* default rate from 9.68% to 14.76%.

*See* Ex. 10 at FMD 267(emphasis added). Thus, even if Plaintiffs' allegation was correct that short term default rates had been 14-15% or projected short-term default rates were as high as 18%, FMD's disclosed long-term expectations were in line with them. Moreover, at this same time, FMD's static pool disclosures (filed on Form 8-K) provided great detail about the current (and prior) delinquency, deferral and cumulative loss position of each of the Trusts at various moments in time. *See*, *e.g.*, Ex. 12 at FMD 281-303.

First Marblehead also disclosed that rising default rates were a risk, stating explicitly that,

> Increases in our estimates of defaults ... as well as decreases in
> default recovery rates ... would have a negative effect on the value
> of our additional structural advisory fees and residuals ... If
> defaults increase beyond the level of expected third-party
> reimbursement, then these changes will have an additional
> negative effect on the value of our additional structural advisory
> fees and residuals.

Ex. 7 at FMD 236.[36]

### 3. *Plaintiffs' TERI Allegations Fail.*

Plaintiffs allege that FMD fraudulently "concealed ... [its] inability to manage TERI's

risk" and TERI's "inability to guarantee First Marblehead loans." CAC ¶ 181(7). As a result,

Plaintiffs claim, FMD also concealed that it would be unable to securitize future loans.[37] CAC

¶¶ 181(5) and (6). But, once again, Plaintiffs' claim fails because this risk *was actually disclosed*

in the publicly available documents cited in the Complaint and because their allegations are not

pleaded with particularity.

#### a) **First Marblehead Disclosed the Risks Associated with Its Reliance on TERI.**

FMD disclosed that it could not manage all of the risks associated with its relationship

with TERI, and that it would suffer if these risks came to fruition. More specifically, FMD

---

[36]   *See also* Ex. 4 at FMD 206; Ex. 9 at FMD 256 (similar). Contrary to Plaintiffs' assertion that "the liability for defaulting student loans would fall on the Company should TERI become insolvent," CAC ¶77, FMD had no guaranty obligations with regard to any defaulted loans. *See, e.g.*, Ex. 3 at FMD 65 ("We do not take a direct ownership interest in the loans our clients generate, nor do we serve as a … guarantor with respect to any loan programs that we facilitate").

[37]   Although seemingly superfluous, Plaintiffs also allege nondisclosure of FMD's "true role in managing TERI's business and operations." *Id.* In fact, this information was disclosed in the SEC filings cited in the Complaint. For example, FMD disclosed the nature of its relationship with TERI in each of its public filings: "In June 2001, we purchased the loan processing operations of TERI and entered into a series of agreements to govern future securitizations of TERI-guaranteed loans. TERI continues to provide private student loan guarantee [sic], education information and counseling services for students, and is the exclusive third-party provider of borrower default guarantees for our clients' private label loans. We have entered into an agreement to provide various services for TERI and received fees from TERI for services performed of $106.1 million, or 19% of total service revenue, for fiscal 2006, and $78.2 million, or 19% of total service revenue, for fiscal 2005. … We also have entered into an agreement to receive from TERI updated information about the performance of the student loans it has guaranteed, to allow us to supplement our database. Each of these agreements with TERI had an initial term through June 2006. In October 2004, we exercised our option to renew each agreement for an additional five-year term, through June 2011." *See, e.g.*, Ex. 3 at FMD 49, Ex. 4 at FMD 204, Ex. 7 at FMD 237; Ex. 9 at FMD 257-58 (similar).

warned that if TERI did not continue to do business with FMD, or TERI could not comply with its obligations (the most prominent of which was to guarantee loans in FMD-structured securitizations), FMD's ability to obtain loans for securitizations would be impaired and its ability to structure securitizations would "diminish significantly." *See, e.g.*, Appx. A, § 2. FMD also disclosed that structuring securitizations accounted for most of its revenues and nearly all of its earnings. *See supra* at 4; Ex. 3 at FMD 28, 34, 45. *Id.*, Appx. A, § 3.

FMD also warned, in detail, of the risks that investors faced if TERI's ratings were downgraded:

> *Our business could be adversely affected if TERI's ratings are downgraded.*
>
> In its role as guarantor in the private education lending market, TERI agrees to reimburse lenders for unpaid principal and interest on defaulted loans. TERI is the exclusive provider of borrower default guarantees for our clients' private label loans. As of September 30, 2006, TERI had a Baa3 counterparty rating from Moody's Investors Service, which is the lowest investment grade rating, and an insurer financial strength rating of A+ from Fitch Ratings. If these ratings are lowered, our clients may not wish to enter into guarantee arrangements with TERI. In addition, we may receive lower structural advisory fees because the costs of obtaining financial guarantee insurance for the asset-backed securitizations that we structure could increase. Finally, the inability of TERI as student loan guarantor to meet its guaranty obligations could reduce the amount of principal or interest paid to the holders of asset-backed securities, which could adversely affect our residual interests in securitization trusts or harm our ability to structure securitizations in the future. In each such case, our business would be adversely affected.

*See* Appendix A, § 2.[38] *See* also Ex. 4 at FMD 205, Ex. 7 at FMD 238, Ex. 9 at FMD 258.

Based on these disclosures, no investor could draw any conclusion other than that FMD's business (and ability to securitize future loans) relied heavily on TERI's stability and FMD's relationship with TERI, and that there were risks inherent in these relationships that were beyond FMD's power to control. Obviously, any bankruptcy or credit downgrade would impair TERI's

---

[38] The debt prospectuses also cautioned: "If TERI defaults on its guaranty obligations, and you own any class of notes, you will rely primarily on payments from the related borrower for payments on the related private student loan and, to a limited extent, on guaranty fees paid to TERI but deposited in the TERI pledge fund and pledged by TERI to secure its guaranty obligations. In these circumstances, you will bear the risk of loss . . ." Ex. 18 at FMD 340.

ability to perform its obligations and to serve as guarantor for future securitizations, and as a result, it would jeopardize FMD's business and ability to securitize future loans. Thus, the relevant risks were disclosed, and Plaintiffs' claim fails as a matter of law. *Compare* Appx. A, § 3 *with, e.g., Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 879-880 (1st Cir. 1991) (affirming dismissal of complaint where filings contained meaningful risk disclosures); *In re Number Nine Visual Tech. Corp. Secs. Litig.*, 51 F. Supp.2d 1, 21-22 (D. Mass. 1999) (dismissing complaint where allegedly misleading statements were accompanied by relevant cautionary language) (*applying Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996)).

> **b)** **Plaintiffs' Confidential Witness Allegations Do Not Give Rise to a Cogent Inference of Scienter**

Plaintiffs' allegation that FMD knew, pre-bankruptcy, that TERI was in danger of being unable to guarantee student loans and would, in fact, be unable to do so in the future is supported only by the speculation of anonymous sources (primarily the "former CISO.") *See* CAC ¶¶ 71, 73, 74, 81-85. In this regard, Plaintiffs claim that the CISO told them that: (i) "it was clear to First Marblehead executives by November 2007 that TERI would have major solvency issues *if the negative default trends continued*;"[39] (ii) TERI management told FMD in December 2007 that "*the TERI trust* was running out of funds due to a systematic increase in loan defaults" and asked for a cash infusion; and (iii) FMD "ignored" these "warnings" and "refused." CAC ¶ 85 (emphasis added).

---

[39] The CISO also allegedly said that two of the defendants (Kopnisky and Tarr) "were well aware of TERI's cash position many months before TERI filed for bankruptcy in April 2008." CAC ¶ 84. This adds nothing to the first bit of speculation, because the Complaint does not allege what the cash position was or why it portended a near-term financial crisis at TERI. Moreover, such bald allegations made by a confidential witness regarding what a defendant or senior management "knew" are not enough. *See Zack v. Allied Waste Indus.,* 2005 U.S. Dist. LEXIS, at * 21-22 (D. Ariz. Dec. 15, 2005), *aff'd, 2008 U.S.* App. LEXIS (9th Cir. April 19, 2008) (refusing to credit confidential witnesses' conclusory allegations of what "senior management" "knew" because they were pleaded without particularity or specificity).

As noted above, the CISO allegations are inadequate.  *See supra* at 19-25.  He is not alleged to have had any responsibilities relative to TERI's credit standards or its financial condition.  Nor is he alleged to have attended either of the two meetings referred in the Complaint.  *See* CAC ¶¶ 72, 85.  Thus, the Complaint fails even to suggest that it is remotely probable that he "would possess the information alleged."  *See Cabletron*, 311 F. 3d at 28 (*quoting Novak*, 216, F. 3d at 314).  Hearsay and speculation are not enough.  *CalPERS*, 394 F.3d at 154 (disregarding allegations of a meeting by a vice president not alleged to have been employed at the time, and with no apparent basis for knowledge); *In re Vertex Pharms., Inc., Sec. Litig.*, 357 F. Supp. 2d at 353 (D. Mass 2005) (rejecting confidential witness that did not have personal knowledge of the most important facts alleged).[40]  And Plaintiffs, and the CISO, offer nothing more than bald allegations (*e.g.,* that it was "clear" to FMD executives in November 2007 that TERI would face solvency problems (*see* CAC ¶ 84)) with respect to the TERI bankruptcy.  *See Zack v. Allied Waste Indus.*, 2005 U.S. Dist. LEXIS, at * 21-22 (D. Ariz. Dec. 15, 2005) ("confidential witnesses' conclusory allegations of what senior management 'knew,' without particularity or specificity" indicate that the witnesses' "knowledge is not averred").[41]

### 4. *Plaintiffs Do Not Plead Factual Allegations Sufficient to Support their Claim that FMD Knew During the Class Period that TERI Could Not Guarantee FMD-Structured Loans*

---

[40]     *See also In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d at 290-91 (bald declarations of confidential witness, without personal knowledge, are insufficient); *cf. CalPERS*, 394 F.3d at 149 (noting that the court should not be "left to speculate whether the anonymous sources obtained the information they purport by firsthand knowledge or rumor);" *In re MSC Indus. Direct Co., Inc.*, 283 F. Supp. 2d at 847 (disregarding confidential witnesses who had no connection with the relevant department (accounting) where there were no allegations that their work provided them a basis for such knowledge).  *See also* fn. 29, *supra* at p. 21.

[41]     For example, the allegation that TERI had office space in the same building as FMD, shared IT resources, or had a close relationship, do not support a cogent inference of scienter.  *See* CAC ¶¶ 78, 80.  In any event, other allegations of the Complaint undermine Plaintiffs' proposed  illogical inferences in this regard.  *See, e.g.,* CAC ¶ 80 (CISO asserts that FMD and TERI had a "bad marriage" and that there was a "great deal of animosity between the executives of each company"); Ex. 3 at FMD 21, 42 (listing address for FMD's "principal executive offices" as Prudential Tower, 800 Boylston St., 34th Fl., Boston, MA); Ex. 4 at FMD 202 (same), Ex. 5 at FMD 215 (same); Ex. 18 at FMD 350 ("TERI's offices are located at 31 St. James Avenue, Boston").

In any event, what the confidential sources are alleged to have said is insufficient to state a claim. Neither Plaintiffs nor their sources allege that FMD had advance notice of TERI's plans to file for reorganization under Chapter 11. Neither do they allege a basis to conclude that FMD knew how long it might be before TERI would experience real problems. Thus, FMD's repeated warnings that it would be affected adversely if TERI became unavailable (or had its credit rating cut) were adequate to inform investors of the existing risks, and were in no way misleading. *See, e.g.,* Appendix A, § 2.

For example, Plaintiffs attribute to the CISO the assertion that TERI believed there could be a problem *if* "negative default trends continued," and that he later claimed the "TERI trust" (whatever that might be) was "running out of funds."[42] CAC ¶¶ 84-85. Neither Plaintiffs nor the CISO, however, address the question of how long even TERI supposed that it would take for a real problem to arise. Plaintiffs supply not one piece of hard data showing that an emergency was imminent.[43] Indeed, the very allegation that First Marblehead refused to help TERI (CAC ¶¶ 85, 86) suggests Defendants did not think the situation was dire: what would have been FMD's motive to let TERI fail?

Any suggestion that the TERI bankruptcy filing (four or five months after the alleged conversations with TERI's CEO in late 2007) demonstrates that FMD knew of a prior emergency would, of course, rely impermissibly on hindsight to infer scienter. *See*, *e.g.*, *Rodriguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 97 (1st Cir. 2007) (affirming dismissal of claim that amounted

---

[42]     Plaintiffs' (and the CISO's) reference to the "TERI trust" is puzzling. As disclosed in the SEC filings discussed above, TERI's assets were not at risk with respect to loans included in FMD-structured securitizations until the amounts pledged by TERI in the segregated reserve accounts for each Trust were exhausted. These pledged accounts were not trusts, and were in no danger of being exhausted by Class Period loans. *See supra* at 9 and 9, n. 16.

[43]     Likewise, as noted above, Plaintiffs' theory that increased defaults caused TERI's problems or were caused by undisclosed deterioration of borrower credit quality during the Class Period is not factually supported. *See supra* at 9.

to "fraud by hindsight," which the First Circuit has "consistently rejected") (*citing Ezra Charitable Trust v. Tyco Int'l, LTD*, 466 F.3d 1, 6 (1st Cir. 2006).

**5.** **Plaintiffs' Financial Statement Allegations Do Not State A Claim.**

Plaintiffs allege that "First Marblehead's statements and filings during the Class Period were materially false and misleading because they … misrepresented the true earnings and financial condition of the Company …" CAC ¶ 181. Although Plaintiffs do not identify which, if any, statements regarding the company's "earnings and financial condition" were allegedly false or misrepresented, Plaintiffs seem to claim that FMD improperly valued its rights to future payments. *See* CAC ¶¶ 9, 32-39, 182-84. This vague allegation, however, fails to state a claim.[44]

FMD never restated nor withdrew its financial statements, which were audited by KPMG. FMD was required under the accounting rules to recognize revenue on rights to future payment at the time of each securitization. *See supra* at 4-5. FMD publicly disclosed its discounted cash flow methodology; its reliance on subjective assumptions; the key assumptions used; the fact that variance between what might occur in the future and its current assumptions would impact the numbers reported; and a sensitivity analysis showing the impact of variability of its assumptions. *Id.* FMD disclosed that its assumptions were based on more then twenty years of data about student loan terms, repayment and collections. *See* Ex. 3 at FMD 36, 49, 51-52.

FMD's projections regarding future payments and related disclosures are subject to the Reform Act's "safe harbor" for forward-looking statements and the "bespeaks caution" doctrine. 15 U.S.C. § 78u-5(c)(1)(A)(i). *See also* 15 U.S.C. § 78u-5(i)(1) (defining "forward-looking

---

[44]     Plaintiffs claim that "the veracity of the financial statements [regarding rights to future payments] would be called into serious question as First Marblehead plunged into financial distress due to inadequate loss reserves associated with the Company's securitizations." CAC ¶ 49. This assertion is nonsense. Loan loss reserves have nothing to do with the accounting for these rights. As Plaintiffs should know, FMD did not make private student loans and thus had no loan loss reserves. *See* n. 42, *supra.*

statements" to include "projections of revenues, income and earnings … and disclosure of the issuer's assumptions underlying the foregoing").[45]  Both insulate from liability those who make forward looking statements if accompanied by appropriate warnings that they may not come true. *See*, *e.g.*, *In re Ibis Tech. Sec. Litig.*, 422 F. Supp.2d 294 (D. Mass. 2006) (granting motion to dismiss based on safe harbor protection); *In re Parametric Tech. Corp. Sec. Litig.*, 300 F. Supp.2d 206 (D. Mass. 2001) (same); *In re Boston Tech, Inc. Sec. Litig.*, 8 F. Supp. 2d 43 (D. Mass. 1998) (same).  FMD did provide adequate (indeed, abundant) warnings in this regard.  *See* Appx. A, § 1.  In addition to the narrative warnings, FMD provided a sensitivity analysis that specifically quantified how changes in those assumptions would affect the numbers reported. *See*, *e.g.*, Ex. 3 at FMD 72-74.  Thus, the Reform Act and the bespeaks caution doctrine render these statements inactionable.

Plaintiffs do not even attempt to plead facts showing actual knowledge of falsity of the financial statements, as required by the safe harbor. 15 U.S.C. § 78u-4(f)(10) (exception to safe harbor where defendant "makes an untrue statement of a material fact, with actual knowledge that the representation is false…").  Nor have Plaintiffs pleaded the approximate amount by which FMD financial statements were overstated, and what the correct valuation should have

---

[45]      Courts have consistently recognized that valuations utilizing discounted cash flow methodology are inherently forward-looking for purposes of the statutory safe harbor and the related bespeaks caution doctrine. *See*, e.g., *Little Gem Life Sciences LLC v. Orphan Medical, Inc.*, 2007 WL 541677, at *6 (D.Minn. Feb. 16, 2007) ("In arriving at a present value, the discounted cash flow analysis incorporates forward looking assumptions about future cash flows. Therefore, a discounted cash flow analysis is forward looking for the purposes of the bespeaks caution doctrine.").  *See also Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 539 n.23 (1983) ("the discount rate also turns on predictions of the future").

been.[46] *See In re Polaroid Corp. Sec. Litig.*, 134 F.Supp.2d 176, 186 (D. Mass. 2001) ("In order to plead adequately financial fraud based on improper revenue recognition, the complaint must describe the violations at issue with sufficient particularity, setting forth such basic details as … the approximate amount by which revenues and earnings were overstated") (*quoting Greebel v. FTP Software, Inc.*, 194 F.3d 185, 204 (1st Cir. 1999)).  Finally, given that First Marblehead never corrected its financial statements, these alleged misrepresentations cannot have caused any loss because any "inflation" resulting therefrom is still reflected in the stock price.  *Semerenko v. Cendant Corp.*, 223 F.3d 165, 185 (3d Cir. 2000) ("In the absence of a correction in the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time simply by reselling the security at the inflated price.")

### 6.     *Plaintiffs' Internal Controls Allegations Are Inactionable.*

Plaintiffs' internal controls allegations fail for the same reasons that the accounting allegations fail.  *See* CAC ¶¶ 9, 181, 184 (alleging that FMD lacked adequate internal and financial controls).  Plaintiffs do not identify a false statement regarding FMD's internal controls or any specific internal controls that were inadequate.  Nor do they explain why any statement is misleading or how any inadequacy within FMD's internal controls resulted in any false statement.  *See In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005)

---

[46]      Since valuation is inherently a matter of judgment and opinion, plaintiffs must plead facts with particularity to demonstrate that the valuation is both objectively *and* subjectively false.  *See In re Credit Suisse First Boston Corp. Analyst Reports Sec. Litig.*, 2005 U.S. Dist. LEXIS 6345, at *16 (D. Mass. March 31, 2005) (for stated opinion to be actionable, it "must not only be subjectively false – the speaker did not believe it – but also objectively false as well") (*citing Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095-96 (1991)).  Indeed, "given the difficulty of valuing illiquid securities, and the multitude of factors that may appropriately be taken into account," simply "alleging disagreement" with the Company's valuation of its back-end residual interests and structural advisory fees, as Plaintiffs do here, "does not equate to alleging fraud" or even provide a basis to infer that the Company's fair valuations were "in fact incorrect or inflated."  *In re Allied Capital Corp. Sec. Litig.*, 2003 U.S. Dist. LEXIS 6962, at *13 (S.D.N.Y. 2003).  *See also In re Eaton Vance Corp. Sec. Litig.*, 206 F. Supp. 2d 142, 152 (D. Mass. 2002) (dismissing complaint premised on challenge to "fair value" calculations because a "vague allusion to a failure to account for adverse market condition [in fair calculation] is not sufficient to plead fraud"); *Wilson v. MicroFinancial, Inc.*, 2006 U.S. Dist. LEXIS 38827, at *37 ("realization of revenue is 'fundamentally a subjective determination' over which reasonable minds may differ") (*quoting In re Galileo Corp. Shareholders Lit.*, 127 F. Supp. 2d 251, 265 (D. Mass. 2001)).

("generalizations regarding integrity, financial discipline and risk management," including statement that "processes are in place to ensure credit risk instruments are accurately assessed, properly approved, and continuously monitored," are not actionable); *In re Buca, Inc. Sec. Litig.*, 2007 WL 2509716 (D. Minn. Aug. 30, 2007) (dismissing complaint where plaintiffs failed to tie alleged internal control deficiencies to purportedly fraudulent accounting schemes).

Even if Plaintiffs had alleged a false statement, and stated why it was false (which they do not), Plaintiffs make no attempt to allege that anyone knew that FMD's controls were inadequate. *Compare In re FBR Inc. Sec. Litig.*, 544 F. Supp.2d 346, 359-60 (S.D.N.Y. 2008) (that company's risk management program failed to root out alleged insider trading did not render statements regarding risk management false when made). This is not surprising. FMD's auditors consistently opined that FMD's internal controls were adequate, and Plaintiffs fail to explain why they believe the auditors were wrong. *See* Ex. 3 at FMD 97, Ex. 4 at FMD 207.

## 7. *Alleged Mismanagement Does Not State a Claim.*

Many of Plaintiffs' allegations allege no more than mismanagement. For example, Plaintiffs allege in paragraph 65 that "management" overlooked the risk management department's "concerns" and "alarm" about lowering credit standards, and "eschewed" discussion of corporate strategy and risk. Paragraph 85 alleges that the Company ignored TERI's warnings and refused to offer TERI any assistance. Mismanagement, however, is not actionable under the securities laws, *Santa Fe Industries v. Green*, 430 U.S. 462 (1977), and courts routinely reject claims to bootstrap mismanagement claims into fraud claims through allegations that mismanagement took place but was not disclosed. *See e.g.*, *Shaw v. Digital Equip. Corp.*, 82 F.3d at 1214 ("To the extent that the claim comprises allegations of mismanagement, it is not cognizable under the securities laws."); *Burstein v. Applied Extrusion Technologies*, 150 F.R.D. 433, 440 (D. Mass. 1993) (same).

36

## II.  PLAINTIFFS' SCIENTER ALLEGATIONS FAIL

Plaintiffs must allege, with particularity, facts giving rise to a strong inference that Defendants acted with scienter.  As noted above, Plaintiffs provide no facts suggesting that any Defendant knew a false statement had been made.  They also, impermissibly, rely on hindsight.  *See supra* at 2.  We now know that FMD did not structure a securitization after September 2007, and we now know that TERI filed for bankruptcy.  It is impermissible, however, to infer that what has now occurred must previously have been known.[47]  *See id.*  Plaintiffs' other attempts to plead scienter also fail as a matter of law.

### A.  *Allegations Regarding Defendants' Senior Positions Do Not Suffice to Plead Scienter*

Courts uniformly reject conclusory allegations, such as those in Paragraph 190, which purport to plead scienter by alleging baldly that Defendants "must have" known about the alleged fraud by virtue of the mere fact that their "positions" within the Company made them "privy" to information.  *See e.g.*, *Maldonado v. Dominguez*, 137 F.3d 1, 10 (1st Cir. 1998) (rejecting allegations that defendants must have been aware of facts by virtue of their positions); *In re Galileo*, 127 F.Supp.2d at 261 ("Nor is scienter pleaded sufficiently by an allegation that ... defendants must have known facts solely by virtue of their positions with the issuer of the securities"); *In re Sonus Networks, Inc. Sec. Litig.*, No. 04-1 0294-DPW, 2006 U.S. Dist. LEXIS 28272, at *78 (D. Mass. May 10, 2006) (citing *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004) ("fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information").

---

[47]      The facts at hand are distinguishable from those in *Boston Scientific*, where the Court found that "fraud in the hindsight" did not apply because it could be inferred based on Plaintiffs' allegations and supporting documents that Defendants actually knew in advance that things would turn out badly.  *Miss. Pub. Emples. Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 90 (1st Cir. 2008) (Defendants were aware of certain non-deflation complaints and thus could have predicted that non-deflation problem at issue in the case would occur).

**B.** ***Plaintiffs Fail to Allege Facts from Which to Infer Motive to Engage in Fraud***

Plaintiffs also fail to plead "motive and opportunity."

**1.** ***FMD's Credit Rating***

Plaintiffs claim absurdly that the individual defendants were motivated to defraud in order to maintain FMD's credit rating. This argument is fatally undermined by their failure to plead any fact suggesting that FMD even has one. Even if it did, numerous courts have held that allegations that corporate officials were motivated to commit fraud in order to generally benefit the corporation do not adequately plead motive. *See, e.g., Guerra v. Teradyne, Inc.*, 2004 U.S. Dist. LEXIS 28548, at *80 (D. Mass. Jan. 16, 2004) (collecting cases).[48] Allegations that Defendants committed fraud in order to maintain First Marblehead's credit rating are indistinguishable from the allegations rejected in these cases.

**2.** ***Incentive Compensation***

Plaintiffs allege that Messrs. Kopnisky, Hupalo and Tarr were motivated to commit fraud because they received incentive awards "keyed to the Corporation's income from operations for Fiscal 2007." CAC ¶ 192. But the Complaint nowhere alleges – at all, much less with particularity – that First Marblehead ever *misstated* its income from operations for 2007 or any other period. Thus, Plaintiffs' theory makes no sense. Even if Plaintiffs actually had alleged a plausible connection between the conduct at issue and anyone's compensation, it would still be too generic to furnish a strong inference of scienter. *See In re K-Tel Int'l Sec. Litig.*, 300 F.3d 881, 894-5 (8th Cir. 2002) (rejecting allegations of motive to keep stock price high to raise

---

[48]        *See also In re Great Atlantic & Pacific Tea Co., Inc. Sec. Litig.*, 103 Fed. Appx. 465, 469 (3d Cir. July 9, 2004) (rejecting company's "desire to manage its earnings in order to meet analyst and market expectations" as "general corporate motive [is insufficient] to give rise to a strong inference of scienter"); *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 352 (4th Cir. 2003) (desire to promote acquisitions and otherwise improve company's financial position insufficient to infer scienter because such motives are "generalized" and "shared by *all* companies"); *Novak v. Kasaks*, 216 F.3d at 307 ("plaintiffs [cannot] proceed based on motives possessed by virtually all corporate insiders, including . . . the appearance of corporate profitability") (internal citations omitted).

compensation).  "If scienter could be pleaded on th[is] basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."  *Acito v. IMCERA Group*, 47 F.3d 47, 54 (2d Cir. 1995).  *See also Ferber v. Travelers Corp.*, 785 F. Supp. 1101, 1107 (D. Conn. 1991) ("Incentive compensation can hardly be the basis on which an allegation of fraud is predicated"); *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068-69 (5th Cir. 1994) (same).

### 3.    *Trading by Insiders*

Plaintiffs focus mostly on the Individual Defendants' stock sales. But "[i]nsider trading cannot establish scienter on its own."  *Miss. Pub. Emples. Ret. Sys. v. Scientific*, 523 F.3d 75, 92 (1st Cir. 2008) (*citing Greebel*, 194 F.3d at 197-98); *Shaw*, 82 F.3d at 1224 ("Of course, the mere fact that insider stock sales occurred does not suffice to establish scienter").  Because none of Plaintiffs' other allegations contribute to the requisite inference, the stock sales should not be considered.  *N.J. Carpenters,* 537 F.3d at 55 (having discounted other inferences of scienter, holding that "any insider trading which occurred during the class period...cannot be used to support a strong inference of scienter").

In any event, the stock sales are insufficient to contribute to a strong inference of scienter.  "At a minimum, the trading must be in a context where defendants have incentives to withhold material, non-public information, and it must be unusual, well beyond the normal patterns of trading by those defendants."  *Greebel*, 194 F.3d at 198.  In context, the trading in this case by just a few of the Individual Defendants does not even approach that high threshold.

### a)    **Most Defendants Sold None of Their First Marblehead Stock.**

The Complaint names eight Individual Defendants, but details the trading of only three: Messrs. Anbinder, Alexander, and Berkley.  CAC ¶ 194.  The absence of sales by some defendants negates scienter for all, because one would expect that if there was a "scheme" to

inflate share price, all defendants would have participated.  *Abrams v. Baker Hughes Inc.*, 292

F.3d 424, 435 (5th Cir. 2002) ("unusual sales by one insider do not give rise to a strong inference

of scienter when other defendants do not sell").  Three other Courts of Appeals have reached the

same conclusion.[49]

> **b)** **Stock Sales by the Individual Defendants Were Not Suspicious.**

Mr. Alexander.  Mr. Alexander's trading should not be considered at all.  He was an

outside director (CAC ¶ 24) who is not alleged to have been involved in day to day management,

to have made any statement at issue, or to have been involved in the issuance or preparation of

any statement at issue.  Nor do Plaintiffs allege with particularity, either through their

confidential sources or otherwise, that he received any of the alleged information they rely on to

show that the Company's statements were false or misleading.[50]  Thus, his sales do not support

an inference of scienter, much less a strong one.  *See Malin v. XL Capital Ltd.*, 499 F. Supp. 2d

117, 153-154 (D. Conn. 2007) (outside director's trading, while substantial, did not give rise to

an inference of scienter where he was not alleged to have made any of the statements at issue).[51]

In any event, Mr. Alexander's trades are not suspicious for two reasons.  First, according

to the CAC, during the Class Period he sold a low percentage of his holdings – just 13.81

---

[49]     *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999) ("Here, three of the individual defendants sold no stock at all during the class period, raising doubt whether the sales were motivated by an intent to profit from inflated stock prices before the upcoming losses were reported"); *Acito*, 47 F.3d at 54 (lack of sales by several defendants "undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit"); *Higginbotham*, 495 F.3d at 759 ("[o]ne possible inference is that the absence of sales by other managers who would have [allegedly] been in the know . . . implies that nothing was thought to be out of the ordinary . . . Because *Tellabs* instructs us to consider all possible inferences, and not just those that favor plaintiffs, the absence of any demonstration that [the period in question] was an unusual period for managerial sales means that the complaint lacks the required 'strong' determination of scienter").

[50]     As an outside director, Mr. Alexander is not covered by group pleading.  *See e.g., In re Nat'l Century Fin. Enters., Inv. Litig.*, 504 F. Supp. 2d 287, 297-300 (S.D. Ohio 2007) (citing *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1011 (N.D. Cal. 1994)) ("The complaint's reliance on group pleading with respect to the Outside Directors is problematic because outside directors '[b]y definition . . . do not participate in the corporation's day-to-day affairs'").

[51]     *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 898 (W.D.N.C. 2001) (finding trading by former chairman irrelevant to scienter analysis because, *inter alia*, plaintiffs did not allege he made any actionable misstatement).

percent.  (CAC ¶ 193).  Such small percentages do not give rise to an inference of scienter.  *See*, *e.g.*, *Wilson*, 2006 U.S. Dist. LEXIS 38827, at *38-39 (sale of "only" 16 percent of holdings not sufficiently suspicious for scienter, even though totaling several million dollars); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1094 (9th Cir. 2002) (no inference of scienter could be drawn from sale of "only" 13 percent).  Second, the timing of these trades rebuts an inference of scienter.  His last sale took place on December 14, 2006,[52] more than *eleven months* before the first "partial disclosure" that supposedly began to reveal the alleged fraud.  *See* CAC ¶ 201.  Such a "broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter."  *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) (no scienter where sales made twelve, four, and three months before negative disclosure).[53]  *See also In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp. 2d 134, 163-64 (D. Mass. 2001) (insider sales, though larger in volume than normal, did not support finding of scienter because timing was not suspicious; the "sales did not occur because of a big 'event' unknown to the public").

Mr. Berkley.  Mr. Berkley also is alleged only to have been a non-employee director, CAC ¶ 25, and the Complaint sets forth no facts connecting him either to any statement at issue or to any of the "facts" purportedly showing falsity.  He is alleged to have sold only 12.9 percent of his shares (CAC ¶ 193), and his last trade was on February 9, 2007 (*see* Ex. 16), more than nine months before the first alleged negative disclosure cited by Plaintiffs.  Thus, his trading is irrelevant and not suspicious for the reasons set forth above.

Mr. Anbinder.  Mr. Anbinder also was a non-employee director throughout the Class Period (CAC ¶ 23) who is not alleged to have been involved in day to day management, to have

---

[52]    *See* Ex. 15.

[53]    *See also In re Spectrum Brands, Inc. Sec. Litig.*, 461 F. Supp. 2d 1297, 1317 (N.D. Ga. 2006) (allegations of stock sales insufficient where largest sale was made three months prior to adverse disclosure).

made any statement at issue, to have been involved in the issuance or preparation of any statement at issue, or to have received any of the adverse information upon which Plaintiffs rely. There are other cogent and compelling reasons to infer that his sales were benign. *See Higginbotham v. Baxter International, Inc.*, 495 F.3d 753, 759 (7th Cir. 2007) (noting that under *Tellabs*, all plausible inferences explaining trading must be considered in evaluating scienter). Like the other trading Defendants, Mr. Anbinder sold a relatively small share of his total holdings (24.95 percent, *see* CAC ¶ 193), and even that percentage must be viewed in the context of the even smaller percentages sold by Messrs. Alexander and Berkley. *See, e.g., In re Peritus Software Servs., Inc.*, 52 F. Supp. 2d 211, 225 (D. Mass. 1999) ("the fact that Chan, Catalano, and Dreary respectively retained 94%, 62%, and 75% of their Peritus holdings … suggests that the sales were not unusual or motivated by a desire to capitalize on knowledge of inflated stock values") (*citing In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117-18 (9th Cir. 1989) (relative share of officer's holding sold is important to question of whether sales can support inference of scienter)). Moreover, Mr. Anbinder's sales were pursuant to trading plans put in place on December 9, 2005 (before the Class Period) and December 5, 2006,[54] which were set up in advance of his retirement.[55]

---

[54] See, e.g., Ex. 17 (reporting to the SEC that Mr. Anbinder's trades, made indirectly by way of the Roxbury Management Company, LLC "were effected pursuant to a Rule 10b5-1 trading plan entered into by Roxbury Management Company, LLC on December 5, 2006."); Ex. 13 (reporting to the SEC that Mr. Anbinder's trades, made indirectly by way of the Roxbury Management Company, LLC, "were effected pursuant to a Rule 10b-5-1 trading plan entered into by Roxbury Management Company LLC on December 9, 2005."). Under *Boston Scientific,* references to trading plans on Form 4s do not, alone, conclusively defeat scienter. 523 F.3d at 92. However, nothing in Boston Scientific suggests the Court may not consider the existence of the trading plans in the context of other innocent explanations.

[55] Mr. Anbinder was in his late sixties at the time of these trades (Ex. 2 at FMD 13 (listing Mr. Anbinder's age as 67)), retired from the Company to become a consultant on June 30, 2006 (well over a month before the Class Period began) (Ex. 11 at FMD 274 ("Mr. Anbinder retired as an employee of the Corporation on June 30, 2006, although he remains a consultant to, and director of, the Corporation")), and subsequently left that position on December 31, 2007 (though he remained an outside director) (Ex. 9 at FMD 259 ("On May 8, 2007, we entered into a letter agreement with Stephen E. Anbinder extending to December 31, 2007 the term of his Consulting Period")). *See Greebel*, 194 F.3d at 206-07 (no scienter from retiring executive's sales).

### c)     Sales by Three Non-Defendants Are Irrelevant

Plaintiffs also mention, in a chart, sales by three non-defendants.  CAC ¶ 194.  These sales are irrelevant, because they are neither alleged to have played any role in any "scheme" to inflate share price nor to have been the beneficiaries of the "scheme."  *See In re Blockbuster Inc. Secs. Litig.*, No. 3:03-cv-0398-M, 2004 U.S. Dist. LEXIS 7173, at *56 n. 5 (N.D. Tex. Apr. 26, 2004).[56]

## III.    PLAINTIFFS DO NOT ADEQUATELY ALLEGE LOSS CAUSATION

Plaintiffs must plead and subsequently prove that Defendants' alleged misrepresentations proximately caused Plaintiffs' economic loss.  15 U.S.C. § 78u-4(b)(4); *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  Plaintiffs may not infer causation from the mere fact of loss because a change in "price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."  *Id.* at 342-43.  Thus, plaintiff must allege that "the truth became known," causing the share price to decline.  *Id.* at 347; *see also In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 46 (D. Mass. 2006) (citing *Suez Equity-Investors, L.P. v. Toronto Dominion Bank*, 250 F.3d 87, 96 (2d Cir. 2001).  The court  "need not … accept as true [loss causation] allegations that contradict matters properly subject to judicial notice or by exhibit … [n]or is the court required to accept as true [loss causation] allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. Cal. 2008).

---

[56]     *See also In re Visual Networks, Inc.*, 217 F. Supp. 2d 662, 669 (D. Md. 2002) (non-defendant "key" executives' stock sales "irrelevant" to plaintiffs' attempts to establish scienter); *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d at 898 (failure to allege non-defendant insider made any actionable misstatement rendered his trading "irrelevant" as a basis for inferring scienter); *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 835 (C.D. Cal. 1998) (declining to consider allegations of trading by nondefendants that plaintiff "for whatever reason decided to include in the stock table in the CAC").

The Supreme Court's admonition in *Dura* is especially pertinent here, given that the obvious explanation for FMD's reversals and the decline in the value of Plaintiffs' stock is the downturn in the credit markets and the economy generally. *See* 11-14*, supra.* The Complaint itself is replete with references to declining economic conditions and their effect on First Marblehead.[57] As the Second Circuit has held, "[w]hen the plaintiff's loss coincides with a market wide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994).

Plaintiffs nonetheless allege the conclusion that the "timing and magnitude of FMD's common stock price decline negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct." CAC ¶ 203. They allege instead that five announcements each partially revealed "the truth" about the various "facts" allegedly misrepresented and/or concealed by Defendants, and that these announcements cumulatively removed the prior "inflation" from First Marblehead's stock price (CAC ¶ 201). However, the Complaint does not explain *how* any of these announcements revealed to the market that any prior representation was false, or disclosed to the market any allegedly concealed fact. Plaintiffs do not point to any language within any of these announcements that constituted a "correction" – as opposed to new information, or a new third-party opinion. Nor do Plaintiffs

---

[57]     *See e.g.*, CAC ¶ 121 (citing to an April 26, 2007 press release, which noted that adjustments due to the "current interest rate environment and securitization market" had reduced receivables and securitization revenues"); CAC ¶ 160 (citing to a Dec. 7, 2007 press release, which noted the "uneconomic terms in the current capital markets"); CAC ¶ 159 (citing to a Dec. 5, 2007 TheStreet.com article referring to "heightened credit risk aversion across all asset classes"); CAC ¶ 165 (Mr. Kopnisky, commenting on the results of the second quarter of fiscal 2008 and the six-month period ended Dec. 31, 2007, said "'Even though our business volumes were strong in the second fiscal quarter, earnings were affected by the volatility in the capital markets'"); CAC ¶ 168 (Mr. Kopnisky said in March 2008 that "First Marblehead's management team has been focused on adjusting our business model to manage the challenges presented by the current negative consumer credit cycle and the capital markets credit dislocation").

identify any prior statement that was "corrected." Instead, Plaintiffs appear to rest solely on the theory that the mere *fact* of the downgrades, the decision to issue a lower dividend, and the TERI bankruptcy, collectively, somehow *implicitly* revealed the "scheme" to inflate the stock price to the market.

These allegations are inadequate for five reasons. First, Plaintiffs' conclusion that the loss was not caused by market forces is due no weight. *See supra* at 44. Second, it is impermissible to plead loss causation "in the aggregate." In *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, for example, the court rejected a theory – very much like that relied on here – that the "aggregate of Halliburton's SEC filings, financial statements, press releases, and conferences with analysts artificially inflated the value of Halliburton's stock price … [and that] each of the four disclosures corrected some of the inflation caused by the aggregate of [its] prior statements."[58] 2008 U.S. Dist. LEXIS 89598, at *20 (N.D. Tex. Nov. 4, 2008).

Third, even taking each of the five announcements separately, none supports Plaintiffs' loss causation argument. As noted above, Plaintiffs do not explain how the language in any announcement "corrected" any prior false or misleading statement, but instead appear to contend that anything "negative" that was disclosed must have revealed the "truth." This is not enough. Courts have carefully distinguished between negative disclosures (which these are) and "corrective" disclosures (which these are not). *See In re Initial Public Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (loss causation does not arise out of disclosures that had

---

[58] *Compare* CAC, ¶ 198 ("During the Class Period … Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of First Marblehead's securities … When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of First Marblehead's securities fell precipitously as the prior inflation came out of the Company's stock price").

"a *negative* effect on stock prices, but not a *corrective* effect").[59]  Plaintiffs may not rely on the

speculation that the market implicitly understood a negative disclosure as revealing prior fraud:

> So long as there is a drop in a stock's price, a plaintiff will always be able to contend that the market "understood" a defendant's statement precipitating a loss as a coded message revealing the fraud.  Enabling a plaintiff to proceed on such a theory would effectively resurrect what *Dura* discredited – that loss causation is established through an allegation that a stock was purchased at an inflated price.

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008).[60]

Indeed, applying this principle, courts have held that announcements of bad news quite

similar to that alleged here did not provide the requisite link between a loss and an alleged

misrepresentation.  For instance, in *Lentell v. Merrill Lynch & Co.,* the court held that analyst

downgrades resulting in stock price declines were not corrective disclosures establishing loss

causation, "because they do not reveal to the market the falsity of prior recommendations."  396

F.3d 161, 175 & n.4 (2d Cir. 2005).  Similarly, in *In re Dell, Inc. Sec. Litig.,* Case No. A-06-CA-

726-SS, 2008 U.S. Dist. LEXIS 86054, at *73 (W.D. Tex. 2008), the Court held that

disappointing earnings or expected earnings statements identified by the Plaintiffs failed to

reveal the falsity of any prior representation.

Fourth, Plaintiffs' loss causation theory crumbles when FMD's extensive disclosures are

considered.  *See* Appendix A & Background.  Plaintiffs contend that that undisclosed lower

FICO scores led to undisclosed default rate increases, the credit rating review and changes, and

---

[59]     For example, in issuing its downgrade, Moody's noted the "worse than expected performance of student loans."  CAC ¶ 166.  Commenting on the announcement, Mr. Kopnisky specifically noted the "challenges presented by the current negative consumer credit cycle and the capital markets credit dislocation."  CAC ¶ 168.  Plaintiff offers nothing suggesting that the Moody's announcement disclosed fraud as distinct from worsening market conditions.  *See Dura*, 544 U.S. at 345 (noting that securities statutes aim to deter fraud, not to provide investors with broad insurance against market losses).  The dividend cut decreased investors' cash flow from owning FMD shares.  This plainly is a cause for a price decline that is unrelated to correction of fraud.

[60]     *See also Halliburton*, 2008 U.S. Dist. LEXIS 89598, at *28 (disclosure of change in estimate was "negative" but not "corrective" because it did not reveal that prior estimate was fraudulent); *Glover v. DeLuca*, No. 2:03-cv-0288, 2006 U.S. Dist. LEXIS 76093, at *120-136 (W.D. Pa. Sept. 29, 2006) (disclosure of company's worsening financial condition and eventual bankruptcy not correction of prior statements, thus no loss causation).

the TERI bankruptcy.  *See* CAC ¶¶ 61-89.  But the Trusts disclosed their FICO scores, and FMD and the Trusts disclosed default rates, long before any of the five announcements.  *Supra* at 7-8. As a matter of law and logic, then, the price drops following the announcements reflect new information, not the implicit "correction" of any fraud.  *Halliburton*, 2008 U.S. Dist. LEXIS 89598, at * 13-14 ("Confirmatory statements, or information already known to the market, are deemed not to actually affect the stock price, because an efficient market does not respond to information already known.");  *Catogas v. Cyberonics*, 2008 U.S. App. LEXIS 19258, at *9 (5th Cir. Tex. Sept. 8, 2008) (unpublished opinion) (same).  Plaintiffs also fail to supply facts to make plausible the claim that Class Period credit changes caused a default spike and the TERI bankruptcy.  *See supra* at 8-10, 22-33.

Finally, the absence of any loss causation is compellingly demonstrated by FMD's stock price movements.[61]  Because FMD's share price already had dropped significantly before the fraud allegedly "was gradually revealed," the Court should conclude – "even applying a notice pleading standard" – that "other factors had caused the decline."  *In re Buca, Inc. Sec. Litig.,*. No. 05-1762, 2006 U.S. Dist. LEXIS 75224, at *28 (D. Minn. Oct. 16, 2006); *see also In re Intelligroup Secs. Litig.*, 468 F. Supp. 2d 670, 695 (D.N.J. 2007) (no loss causation because economic forces unrelated to the disclosure at issue consistently drove down stock price prior to that disclosure).  Indeed, this case is even more compelling that *Buca*, because the stock price not only dropped drastically before any "disclosure" but also continued to decline dramatically even in the gaps between supposed "partial disclosures."  *See supra* at 11-14.

FMD's highest closing daily stock price during the Class Period was $55.26.  *See* Ex. 26. Between January 9, 2007 and November 23, 2007, just *before* the first of the series of supposed

---

[61]     *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 n. 8 (2d Cir. 2000) ("the district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment"); *In re Initial Pub. Offering Sec. Litig.*, 383 F. Supp. 2d at 583 (same).

"partial corrective disclosures" that allegedly *began* to remove the "inflation" from the stock price, the price fell steadily to $29.76, a decline of 46 percent. In November alone, the price already had fallen 23.3 percent from $38.52 (the closing price on October 31), before the first alleged "corrective disclosure" late in the month. *See* Ex. 26. Moreover, the stock price decline that continued after November 23, 2007 plainly reflects the continuation of this downward trend and not some new phenomenon – fraud disclosure – as Plaintiffs claim. Between December 10, 2007 and March 26, 2008 – a period during which, according to Plaintiffs, no "fraud" was revealed – the price of FMD stock nonetheless *declined by 52.41%* from $17.61 to $8.38. *See* Ex. 26.[62] There is, in short, no plausible theory explaining Plaintiffs' losses as revelation of fraud.

## IV. PLAINTIFFS' §20(a) CLAIM FAILS

Plaintiffs' § 20(a) "controlling person" claim fails and must be dismissed because they have not adequately pleaded an underlying violation of § 10(b). See *N.J. Carpenters,* 537 F.3d at 58 (*citing ACA Fin. Guaranty Corp v. Advest, Inc.,* 512 F.3d 46, 67-68 (1st Cir. 2008)) ("Because we have found that plaintiffs have not adequately alleged an underlying 10b-5 violation, [plaintiffs' Section 20(a)] claims must fail; *In re Stone & Webster, Inc., Sec. Litig.,* 424 F.3d at 27; *In re Advanta Corp. Sec. Litig.,* 180 F.3d at 541. *See also, e.g., In re Peritus Software Svcs., Inc. Sec. Litig.,* 52 F.Supp. 2d at 230.

---

[62] December 7, 2007 – the date on which an alleged partial revelation of fraud took place – is the only day the effects of this announcement could have been felt. *See In re Polymedica Corp. Sec. Litig.,* 453 F. Supp. 2d 260, 278 (D. Mass. 2006) ("stock price must quickly and fully reflect the release of public information such that ordinary investors cannot profitably trade on the basis of it, requires that the reaction to news be fully completed on the same trading day as its release – and perhaps even within hours or minutes").

## CONCLUSION

For all of these reasons, the Consolidated Amended Complaint should be dismissed with prejudice and without leave to amend.

_/s/ William H. Paine_____

Jeffrey B. Rudman (BBO# 433380)
William H. Paine (BBO# 550506)
Sherry Hartel Haus (BBO# 663777)
Lauren G. Brunswick (BBO# 660996)
Taylor Washburn (BBO# 671857)
WILMER CUTLER PICKERING
   HALE and DORR LLP
60 State Street
Boston, MA 02109
Tel.: (617) 526-6000
Fax: (617) 526-5000

Christopher Davies (admitted *pro hac vice*)
Ryan P. Phair (admitted *pro hac vice*)
WILMER CUTLER PICKERING
   HALE and DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363

Dated: February 9, 2009

**APPENDIX A**

**RELEVANT CLASS PERIOD RISK DISCLOSURES**

1.  *Risk Disclosures Concerning FMD's Revenue Recognition Model for Deferred Structuring Fees and Residuals*

    "In connection with our recognition of revenue from securitization transactions, if the estimates we make, and the assumptions upon which we rely, in preparing our financial statements prove inaccurate, our actual results may vary from those reflected in our financial statements." Ex. 3 at FMD 46.

    "If the actual performance of some or all of the securitization trusts varies from the key assumptions we use, the actual additional structural advisory fees and residuals we receive from the trusts could be significantly less than reflected in our current financial statements, and we may incur a material negative adjustment to our earnings in the period in which our assumptions change. … In particular, economic, regulatory, competitive and other factors affecting prepayment, default and recovery rates on the underlying securitized loan portfolio … could cause or contribute to differences between the actual performance of the securitization trusts and our key assumptions." *Id.*

    FMD referred to the revenue recognition model as a "critical accounting estimate," in part "due to the level of subjectivity and judgment necessary to account for highly uncertain matters or the susceptibility of such matters to change." *Id.* at FMD 70.

    "Increases in our estimates of defaults, prepayments and discount rates, increases in the spread between LIBOR and auction rate indices, as well as decreases in default recovery rates and the multi-year forward estimates of LIBOR would have a negative effect on the value of our additional structural advisory fees and residuals." *Id.* at FMD 72-73.

2.  *Risk Disclosures Concerning TERI*

    - **"If our relationship with TERI terminates, our business could be adversely affected.**

    In June 2001, we purchased the loan processing operations of TERI and entered into a series of agreements to govern future securitizations of TERI-guaranteed loans. TERI continues to provide private student loan guarantee, education information and counseling services for students, and is the exclusive third-party provider of borrower default guarantees for our clients' private label loans. We have entered into an agreement to provide various services for TERI and received fees from TERI for services performed of $106.1 million, or 19% of total service revenue, for fiscal 2006, and $78.2 million or 19% of total service revenue, for fiscal 2005. In addition, we have agreed to undertake on a best-efforts basis to arrange or facilitate securitizations for a limited category of TERI-guaranteed loans and have the right to receive structural advisory and other fees in connection with these securitizations. We also have entered into an agreement to receive from TERI updated information about the performance of the student loans it has guaranteed, to allow us to supplement our database. Each of these agreements with TERI

had an initial term through June 2006. In October 2004, we exercised our option to renew each agreement for an additional five-year term, through June 2011. If our agreements with TERI terminate for any reason, or if TERI fails to comply with its obligations, our business would be adversely affected and the value of our intangible assets could be impaired for the following reasons:

- we may not be able to offer our clients guarantee services from another guarantor and, accordingly, our access to loans and our opportunities to structure securitization transactions may diminish significantly;
- we may not be successful in establishing an arrangement with a third-party to provide the warranties that TERI currently provides to lenders related to origination services. In such case, we may be required to provide such warranties; and
- if TERI is unable to provide guarantee services, any financial guarantee insurance coverage we obtain in securitization transactions could be more costly, if it is available at all.

In such events, demand for our services, including opportunities to structure and facilitate securitization transactions, could decline, which would adversely affect our business. In addition, the value of the loans in the securitization transactions we facilitate could decline and the value of our residuals could be reduced." *Id.* at FMD 49.

"If TERI defaults on its guaranty obligations, and you own any class of notes, you will primarily rely on payments from the related borrower for payments on the related private school loan and, to a limited extent, on guaranty fees paid to TERI but deposited in the TERI pledge fund and pledged by TERI to secure its guaranty obligations. In that event, you will bear the risk of loss … ." Ex. 18 at FMD 340.

- **"Our business could be adversely affected if TERI's ratings are downgraded.**

In its role as guarantor in the private education lending market, TERI agrees to reimburse lenders for unpaid principal and interest on defaulted loans. TERI is the exclusive provider of borrower default guarantees for our clients' private label loans. As of June 30, 2006, TERI had a Baa3 counterparty rating from Moody's Investors Service, which is the lowest investment grade rating, and an insurer financial strength rating of A+ from Fitch Ratings. If these ratings are lowered, our clients may not wish to enter into guarantee arrangements with TERI. In addition, we may receive lower structural advisory fees because the costs of obtaining financial guarantee insurance for the asset-backed securitizations that we structure could increase. Finally, the inability of TERI as student loan guarantor to meet its guaranty obligations could reduce the amount of principal or interest paid to the holders of asset-backed securities, which could adversely affect our residual interests in securitization trusts or harm our ability to structure securitizations in the future. In each such case, our business would be adversely affected." Ex. 3 at FMD 50.

"Any downgrade in the ratings assigned to your notes could result in a decline in the market value and liquidity of your notes. … Amounts received with respect to the trust

student loans may vary both in timing in amount from the payments actually due … for a variety of economic, social and other factors, including both individual factors, such as additional periods of deferral or forbearance …, and general factors such as a general economic downturn which could increase the amount of defaulted trust student loans. Failures by borrowers to pay timely … will affect the amount of trust revenues, which may reduce the amount … available to be paid to holders of the notes.  In addition, failures by borrowers to pay timely … could obligate TERI as student loan guarantor to make payments thereon, which could adversely affect the solvency of TERI and its ability to meet guaranty obligations. … The funds in the TERI pledge fund may not be sufficient. … Additionally, if TERI were to become subject to any insolvency proceeding, delays in payments of collections on trust student loans to the holders of notes could occur, or … reductions or delays in the amount of payments could result." Ex. 18 at FMD 343, 345.

3.      *Risk Disclosures Concerning the Impact of any Inability to Structure Securitizations*

"We derive a significant portion of our revenue and substantially all of our income from structuring securitization transactions; our financial results and future growth would be adversely affected if we are unable to structure securitizations."  Ex. 3 at FMD 45.

"A number of factors, some of which are beyond our control, may adversely effect our securitization activities," including: "degradation of the credit quality or performance of the loan portfolios in the trusts we structure, which could reduce or eliminate investor demand for future securitizations we facilitate; prolonged volatility in the capital markets general or in the student loan sector specifically, which could restrict or delay our access to the capital markets; … and any material downgrading or withdrawal of ratings given to securities in securitizations we structured, or any occurrence of an event of default with respect to such securities, which could reduce demand for additional securitizations that we structure."  *Id.*

## CERTIFICATE OF SERVICE

I, William H. Paine, hereby certify that on this 9th day of February, 2009, this document, filed through the ECF system, will be sent electronically to the registered participants of record as identified on the Notice of Electronic Filing.

_/s/ William H. Paine_
William H. Paine