**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

IN RE THE FIRST MARBLEHEAD          )     LEAD CASE NO. 08-10612-JLT
CORPORATION SECURITIES LITIGATION   )
_____  )

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND ................................................................................ 3

    A.    The Fraud In Connection With First Marblehead's Credit Guidelines, Defaults, And Inability To Securitize Loans ........................................... 3

    B.    First Marblehead's Relationship With TERI ...................................... 8

    C.    The Truth Is Slowly Revealed About First Marblehead's Financial Situation ............................................................................................ 10

ARGUMENT ....................................................................................................... 11

    A.    Standard Of Review On A Motion To Dismiss .................................. 11

    B.    Defendants' Claimed "Disclosures" Do Not Support A Motion To Dismiss ........ 12

        1.    The Trusts' SEC Filings Do Not Support a Truth on the Market Defense ............................................................................... 14

    C.    The False Statements And Omissions Are Sufficiently Identified And Rule 9(b) And The PSLRA Have Been Satisfied ................................. 17

    D.    Confidential Sources Are Adequately Identified ................................ 20

    E.    The Complaint Pleads A Strong Inference Of Scienter ....................... 23

        1.    The Strong Inference of Scienter Standard ............................ 24

        2.    The Complaint Pleads a Strong Inference of Scienter Because Defendants Ignored Internal Information That Contradicted Their Public Statements ................................................................. 25

        3.    The Inference of Scienter is Strengthened by the Core Business Doctrine ............................................................................... 27

        4.    The Complaint's Insider Trading Allegations Also Contribute to the Strong Inference of Scienter .......................................... 29

    F.    Plaintiffs Have Sufficiently Pled Loss Causation .............................. 31

        1.    To Plead Loss Causation After *Dura,* Plaintiffs Need Only Provide a Short, Plain Statement Consistent with Fed. R. Civ. P. 8(a)(2) ... 32

        2.    A Plaintiff Need Not Allege That the Cause of the Stock Drop Was an Explicit Disclosure (Amounting to a Confession) That a Fraud Has Occurred ....................................................................... 33

        3.    The Court Should Not Entertain Defendants' Inappropriate Factual Arguments at the Motion to Dismiss Stage ............................ 38

    G.    Defendants' False And Misleading Statements And Omissions Were Not Accompanied By Meaningful Cautionary Language ......................... 39

H.     The Complaint Adequately Pleads A Claim Of Control Person Liability
       Under § 20(a) Of The Exchange Act ....................................................................40

CERTIFICATE OF SERVICE ..........................................................................................................43

# TABLE OF AUTHORITIES

<u>CASES</u>

*ACA Financial Guaranty Corp. v. Advest, Inc.*,
    512 F.3d 46 (1st Cir. 2008) ................................................................................................ 24

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) ................................................................................... 11, 12, 18

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,
    No. 3:02-CV-1152-M, 2008 U. S. Dist. LEXIS 89598 (N.D Tex. Nov. 4, 2008) ................ 31

*Backman v. Polaroid Corp.*,
    910 F.2d 10 (1st Cir. 1990) ................................................................................................ 20

*Bell Atlantic Corp. v. Twombly*,
    127 S. Ct. 1955 (2007) ........................................................................................................ 11

*Brumbaugh v. Wave Systems Corp.*,
    416 F. Supp. 2d 239 (D. Mass. 2006) ................................................................... 32, 33, 36

*Caremark, Inc. v. Coram Healthcare Corp.*,
    113 F.3d 645 (7th Cir. 1997) .............................................................................................. 33

*Cooperman v. Individual, Inc.*,
    171 F.3d 43 (1st Cir. 1999) ................................................................................................ 12

*Cosmas v. Hassett*,
    886 F.2d 8 (2d Cir. 1989) .............................................................................................. 27, 28

*Crowell v. Ionics, Inc.*,
    343 F. Supp. 2d 1 (D. Mass. 2004) ............................................................................... 28, 41

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005) .......................................................................................... 31, 32, 34

*EP Medsystems, Inc. v. Echocath, Inc.*,
    235 F.3d 865 (3d Cir. 2000) ............................................................................................... 39

*Epstein v. Itron, Inc.*,
    993 F. Supp. 1314 (E.D. Wash. 1998) ............................................................................... 28

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) .............................................................................................. 20

*Fitzer v. Security Dynamics Technologies, Inc.*,
    119 F. Supp. 2d 12 (D. Mass. 2000) .................................................................................. 23

*Freeland v. Iridium World Communications, Ltd.*,
    545 F. Supp. 2d 59 (D.D.C. 2008) ....................................................................... 14, 35, 37

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) .......................................................................................... 14, 16

*Gebhardt v. ConAgra Foods, Inc.*,
   335 F.3d 824 (8th Cir. 2003) ........................................................................ 39

*Glassman v. Computervision Corp.*,
   90 F.3d 617 (1st Cir. 1996) ......................................................................... 25

*Greater Pennsylvania Carpenters Pension Fund v. Whitehall Jewelers, Inc.*,
   No. 04 C 1107, 2005 U.S. Dist. LEXIS 376 (N.D. Ill. Jan. 10, 2005) ................... 35

*Greebel v. FTP Software, Inc.*,
   194 F.3d 185 (1st Cir. 1991) .................................................................. passim

*Gross v. Summa Four, Inc.*,
   93 F.3d 987 (1st Cir. 1996) ......................................................................... 20

*Huddleston v. Herman & MacLean*,
   640 F.2d 534 (5th Cir. 1981) ....................................................................... 40

*In re Allaire Corp. Securities Litigation*,
   224 F. Supp. 2d 319 (D. Mass. 2002) ........................................................... 39

*In re Atlas Air Worldwide Holdings, Inc. Securities Litigation*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004) ........................................................... 28

*In re Biogen Securities Litigation*,
   179 F.R.D. 25 (D. Mass. 1997) .................................................................... 20

*In re Bradley Pharmaceuticals, Inc. Securities Litigation*,
   421 F. Supp. 2d 822 (D.N.J. 2006) .............................................................. 35

*In re Bristol-Myers Squibb Securities Litigation*,
   No. Civ.A. 00-1990 (SRC), 2005 U.S. Dist. LEXIS 18448 (D.N.J. Aug. 17, 2005) ............ 33

*In re Cabletron Systems, Inc.*,
   311 F.3d 11 (1st Cir. 2002) .................................................................. passim

*In re Cardinal Health Securities Litigation*,
   426 F. Supp. 2d 688 (S.D. Ohio 2006) ......................................................... 36

*In re Cigna Corp. Securities Litigation*,
   459 F. Supp. 2d 338 (E.D. Pa. Aug. 18, 2006) ............................................... 36

*In re Convergent Technologies Securities Litigation*,
   948 F.2d 507 (9th Cir. 1981) ...................................................................... 40

*In re Countrywide Financial Corp. Securities Litigation*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) .................................................... 15, 16

*In re Credit Suisse-AOL Securities Litigation*,
   465 F. Supp. 2d 34 (D. Mass. 2006) .................................................. 13, 14, 31, 32

*In re Enron Corp. Securities, Derivative & "Erisa" Litigation*,
   No. MDL-1446, 2005 U.S. Dist. LEXIS 41240 (S.D. Tex. Dec. 22, 2005) ................. 35

*In re eSpeed, Inc. Securities Litigation*,
   457 F. Supp. 2d 266 (S.D.N.Y. 2006) ........................................................... 33

*In re Flag Telecom Holdings, Ltd. Securities Litigation*,
245 F.R.D. 147 (S.D.N.Y. 2007) ........................................................................ 35

*In re Gilead Sciences Securities Litigation*,
536 F.3d 1049 (9th Cir. 2008) ........................................................................... 32

*In re Honeywell International Securities Litigation*,
182 F. Supp. 2d 414 (D.N.J. 2002) .................................................................... 17

*In re ICG Communications, Inc. Securities Litigation*,
No. 1:00 CV 01864, 2006 U.S. Dist. LEXIS 6695 (D. Colo. Feb. 7, 2006) .......... 34

*In re IMAX Securities Litigation*,
587 F. Supp. 2d 471 (S.D.N.Y. Sept. 16, 2008) ................................................. 38

*In re Immune Response Securities Litigation*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) ................................................................ 40

*In re Initial Public Offering Securities Litigation*,
241 F. Supp. 2d 281 (S.D.N.Y. 2003) ................................................................ 37

*In re Motorola Securities Litigation*,
No. 03 C 287, 2004 U.S. Dist. LEXIS 18250 (N.D. Ill. Sept. 10, 2004) ........ 14, 37

*In re NTL Inc. Securities Litigation*,
347 F. Supp. 2d 15 (S.D.N.Y. 2004) .................................................................. 17

*In re NTL, Inc. Securities Litigation*,
02 Civ. 3013 (LAK) (AJP), 2006 U.S. Dist. LEXIS 5346 (S.D.N.Y. Feb. 14, 2006) ........... 35

*In re PLC Systems, Inc. Securities Litigation*,
41 F. Supp. 2d 106 (D. Mass. 1999) .................................................................. 20

*In re Prudential Securities Ltd. Partnerships Litigation*,
930 F. Supp. 68 (S.D.N.Y. 1996) ...................................................................... 40

*In re Seitel, Inc. Securities Litigation*,
447 F. Supp. 2d 693 (S.D. Tex. 2006) ............................................................... 34

*In re StockerYale Securities Litigation*,
453 F. Supp. 2d 345 (D.N.H. 2006) ............................................................. 31, 38

*In re Stone & Webster, Inc. Securities Litigation*,
414 F.3d 187 (1st Cir. 2005) ................................................................. 18, 19, 21

*In re Tyco International, Ltd.*,
236 F.R.D. 62 (D.N.H. 2006) ............................................................................ 31

*In re Tyco International, Ltd.*,
MDL-02-1335-B, 2004 U.S. Dist. LEXIS 20733 (D.N.H. Oct. 14, 2004) ............ 17

*In re Williams Securities Litigation*,
496 F. Supp. 2d 1195 (N.D. Okla. 2007) ........................................................... 39

*In re Winstar Communications*,
01 CV 3014 (GBD), 01 CV 11522, 2006 U.S. Dist. LEXIS 7618 (S.D.N.Y. Feb. 27,
2006) ................................................................................................................ 35

*In re Xerox Corp. Securities Litigation*,
   165 F. Supp. 2d 208 (D. Conn. 2001)................................................... 20

*Lucia v. Prospect Street High Income Portfolio, Inc.*,
   36 F.3d 170 (1st Cir. 1994)............................................................ 20

*Makor Issues & Rights, Ltd v. Tellabs, Inc.* ("*Tellabs II*"),
   513 F.3d 702 (7th Cir. 2008) ..................................................... 23, 28

*Mallozi v. Zoll Medical Corp.*,
   No. 94-11579, 1996 U.S. Dist. LEXIS 22953 (D. Mass. Mar. 5, 1996)................................ 37

*McCabe v. Ernst & Young, LLP*,
   Civ. No. 01-5747 (WHW), 2006 U.S. Dist. LEXIS 524 (D.N.J. Jan. 6, 2006)...................... 34

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
   547 U.S. 71 (2006)....................................................................... 11

*Mississippi Public Employees' Retirement System v. Boston Scientific Corp.*,
   523 F.3d 75 (1st Cir. 2008)................................................... passim

*Nathel v. Siegal*,
   No. 07 Civ. 10956 (LBS), 2008 U.S. Dist. LEXIS 86297 (S.D.N.Y. Oct. 20, 2008) ........... 38

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)............................................ 20, 21, 23, 26

*Ong ex rel. Ong v. Sears, Roebuck & Co.*,
   459 F. Supp. 2d 729 (N.D. Ill. 2006) .......................................... 35

*Oscar Private Equity Investments v. Allegiance Telecom, Inc.*,
   487 F.3d 261 (5th Cir. 2007) .................................................. 31

*Primavera Familienstiftung v. Askir*,
   130 F. Supp. 2d 450 (S.D.N.Y. 2001).......................................... 39

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ................................................ 29

*Roeder v. Alpha Industries, Inc.*,
   814 F.2d 22 (1st Cir. 1987)..................................................... 12

*Rubinstein v. Collins*,
   20 F.3d 160 (5th Cir. 1994) ................................................... 29

*Ryan v. Flowserve Corp.*,
   444 F. Supp. 2d 718 (N.D. Tex. 2006) ..................................... 31, 33

*Schaffer v. Timberland Co.*,
   924 F. Supp. 1298 (D.N.H. 1996)............................................ 14, 37

*Sekuk Global Enterprises v. KVH Industries, Inc.*,
   C.A. No. 04-306ML, 2005 U.S. Dist. LEXIS 16628 (D.R.I. Aug. 11, 2005) ...................... 32

*Serabian v. Amoskeag Bank Shares, Inc.*,
   24 F.3d 357 (1st Cir. 1994)...................................... 23, 25, 27

*Shaw v. Digital Equipment Corp.*,
  82 F.3d 1194 (1st Cir. 1996) ................................................................ 12, 30

*Sterling Heights Police & Fire Retirement System v. Abbey National, PLC*,
  423 F. Supp. 2d 348 (S.D.N.Y. 2006) ........................................................ 28

*Stumpf v. Garvey* (*In re TyCom Ltd. Securities Litigation*),
  No. 03-CV-1352, 2005 U.S. Dist. LEXIS 19154 (D.N.H. Sept. 2, 2005) ...................... 32, 38

*Sundstrand Corp. v. Sun Chemical Corp.*,
  553 F.2d 1033 (7th Cir. 1977) ............................................................... 24

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier Inc.*,
  No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506 (S.D.N.Y. 2005) ..................... 14, 36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  127 S. Ct. 2499 (2007) ................................................................... 11, 24

*Virginia Bankshares v. Sandberg*,
  502 U.S. 1083 (1991) ......................................................................... 40

*Warshaw v. Xoma Corp.*,
  74 F.3d 955 (9th Cir. 1996) .................................................................. 20

*Winters v. Steinberg*,
  529 F. Supp. 2d 237 (D. Mass. 2008) .......................................................... 40

## STATUTES

15 U.S.C. § 78u-4 ............................................................................ 12, 18

15 U.S.C. § 78u-4(b)(1) ......................................................................... 12

## RULES

Fed. R. Civ. P. 8(a)(2) ...................................................................... 11, 32

Fed. R. Civ. P. 9(b) ........................................................................... 11

Plaintiffs respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss the Amended Class Action Complaint (the "Complaint") pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b).

## PRELIMINARY STATEMENT

This case is about a company that deceptively held itself out to investors as a growing student loan facilitator and securitizer of such loans. During the Class Period, First Marblehead claimed continuing success in securitizing loans and increasing profits by implementing strong credit guidelines governing borrowers, lessening default risks by using a proprietary database, and relying on its related student loan guarantor to remain solvent. Instead, the Company implemented an "Expanded Tier Program" that allowed students with lower credit ratings to borrow money. Even though First Marblehead's risk management department raised concerns about lowering credit criteria, the Company's management generally overlooked these concerns. Even when loan defaults and cancellations began to rise, in 2007, First Marblehead continued with its optimistic forecasts, refusing to acknowledge that these problems were affecting its ability to reap back-end residuals from securitization deals and, indeed, its ability to put together future securitizations.

First Marblehead knew that the guarantor for many of the loans it facilitated and securitized, TERI, was coming under increasing financial pressure because of the rise in default rates, yet hid this information from investors. By the end of 2007 until the end of the Class Period, when TERI declared bankruptcy, Defendants were well aware of TERI's precarious financial situation.

During the Class Period, First Marblehead's stock price went from a high of $57.56 per share to a low of $4.89 because of disclosures about its increasingly dim financial outlook. Like every securities fraud defendant in the past year, Defendants adopt a "we didn't see the financial

1

crisis coming" defense, eschewing any responsibility for shareholder losses.  However, the Complaint alleges with particularity Defendants' material misstatements and omissions, scienter, and loss causation.

Defendants rely on a "truth on the market" defense to argue that it did disclose what the Complaint alleges was not.  However, Defendants rely primarily on SEC filings made by the securitization trusts (the "Trusts") that First Marblehead set up through a subsidiary, and which were separate and distinct from the Company.  The law is clear that such "disclosures" by separate Trust entities are not sufficient to defeat a motion to dismiss against the Company. Plaintiffs also have sufficiently identified the false statements and omissions Defendants made, and have identified confidential sources who have corroborated each other's and the Complaint's allegations.  Plaintiffs additionally have pled a strong inference of scienter because Defendants ignored internal information that contradicted their public statements and engaged in insider trading.  The strong inference of scienter is also bolstered by the core business doctrine recognized by the First Circuit.

Plaintiffs sufficiently pled loss causation because they have provided a short, plain statement of the claim showing that Plaintiffs are entitled to relief.  None of Defendants' ostensible "cautionary statements" fall within the safe harbor exception, as Defendants claim. Finally, because Plaintiffs adequately have pled a § 10(b) claim and the elements of control person liability under § 20 of the Exchange Act, Defendants' motion to dismiss should be denied in its entirety.

## FACTUAL BACKGROUND

**A.    The Fraud In Connection With First Marblehead's Credit Guidelines, Defaults, And Inability To Securitize Loans**

First Marblehead, along with its subsidiaries,[1] provides outsourcing services for private education lending in the United States.  (¶ 32.)[2]  It provides an integrated suite of design, implementation, and securitization services for student loan programs to national and regional financial institutions, as well as businesses, education loan marketers, and other enterprises. (¶ 32.)  Student loan borrowers are generally students with minimal income and assets, with thin credit histories.  (¶ 35.)  The loans are generally 20-year terms and are not backed by collateral. (¶ 35.)  Thus, the risk of default is high.  (¶ 35.)

First Marblehead claimed to be able to profitably underwrite and securitize these loans by maintaining a rigid policy of screening out applicants with FICO credit scores lower than 700. (¶ 36.)  It claimed to lessen the risk of default on the loans by using a proprietary database containing more than 20 years' worth of payment histories of student borrowers.  (¶ 37.)  First Marblehead claimed that screening out loan applicants with FICO credit scores under 700 and using the proprietary database to understand past student borrowers' behavior enabled it to predict future payment behavior and minimize risks of default and cancellation.  (¶ 37.)

The Company considers itself a "leader" in the securitization of private student loans and derived a significant amount of revenue from the securitizations.  (¶ 40.)  First Marblehead is compensated for its securitization services by (1) up-front structural advisory fees that are paid

---

[1] First Marblehead conducts business through the following direct or indirect subsidiaries: First Marblehead Education Resources, Inc.; GATE Holdings, Inc.; The National Collegiate Funding LLC; First Marblehead Data Services, Inc.; First Marblehead Securities Corporation I and II; TERI Marketing Services, Inc.; Union Federal Savings Bank; and UFSB Private Loan SPV, LLC.  (¶ 32 n.2.)

[2] All paragraph references (¶ ___) are to the Amended Class Action Complaint unless otherwise noted.

when a securitization trust purchases the loans and a back-end right to an additional structural advisory fee based on the amount of loans outstanding in the trust over the life of the trust; (2) a second contingent back-end right from a residual interest, if such an interest was created by the trust; and (3) administrative fees from the trusts ranging from 5 to 20 basis points per year of the student loan balance in trust.  (¶ 41.)

First Marblehead recognized up-front structural advisory fees as revenue when the securitization trust purchased the loans and the administrative fees on a monthly basis.  (¶ 42.) Both of these fees were objectively measurable.  (¶ 42.)  However, the Company also assigned a value to back-end rights it recognized as revenue at the time of securitization, even though the value of these rights were unknown and not objectively measurable at the time of securitization. (¶ 43.)  First Marblehead assigned a value to these back-end rights by, *inter alia*, estimating the dollar amount of future student loan prepayments over the 20-year loans, the amount of loan defaults and loan default recoveries over the span of the loans, and then discounting these amounts to a present value.  (¶ 44.)  The Company's estimates used to assign value to its back-end future cash were based on its "proprietary historical data, third-party data and [its] industry experience, adjusting for specific program and borrower characteristics such as loan type and borrower creditworthiness."  (¶ 46.)  It also claimed to "monitor trends in loan performance over time and make adjustments we believe are necessary to value properly our receivables balances at each balance sheet date." (¶ 46.)  But because the historical data First Marblehead used to value its back-end rights was "proprietary," there was no way for the investment community to objectively determine whether the value assigned to these back-end rights was reasonable. (¶ 47.)  The Company repeatedly represented that it did not believe that it was necessary to alter

its assumptions regarding the value of its back-end payments, and did not alter its assumptions except for minor changes in its prepayment assumptions and discount rate applied.  (¶ 48.)

In 2005, Defendant Kopinsky took over as CEO and First Marblehead began a much more aggressive approach to facilitating student loans, according to a Former Senior Vice President for Applications Development.  (¶ 61.)  One of the programs Kopinsky advocated was an "Expanded Tier Program" that catered to students with lower credit ratings.  (¶ 62.)  The Former VP for Applications described this approach as "going downstream" in order to expand loan volume and maximize securitization profitability.  (¶ 62.)

A Former Senior Process Analyst confirmed the existence of the Expanded Tier Program; he stated that Kopinsky implemented a program in 2006 under which students with bad credit were allowed to take up to three lifetime loans with a maximum of $4,000 granted per loan. (¶ 63.)  The Former Process Analyst stated that the Company's credit rules were being "bent" and that the program provided criteria that allowed applicants to take out excessive loans with terms beyond First Marblehead's historical criteria.  (¶ 63.)  According to the Former VP for Applications, First Marblehead's risk management department raised concerns about lowering credit guidelines, but these concerns were generally overlooked by management.  (¶ 65.)  At executive meetings attended by the Former VP of Applications, the focus was not on corporate strategy and risk management, but rather on "hitting numbers" and meeting Wall Street expectations.  (¶ 65.)  The Expanded Tier Program allowed First Marblehead to reap significant short-term financial rewards from securitizations, but at the same time exposed the Company to potentially devastating risks if problems arose during repayment of the loans.  (¶ 64.)

In a January 25, 2007 conference call, Defendant Kopinsky emphasized First Marblehead's "rigid" screening policy applied to evaluating applications for loans, stating that

the FICO scores of the borrowers of the facilitated and securitized loans "remain pretty consistently in that 710 to 720 range." (¶ 114.)  In a press release on April 26, 2007, First Marblehead reported slight changes in its prepayment and discount rate assumptions in valuing its back-end receivables, but mentioned no such change in outlook for default or forbearance rates. (¶¶ 121-122.)  On June 6, 2007, Defendant Tarr again emphasized First Marblehead's "strict underwriting criteria" and stated that "the typical private loan borrower in the programs we administer is an undergraduate student with a 50-year-old parental cosigner with an average FICO score in excess of 700." (¶ 129.)

Risk Management's concerns about the lower credit guidelines began to be justified beginning in 2007. (¶ 66.)  A Former Loan Funding Division Manager stated that, beginning in early 2007, the Company saw a sharp increase in disbursement volumes. (¶ 67.)  The most important data tracked by the Loan Funding Division was the cancellation rate on loans. (¶ 67.) According to this Former Loan Manager, as disbursement volumes were escalating, the cancellation rates were increasing "even faster" in reports he began producing in early 2007. (¶ 68.)  He submitted these reports to his supervisor, who in turn sent them to upper management, including Defendant Baumer. (¶ 68.)  The Former Loan Manager tried to predict the number of cancellations for a given period given the historical figures the Company used, but found such predictions exceedingly unreliable. (¶ 69.)  The cancellation data did, however, jump remarkably in 2007. (¶ 69.)  Beginning in summer 2007, the Former Loan Manager said that the cancellation rates went "off the charts." (¶ 70.)  Between July 2006 and July 2007, cancellations increased 174%. (¶ 70.)  In September 2007, the former Loan Manager said the problem was "huge," with 5,000 cancellations in that month alone. (¶ 70.)

Default rates also began to rise dramatically in 2007.  (¶ 71.)  According to the Former Chief Information Security Officer employed at First Marblehead ("Former CISO") from 2004 through 2008, the Company's default rates were soaring because the Company drastically lowered its credit guidelines to increase loan volume.  (¶ 71.)  According to the Former CISO, the Company had essentially dropped all of its credit criteria.  (¶ 71.)

Another confidential source, the Former Supervisor in the Borrower Output Division, said that the Company told employees at an annual reporting meeting in August 2007 that default rates and fraud rates were increasing.  (¶ 72.)  This was confirmed by a Former Business Development Relationship Manager who worked at the Company from 2006-2008.  (¶ 73.)  According to him, by late 2007 there was a growing awareness among employees in the Company that First Marblehead's forecasting models were no longer able accurately to predict default and cancellation rates.  (¶ 73.)

The increases in cancellation and default rates put First Marblehead in dire financial straits by the end of 2007.  (¶ 74.)  According to the Former VP of Applications, the Company was intentionally concealing its default numbers in December 2007.  (¶ 74.)  Although the Company was publicly disclosing default rates of about 8%, the actual default rate on its securitized loans was approaching about 16%.  (¶ 74.)  These numbers were confirmed by the Former CISO, who said that by the end of 2007 and beginning of 2008, the default rates had climbed as high as 14-15%, and that risk management employees had projected default rates as high as 18% in the short term.  (¶ 74.)

First Marblehead's upper management was aware of the negative cancellation and default rate trends caused by the Company's lower credit criteria.  (¶ 74.)  The Former Loan Manager's reports were received by upper management, including Defendant Baumer.  (¶ 68.)  Also, the

Former CISO confirmed that loan assumptions and default rates were monitored by analyzed by the Risk Management Department; both reported directly to Defendant Baumer, the Company's Chief Risk Officer.  (¶ 75.)

### B.  First Marblehead's Relationship With TERI

Many of the student loans that First Marblehead facilitated and securitized were guaranteed by The Education Resources Institute (TERI).  TERI agreed to reimburse student loan lenders for all unpaid principal and interest on defaulted student loans in exchange for a fee based on the loan type and risk profile of the borrower.  (¶ 52.)  TERI operated out of First Marblehead's office space during the class period.  (¶ 53.)  Moody's ratings service questioned whether the two entities were actually separate.  (¶ 53.)  First Marblehead also purchased TERI's operating assets in 2001 and agreed to "manage TERI portfolio risk profile and recommend guarantee fee structure," provide "default management services," perform "default prevention, default processing and administrative services," and "guarantee claims management and administrative services."  (¶ 53.)  During the Class Period, TERI was required to maintain an escrow, or "Pledged Account," to secure TERI's obligation to purchase defaulted student loans it had guaranteed.  (¶ 54.)  Thus, excessive reduction in the amount of funds TERI deposited into the Pledged Accounts would adversely affect its credit rating.  (¶ 56.)  Under First Marblehead's "strategic relationship" with TERI begun in 2001, First Marblehead acquired TERI's historical database and loan processing operations, and 161 members of TERI's staff became First Marblehead employees.  (¶ 57.)

TERI and First Marblehead were so interconnected that an outsider "would think that they were the same company," according to a Former Business Development Analyst employed at First Marblehead from 2006-2007.  (¶ 78.)  The Former VP for Applications said that in addition to sharing office space, First Marblehead's IT department "supported TERI's general

8

ledger" and that executives from the two companies frequently met.  (¶ 79.)  The Former VP for Applications also confirmed that First Marblehead executives and certain employees had access to all of TERI's financial data (the "Guarantee Database"), which held data about the history of each individual loan facilitated by First Marblehead and guaranteed by TERI.  (¶ 80.)  In addition, certain First Marblehead employees shared dual roles in the companies.  (¶ 81.)  The Former CISO stated that he and several other First Marblehead employees would identify themselves as "an agent of TERI" in some interactions with outside parties.  (¶ 81.)  Thus, it is clear that financial information flowed freely between the two companies.  (¶ 81.)

During the Class Period, however, the relationship between First Marblehead and TERI became antagonistic.  (¶ 82.)  The Former VP for Applications described the relationship as "almost hostile," while the Former CISO described the dealings between the two companies as a "bad marriage."  (¶ 82.)  In November 2007, Defendant Baumer informed the Former CISO that the Company was beginning to see a real trend in loan defaults as a result of the relaxed credit criteria.  (¶ 83.)  The Former CISO said that the TERI trust was modeled to accommodate only a 6-8% default rate, while First Marblehead was experiencing roughly double those figures. (¶ 83.)  He also stated that it was clear to First Marblehead executives by November 2007 that TERI would have major solvency issues if the negative default trends continued.  (¶ 84.)  Thus, First Marblehead executives were aware of TERI's cash position months before it filed for bankruptcy in April 2008.  (¶ 84.)

Indeed, the Former CISO stated that Defendants Kopinsky and Tarr met with TERI's CEO, Willis Hullings, in December 2007, at which time Hullings told Defendants Kopinsky and Tarr that TERI was running out of funds because of a systemic increase in loan defaults.  (¶ 85.) On behalf of TERI, Hullings asked Defendants Kopinsky and Tarr for a cash infusion to

maintain TERI's operations. (¶ 85.) Defendants Kopinsky and Tarr ignored Hullings' warnings and refused to offer TERI any financial assistance, and TERI filed for bankruptcy in April 2008. (¶ 85.)

### C.   The Truth Is Slowly Revealed About First Marblehead's Financial Situation

Throughout the Class Period, Defendants reported quarter after quarter of seemingly strong financial results while boasting about the Company's ability to complete additional securitizations. (¶ 2.) As a result of Defendants' statements, First Marblehead stock traded as high as $57.56 per share during the Class Period. (¶ 2.) But on November 26, 2007, an analyst downgraded First Marblehead after reviewing TERI's finances in light of Fitch Ratings, Ltd.'s downgrade of TERI's credit and concluded that TERI did not have enough cash to buy all the guaranteed loans that were going to be in default. (¶¶ 149-150.) On this news, First Marblehead's stock price dropped approximately 10%. (¶ 151.)

Then, on December 4, 2007, Moody's Investors Service announced that it might lower ratings on $822 million of securities facilitated by the Company between 2003 and 2007. (¶ 4.) Moody's stated that loans originated through First Marblehead's "direct to-consumer channel appear to default at a significantly higher rate compared to loans originated through school financial aid offices." (¶ 152.) In response to this news, a First Marblehead spokesperson stated that "[w]e have been monitoring our portfolio and its remains within our expectations." (¶ 154.)

On December 5, 2007, Moody's announced that it might lower ratings on an additional $113 million of securities the Company had facilitated. (¶ 5.) With these announcements, the price of First Marblehead stock plunged 20.2%, to $19.93. (¶ 155.) Then, on December 7, 2007, the Company announced that it would cut its dividend by 56% and would not securitize any loans during the quarter; its share price dropped more than 10% to $15.89. (¶ 161.) TERI filed

for bankruptcy protection on April 7, 2008, after the markets closed; on April 8, First

Marblehead stock sank to $4.89, a decline of 36.5% from the day before.  (¶ 171.)

## ARGUMENT

### A.    Standard Of Review On A Motion To Dismiss

As accentuated in the first sentence of *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.

Ct. 2499 (2007), the Supreme Court "has long recognized that meritorious private actions to

enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and

civil enforcement actions."  *Id.* at 2504.  "'[P]rivate securities litigation [i]s an indispensable tool

with which defrauded investors can recover their losses' – a matter crucial to the integrity of

domestic capital markets."  *Id.* at 2508 n.4 (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc.*

*v. Dabit*, 547 U.S. 71, 81 (2006)).

Under Federal Rule of Civil Procedure 8(a), to successfully state a claim, a plaintiff is

required merely to set forth "a short and plain statement of the claim showing that the pleader is

entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Federal Rule of Civil Procedure 9(b) sets forth an

exception to this "notice pleading" standard, providing that "[i]n alleging fraud or mistake, a

party must state with particularity the circumstances constituting fraud or mistake.  Malice,

intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R.

Civ. P. 9(b).

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6),

the Court must take the well-pleaded allegations in the complaint as true, and make all

reasonable inferences in favor of the plaintiff.  *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st

Cir. 2002); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 191 (1st Cir. 1991).  To survive a

motion to dismiss, the facts alleged need only "be enough to raise a right to relief above the

speculative level."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007).  Additionally, a

court may not decide questions of fact when ruling on a motion to dismiss. *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir. 1987).

The Private Securities Litigation Reform Act ("PSLRA") imposes heightened pleading requirements on claims of securities fraud under the 1934 Act. *See* 15 U.S.C. § 78u-4. The First Circuit has held, however, that the "PSLRA did not alter this circuit's [already] rigorous reading of the standards for pleading fraud" under Federal Rule of Civil Procedure 9(b). *Aldridge*, 284 F.3d at 78 (citing *Greebel*, 194 F.3d at 193-94). Accordingly, a plaintiff in a federal securities fraud action is required to "specify each allegedly misleading statement or omission," including its time, place, and content. *Id.* The plaintiff must also provide factual support for the claim that the statements or omissions were fraudulent, and when claims are brought "on information and belief, he must set forth the source of the information and the reasons for the belief." *Id.* (internal quotation marks omitted); *see also* 15 U.S.C. § 78u-4(b)(1). Nevertheless, the First Circuit "has said repeatedly that the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 33 (1st Cir. 2002) (citing *Cooperman v. Individual, Inc.*, 171 F.3d 43, 48-49 (1st Cir. 1999); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1225 (1st Cir. 1996)).

Viewed against this backdrop, the allegations of the Complaint, when considered in their entirety, evidence a right to relief that is far from speculative, necessitating the denial of Defendants' Motion to Dismiss.

### B.       Defendants' Claimed "Disclosures" Do Not Support A Motion To Dismiss

Defendants' primary argument in support of dismissal is that First Marblehead adequately disclosed information concerning its various Trusts' loan assets, FICO scores of borrowers, and default and delinquency rates, among other things, in its Trusts' SEC filings. (*See, e.g.*, Defs.' Br. 1, 3-4, 7-10, 17-18, 25-26.) For example, Defendants claim that "nearly

everything that Plaintiffs allege not to have been disclosed was, in fact, disclosed" (*id.* at 1);

"[t]he Complaint ignores all of the SEC filings made by the securitization trusts during the Class

Period, and most of FMD's own SEC filings" (*id.* at 3); "the Trusts incorporated by reference

into the final Supplemental Prospectus information regarding delinquencies, cumulative losses

and prepayments of the loans owned by the Trusts at specified time" (*id.* at 4 n.4); "the loans

owned by the Trusts were described in detail in various required SEC filings during the Class

Period" (*id.* at 7); "during the Class Period, the actual cumulative default rate for each Trust was

reported in the Trusts' Form 10-D filings or could readily be calculated from the static pool data"

(*id.* at 10); "[t]he SEC filings during the Class Period disclosed that borrowers were not required

to have a FICO score above 700" (*id.* at 17); and "[t]hese SEC filings expressly disclosed that

throughout the Class Period FICO scores of 625 and above were permitted" (*id.* at 17-18).  These

"disclosures" do not negate or neutralize Plaintiffs' factual allegations, and do not support

Defendants' motion to dismiss.

   Although Defendants explicitly avoid the term, they are relying on what courts have

recognized as a "truth on the market" defense.  Plaintiffs have pled their case as a fraud on the

market action, not a direct reliance action.  (*See* ¶¶ 204-05.)  A plaintiff's presumption of

reliance under the fraud on the market theory is a rebuttable presumption:

> A defendant may [still] rebut the fraud on the market presumption by showing
> that it made no material misrepresentations because the alleged
> misrepresentations were already known to the market – a so-called "truth on the
> market" defense.  "However, the corrective information must be conveyed to the
> public with a degree of intensity and credibility sufficient to counter-balance
> effectively any misleading information created by the alleged misstatements."

*In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 51 (D. Mass. 2006) (quoting *Teamsters*

*Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05 Civ. 1898 (SAS), 2005 U.S.

Dist. LEXIS 19506, at *24-25 (S.D.N.Y. 2005) (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000))).

Under the truth on the market theory, a defendant may attempt to rebut the fraud on the market presumption by arguing that the market was aware of "sufficient accurate information to neutralize any misleading impressions" created by defendants. *Ganino*, 228 F.3d at 168. In *Ganino*, the defendants – like Defendants here – argued that SEC filings of another company it was doing business with contained enough accurate information to effectively neutralize any misleading impressions in defendants' financial reports. *Id.* The Second Circuit rejected the defendants' argument, noting that even if it assumed "that [the SEC] disclosures were factually accurate, we cannot decide on the present record whether those disclosures were conveyed with sufficient 'intensity and credibility' as to dispel the false impression created by [defendants'] alleged misrepresentations." *Id.* The Second Circuit also noted that "[t]he truth-on-the-market defense *is intensely fact-specific* and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Id.* at 167 (emphasis added).[3]

> **1.**      **The Trusts' SEC Filings Do Not Support a Truth on the Market Defense**

SEC filings by First Marblehead's securitization trusts do not support a truth on the market defense. Defendants rely heavily on the Trusts' prospectuses and SEC filings – not First Marblehead's filings – as evidence that the "static pool" data was available to the market.

---

[3] Numerous other courts have similarly held that a truth on the market defense is inappropriate for resolution in the absence of a fully-developed factual record. *See, e.g.*, *Freeland v. Iridium World Commc'ns, Ltd.*, 545 F. Supp. 2d 59, 78-79 (D.D.C. 2008) (same and collecting cases); *Credit Suisse-AOL*, 465 F. Supp. 2d at 53 n.22 (same); *In re Motorola Sec. Litig.*, No. 03 C 287, 2004 U.S. Dist. LEXIS 18250, at *86 (N.D. Ill. Sept. 10, 2004) (same); *Schaffer v. Timberland Co.*, 924 F. Supp. 1298, 1309 (D.N.H. 1996) ("The court finds that the truth on the market defense presented by the defendants necessarily involves a fact-intensive inquiry which is ill-suited to a motion to dismiss.").

(Defs.' Br. 4 n.4 (referencing Exhibits 18-23); *id.* at 7, 8 & n.13, 10 & n.17).)  The sources for determining the actual cumulative default rate for each Trust, according to Defendants, were "the Trust's Form 10-D filings or could readily be calculated from the static pool data."  (*Id.* at 10 & n.17 (explaining the calculation required to determine the cumulative default rate from the Trust's filings).)  Static pool data "is information about a loan pool's status at a moment in time."  (*Id.* at 4 n.4.)  But this material filed by the Trusts does not aid a truth on the market defense.

A California district court recently decided this issue on facts almost identical to the facts in this case.  *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008).  In *Countrywide*, the company engaged in mortgage-related operations and mortgage securitizations, complex financial transactions that were "relatively difficult to value."  *Id.* at 1159.  In response to plaintiffs' § 10(b) claims, defendants mounted a truth on the market defense.  *Id.* at 1160.  The defendants alleged that the majority of the company's mortgages were securitized into mortgage-backed securities (MBS) and sold into the private secondary market.  *Id.*  at 1159-60.  Like the First Marblehead ABS Trusts' prospectuses, "[t]he prospectuses are on file with the SEC and available to the public."  *Id.* at 1160.  Like Defendants here, the Countrywide defendants "assert[ed] that these documents put the truth on the market, thereby foreclosing the possibility that Plaintiffs 'relied' on the misrepresentations in paying a market price for the securities."  *Id.*  The court took notice of the prospectuses, "*but not for the truth of the matters asserted therein.*"  *Id.* (emphasis added).  The court also explicitly noted SEC Regulation AB, which governs many of the disclosures in MBS and ABS offerings and which "relies heavily on disclosing historical loan performance data."  *Id.*[4]

---

[4] (*See* Defs.' Br. 4 n.4 (noting that the First Marblehead trusts "generally sell their debt securities in public offerings registered with the SEC pursuant to Regulation AB").)

The Countrywide defendants – again, like Defendants here – argued that "the MBS prospectuses, issued by SIVs [structured investment vehicles] and *not Countrywide itself*, put the truth on the market and thereby negate the reliance element." *Id.* (emphasis added).  The court rejected defendants' argument "at the pleading stage" because they had not shown that the information in the SIV prospectuses was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations." *Id.*  The court recognized that Countrywide's MBS "were complex instruments and the prospectuses are very large documents; it is perfectly reasonable to infer that this complexity, coupled with Countrywide's alleged public misrepresentations, would blunt the effect of any disclosures in MBS' prospectuses." *Id.*; *see also Ganino*, 288 F.3d at 168 (reversing district court's dismissal and rejecting defendants' argument that "SEC filings during the Class Period contained sufficient accurate information to neutralize any misleading impressions created by [company's] financial reports").

The facts in *Countrywide* are analogous to the facts here.  Defendants claim that Plaintiffs ignore information contained in the securitization trusts' SEC filings that disclose information Defendants claim neutralize alleged misrepresentations or omissions.[5]  The Trusts are directly

---

[5] Specifically, Defendants point to SEC filings by The National Collegiate Funding LLC on behalf of the various issuing National Collegiate Loan Trusts.  (*See* Defs.' Br. 4 n.4 (referencing trusts prospectuses as Exhibits 18-23 for static pool data); *id.* at 5 n.5 (referencing Exhibit 18 for disclosure of TERI's pledged accounts); *id.* at 6 (referencing Exhibit 18 for disclosure of default information and guaranty commitments); *id.* at 6 n.7 (referencing Exhibits 18-23 for disclosures regarding assets, loan loss reserves, loan losses, reserve ratio, and "other related information"); *id.* at 7 (referencing Exhibits 18-23 for disclosures of detailed descriptions of loans and credit quality of borrowers); *id.* at 7 n.8 (referencing Exhibits 18-23 for disclosures about amount of loans securitized, number of borrowers, average loan size, number of loans, average principal balance, and average interest rate); *id.* at 8 (referencing Exhibits 18-23 for disclosures of delinquency and default status of loans); *id.* at 9 n.16 (referencing Exhibits 18-23 for disclosures of TERI guaranty pledges); *id.* at 10 (referencing trust SEC forms Exhibits 27-32 for disclosure of default rates or how to calculate default rate from static pool data); *id.* at 11 n.19 (referencing

comparable to the SIVs in *Countrywide*.  These filings by the Trusts, and not First Marblehead,

do not support a truth on the market defense in favor of First Marblehead and thus do not support

Defendants' motion to dismiss.

   **C.    The False Statements And Omissions Are Sufficiently Identified And Rule
         9(b) And The PSLRA Have Been Satisfied**

   Defendants begin their argument by contending that Plaintiffs have failed to identify each

statement or omission alleged to be false and misleading and the reasons it is false and/or

misleading, asserting that the Complaint relies on "puzzle pleading."  (Defs.' Br. 15-16.)[6]  A

review of the Complaint shows that this assertion is manifestly inaccurate.  (¶¶ 90-180.)  Each

false statement alleged in the Complaint is clearly described together with the reasons for the

statements' falsity.  (*Id.*)

   As the First Circuit stated in *In re Stone & Webster, Inc. Securities Litigation*, 414 F.3d

187 (1st Cir. 2005), the PSLRA requires that a complaint alleging securities fraud must "specify

each statement alleged to have been misleading [and] the reason or reasons why the statement is

---

Exhibit 18 for disclosure of default and recovery rates); *id.* at 17 n. 27 (referencing trusts' SEC
filings as disclosure showing that a statement "was not misleading in the manner Plaintiffs
imply").)

[6] Defendants contend erroneously that the Complaint is a "puzzle pleading" that fails to state
with particularity the specific claims made against each of the Individual Defendants.  (Defs.' Br.
15-16.)  To the contrary, the Complaint organizes the allegations into identifiable sections with
clear, concise headings and subheadings that allowed the Defendants – and now this Court – not
only to understand and evaluate the nature of Plaintiffs' claims, but also to read precisely why
the Defendants' numerous statements and omissions during the Class Period were knowingly
false and misleading.  *See, e.g.*, *In re Honeywell Int'l Sec. Litig.*, 182 F. Supp. 2d 414, 416
(D.N.J. 2002) (rejecting argument that complaint was a "puzzle pleading," noting that the
"Complaint certainly is not short, but if it is a puzzle, it is meant for a child and can be assembled
readily"); *In re NTL Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 22 (S.D.N.Y. 2004)  (rejecting "puzzle
pleading" argument and finding that "the complaint[] specifically identif[ies] the date,
publication and speaker of each of the alleged misstatements or omissions."); *In re Tyco Int'l,
Ltd.*, MDL-02-1335-B, 2004 U.S. Dist. LEXIS 20733, at *30 (D.N.H. Oct. 14, 2004) (rejecting
defendants' assertion regarding puzzle pleading and finding that plaintiffs' extremely detailed
complaint was a "*reasonable way to address a complicated securities fraud case*") (emphasis
added).

misleading."  414 F.3d at 194 (citing 15 U.S.C. § 78u-4(b)(1)).  In satisfying this requirement, a complaint "must provide factual support for the claim that the statements or omissions were fraudulent, that is, facts that show exactly why the statements or omissions were misleading." *Id.* (citing *Aldridge*, 284 F.3d at 78 (1st Cir. 2002)).  There is no requirement, however, that the plaintiff "plead evidence."  *Id.* at 199.

The Complaint plainly identifies each of the alleged omissions and false and misleading statements and the reasons why the statements or omissions are false and misleading.  (*See, e.g.*, ¶¶ 90-180.)  Each statement is specifically identified according to what was said, when it was said, and how it was said.  (*Id.*)  Moreover, the reasons for the falsity of each statement are laid out in detail.  (¶¶ 32-89.)

For example, the Complaint alleges that beginning in 2005, the Company "implement[ed] several programs, including an "Expanded Tier Program," that catered to students with lower credit ratings" (¶ 61) and that "Defendants failed to disclose to the investing public that they had enacted a dramatic shift in credit criteria – a fundamental and material aspect of their business" (¶ 64).  Plaintiffs further allege that these relaxed credit standards resulted in soaring default rates and increasing fraud rates (¶¶ 71-72) such that "First Marblehead was in dire straits by the end of 2007" (¶ 73).

The Complaint also alleges with specificity that, on September 10, 2007, the Company "announc[ed] a planned securitization of private loans guaranteed by TERI."  (¶ 141.) Specifically, the Company stated that it expected to "raise approximately $2.8 billion from the sale of asset-backed securities."  (*Id.*)  Then, on September 17, 2007, the Company announced that this securitization would result in "up-front structural advisory fees of approximately $177.1 million."  (¶ 142.)  On September 20, 2007, the Company raised its revenue expectations further,

stating that it expected to "recognize revenue of approximately $306.3 million" as a result of the planned securitizations.  (¶ 143.)  Finally, on October 25, 2007, the Company announced its fiscal first quarter 2008 results, during which Defendant Kopinsky stated that the Company was "off to a great start to the fiscal year" (¶ 145) and that the Company was "not making any changes to any of the [] assumptions" used to value its outstanding securitizations (¶ 146).

As detailed in the Complaint, these statements were knowingly false and misleading when made because the Company knew that the planned $2.8 billion securitization would not be finalized and the claimed $306.3 million in revenue would never be realized because of the looming TERI bankruptcy and credit agency write-downs.  (*See, e.g.*, ¶¶ 77-89, 160.)  Further, the Company knew that its valuation assumptions were invalid and that its revenue and income were overstated.  (*See, e.g.*, ¶¶ 61-65, 71-76, 164.)

In *Stone & Webster*, the First Circuit upheld a Rule 10b-5 claim regarding the failure of the officer defendants to disclose the illiquidity of their company, observing that:

> The Complaint paints a detailed account of the deteriorated financial condition at S&W, replete with factual support and citations to sources likely to have knowledge of the matter.  The Complaint also identifies with specificity the statements alleged to be false and misleading and explains in what respect they were misleading.

414 F.3d at 210.

The Complaint here provides even greater detail by identifying the statements alleged to have been false and misleading, stating why they were false and misleading, and alleging how and when the false and misleading statements were made.  (¶¶ 90-180.)  Additionally, the statements here concern First Marblehead's only business:  securitizing and servicing student loans.  As such, the Complaint fully comports with the First Circuit's requirements for pleading false and misleading statements in a securities fraud complaint.

Further, even if the alleged false and misleading statements are determined to have been literally true at the time they were made, Defendants' Motion to Dismiss still fails.  Although the duty to disclose does not require the disclosure of all other facts "that, too, would be interesting, market-wise," the duty does require the disclosure of facts "that are needed so that what was revealed would not be so incomplete as to mislead."  *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990) (internal quotations omitted); *accord Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir. 1996).  Because some statements, "although literally accurate, can become, through their context and manner of presentation, devices which mislead investors," "the disclosure required by securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."  *Lucia v. Prospect St. High Income Portfolio, Inc.*, 36 F.3d 170, 175 (1st Cir. 1994); *accord In re Biogen Sec. Litig.*, 179 F.R.D. 25, 34-35 (D. Mass. 1997).[7]

### D.   Confidential Sources Are Adequately Identified

Defendants' primary objection to Plaintiffs' alleged omissions and false and misleading statements is Plaintiffs' purported lack of sufficient identification of Plaintiffs' confidential sources.  (*See, e.g.*, Defs.' Br. 19-36.)  These arguments are without merit.  There is no requirement that Plaintiffs identify confidential sources by name.  *Cabletron*, 311 F.3d at 20-21; *see also Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) ("no requirement in existing law that, in the ordinary course, complaints in securities fraud cases must name confidential sources"); *In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 223 (D. Conn. 2001).

---

[7] Moreover, "[w]hether a statement is misleading and whether adverse facts are adequately disclosed are generally questions that should be left to the trier of fact."  *In re PLC Sys., Inc. Sec. Litig.*, 41 F. Supp. 2d 106, 116 (D. Mass. 1999) (citing *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)).  "Only if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)."  *Id.* (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)).

In *Cabletron*, the First Circuit expressly endorsed the Second Circuit test regarding confidential sources:

> [W]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false.  Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the sources would posses the information alleged.  In both of these situations, the plaintiffs will have pleaded enough facts to support their belief, even though some arguable relevant facts have been left out.

*Cabletron*, 311 F.3d at 29 (citing *Novak*, 216 F.3d at 314).

The Plaintiffs' sources have been adequately identified.  Each of the sources' former job positions with First Marblehead, responsibilities, and job titles are adequately described in the Complaint such that Defendants and the Court can readily determine that the source was likely to have been in a position to know the information for which he or she is cited.  Here, the information provided by Plaintiffs' sources is corroborated by their positions within the Company.  The First Circuit, in *Stone & Webster*, stated that, "[w]ith respect to basis, while the sources of information on which the Complaint relies for these allegations are not overwhelmingly impressive, they include sources within the Company who *might well have access to the kind of information* for which they are cited."  414 F.3d at 198-99 (emphasis added).  Similarly, in this case, given the description of their former job titles, responsibilities, or positions as set forth in the Complaint, there can be no question that Lead Plaintiff's sources "might well have access to the kind of information for which they are cited."  *Id.*

A review of the Complaint shows that Plaintiffs' sources are described with sufficient particularity.  For example, the Former Senior Vice President for Applications Development (Former VP of Applications") is identified in the Complaint as being employed by First

Marblehead from 2005 through 2007 (¶ 61) and as attending executive meetings where corporate strategy and risk management was discussed (¶ 65).

The Former Loan Funding Division Manager ("Former Loan Manager") is identified as being employed by First Marblehead from 2004 through 2008.  The Complaint specifies that "his group was responsible for, among other things, producing disbursement reports to lender clients, processing payments and disbursements, and tracking exceptions and change management." (¶ 67.)  Further, the Former Loan Manager submitted these reports to his supervisor, Darren McInnis, who then sent the reports to upper management, including Defendant Baumer.  (¶ 68.)

The Former Chief Information Security Officer ("Former CISO") is identified as being employed by First Marblehead from 2004 through 2008 (¶ 71) and reporting directly to Defendant Baumer, the Company's Chief Risk Officer (¶ 75).

Each of these former First Marblehead employees was employed by the Company during the Class Period.  Significantly, each employee either reported directly to the executives and directors of First Marblehead, or, in the case of the Former VP of Applications, "attend[ed] executive meetings where corporate strategy and risk management [were] discussed."  (¶ 65).

Defendants complain that these descriptions are too broad or too vague to permit the Court to determine whether the sources were in a position to know about the fraud alleged in the Complaint.  (Defs.' Br. 19-22.)  This argument overlooks the fact that Plaintiffs have specifically identified the sources' job responsibilities and job descriptions.  Further, given the precise nature of the factual allegations in question, and the substantial corroboration provided by numerous other sources throughout the Complaint, the argument that Plaintiffs' sources are too vaguely identified is unfounded.  The Complaint provides more than ample identification of the sources

to enable the Court to determine whether they were likely to know the information attributed to them.

Finally, in considering whether Plaintiffs have provided adequate source descriptions, the Court can also look at the corroborating facts pled. *See Fitzer v. Sec. Dynamics Techs., Inc.*, 119 F. Supp. 2d 12, 22 (D. Mass. 2000) ("Where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants statements were false.") (citing *Novak*, 216 F.3d at 313). Here, the particularized nature of Plaintiffs' allegations permits this Court to make such an evaluation. For example, as previously discussed, the Complaint describes how Defendants failed to disclose that the Company had lowered its credit guidelines, was experiencing rising defaults, and would be unable to securitize loans going forward. (*See, e.g.*, ¶¶ 61-65, 71-86, 181.)

### E.     The Complaint Pleads A Strong Inference Of Scienter

When viewed as a whole, the Complaint pleads a strong inference of scienter. The Complaint alleges that Defendants were aware of, or recklessly disregarded, internal information indicating that First Marblehead's ability to securitize loans was in jeopardy, and that the Individual Defendants made public statements that were contradicted by this information. The First Circuit has squarely recognized that such allegations suffice to plead scienter. *See Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 367-68 (1st Cir. 1994). Moreover, First Marblehead's core business – and profit source – was securitization of student loans. When a company's key business segment or product is the subject of misleading statements, numerous courts have held that executives are more likely to have been aware of negative developments, and thus, the inference of scienter is strengthened. *See, e.g.*, *Makor Issues & Rights, Ltd v. Tellabs, Inc.* ("*Tellabs II*"), 513 F.3d 702, 709 (7th Cir. 2008). When considered in conjunction

23

with Complaint's insider trading allegations, discussed below, the PSLRA is satisfied, and Defendants' motion to dismiss should be denied.

### 1.    The Strong Inference of Scienter Standard

In the First Circuit, a plaintiff may plead a strong inference of scienter by alleging "conscious intent to defraud" or "a high degree of recklessness." *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir. 2008) (internal quotations and citations omitted). Recklessness includes:

> "[H]ighly unreasonable omission[s], involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which present[ ] a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

*Greebel*, 194 F.3d at 198 (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)).

On a motion to dismiss, the complaint must be viewed in its entirety and all facts alleged must be accepted as true. *See Tellabs*, 127 S. Ct. at 2509; *ACA Fin.*, 512 F.3d at 59 ("scienter should be evaluated with reference to the complaint as a whole rather than to piecemeal allegations"). The inquiry is thus whether the allegations "taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets th[e] standard." *Tellabs*, 127 S. Ct. at 2509 (emphasis in original deleted). The Court must also weigh the competing inferences for and against the plaintiffs.[8]  "[W]here there are equally strong inferences for and against scienter" the tie goes to the plaintiff. *ACA Fin.*, 512 F.3d at 59; *Tellabs*, 127 S. Ct. at 2504-05 (a strong inference of scienter "must be cogent and at least as

---

[8] Despite its obligation to the weigh competing inferences, even after *Tellabs*, the First Circuit has held that courts remain bound to draw all reasonable factual inferences in favor of Plaintiffs. *See ACA Fin.*, 512 F.3d at 58; *Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 85 (1st Cir. 2008).

compelling as any opposing inference of non-fraudulent intent"). Finally, Plaintiffs are not required to prove their case at the pleading stage or plead direct evidence. *See In re Cabletron Sec. Litig.*, 311 F.3d 11, 43 (1st Cir. 2002); *Boston Scientific*, 523 F.3d at 90. Although it must be "strong," "[t]he inference [of] . . . scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 127 S. Ct. at 2510 (citations omitted). Thus, Plaintiffs can plead scienter based on "indirect and circumstantial evidence." *Greebel*, 194 F.3d at 195.

The First Circuit has cautioned that courts must not apply the PSLRA's pleading standard too strictly. *See Boston Scientific*, 523 F.3d at 78-79, 90 ("[A]t this stage, a court must be cautious. The case has not yet developed . . . [and] the court is essentially making a prediction that the discovery process will yield only evidence that requires the benefit of the hindsight bias to seem adequate [to support the allegations]."). Denying a motion to dismiss at the pleading stage is not a decision on the merits, but "means only that the claims are not to be dismissed at this very early stage." *Id.* (quoting *Cabletron*, 311 F.3d at 20).

> **2.    The Complaint Pleads a Strong Inference of Scienter Because Defendants Ignored Internal Information That Contradicted Their Public Statements**

Allegations that executives intentionally or recklessly ignored internal information indicating that their public statements were misleading are classic evidence of scienter. *See Serabian*, 24 F.3d at 368 (finding that plaintiffs pleaded scienter when they alleged that "reports and documents presented to defendants at relevant times that were inconsistent with the defendants' public statements"); *see also Glassman v. Computervision Corp.*, 90 F.3d 617, 627 (1st Cir. 1996) (recognizing that forecasts "may be actionable to the extent that they are not reasonably based on, or are inconsistent with, the facts at the time the forecast is made"). As other circuit courts have recognized, "securities fraud claims typically have sufficed to state a

claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308; *id*. at 311 (recognizing that after the PSLRA scienter is plead where executives "knew facts or had access to information suggesting that their public statements were not accurate").  That is precisely what happened here, and thus, contrary to Defendants' assertions, Plaintiffs offer facts other than the Individual Defendants' senior positions in the Company to support a strong inference of scienter.

The Complaint alleges that Defendant Kopinsky took over the Company in 2005, and implemented the "Expanded Tier Program," which catered to students with lower credit ratings. (¶¶ 61-63.)  Defendant Kopinsky's riskier approach to lending had a predictable effect; it increased default rates.  (¶¶ 64, 68, 71.)  The Company's Chief Information Security Officer ("CISO") confirmed that in 2007 default rates began to soar (¶ 71), and at an annual meeting the Company told employees that default rates were increasing and that the Company was having difficulty selling its commercial paper (¶ 72).  Other employees corroborated these accounts and noted that by December 2007 the Company was intentionally concealing its default rates.  (¶ 74.) Although these changes alarmed First Marblehead's risk management department, management ignored the warnings.  (¶ 64.)

The Complaint also alleges that the Individual Defendants each had direct access to all of this information.  (¶¶ 75-76.)  In fact, Defendant Baumer directly told the former CISO in November 2007 that the Company's default rates had increased because of the expanded loan criteria.  (¶ 83.)  The Individual Defendants were also aware of TERI's deteriorating cash position long before it declared bankruptcy because Defendants Kopinsky and Tarr met with TERI's CEO and refused his request for a cash infusion.  (¶¶ 84-85.)

Nonetheless, the Individual Defendants continued to make positive statements that were not supported by the facts.  For example, in August 2007 – when the Company was warning employees internally of increasing default rates (¶ 72) – Defendant Kopinsky publicly painted a rosy picture of the Company's growth prospects (¶¶ 132, 134).  At the same time, Defendant Hupalo stated that the Company's default rate assumption was "appropriate" and led investors to believe that the credit characteristics of the Company's loan pool were "strong."  (¶ 133).[9] Logically, these allegations give rise to a strong inference that Defendants Kopinsky and Baumer had direct knowledge of First Marblehead's increasing default rates, and because lower level employees have stated that these facts were well-known within the Company the other Individual Defendants would have been reckless not to have known.  These allegations suffice to plead scienter.  *See Serabian*, 24 F.3d at 368.[10]

### 3. The Inference of Scienter is Strengthened by the Core Business Doctrine

The inference of scienter is further strengthened because the negative internal information identified in the Complaint concerned First Marblehead's core business.  Courts frequently impute knowledge of critical facts concerning a company's core operations to a company's top officers.  *See, e.g.*, *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989); *Crowell v.*

---

[9] All of the Individual Defendants' false and misleading statements are listed in paragraphs 90-148 of the Complaint.

[10] Against this background, Defendants' contention that Plaintiffs merely pleaded fraud by hindsight is incorrect.  (Defs.' Br. 37.)  In *Boston Scientific*, the First Circuit recognized that courts must be cautious applying this rationale on a motion to dismiss and acknowledged that "a bad outcome truly is relevant to the likelihood of fraud."  523 F.3d at 90.  The *Boston Scientific* court noted that the defendants before it had access to information indicating that their public statements might have been misleading.  *See id.*  The court also found it reasonable to infer that defendants had access to and constantly monitored the current information concerning their product, and thus rejected defendants' fraud by hindsight argument.  *Id.* at 91.  This case is no less compelling.  Plaintiffs have identified internal information that contemporaneously should have alerted Defendants to the misleading nature of their statements, and thus fraud by hindsight is not relevant.

*Ionics, Inc.*, 343 F. Supp. 2d 1, 19 (D. Mass. 2004) ("it can be inferred that top executives . . . were aware of a scheme involving systematically fraudulent sales practices, given the importance of the [business unit] to [Defendants'] business that year").[11]  In *Cosmas*, the Court found that the defendant's sales to China were "a significant part of" its business, and thus, there was a "strong inference" that the defendant directors "had knowledge of the . . . import restrictions [that] . . . apparently eliminated a potentially significant source of income for the company."  886 F.2d at 13.

More recently, the Seventh Circuit recognized that when the fraud concerns a company's most important product, "[t]hat no member of the company's senior management who was involved in authorizing or making public statements about the demand for [those core products] knew that [the statements] were false is very hard to credit . . . ."  *Tellabs II*, 513 F.3d at 709. The Seventh Circuit emphasized that Tellabs' CEO sat at the top of the corporate pyramid and issued almost all of the false statements about the company's key products.  *Id.* at 711.  As such, the *Tellabs II* Court found that it was "conceivable" that he "was unaware of the problems of his company's two major projects and merely repeating lies fed to him by other executives of the Company . . . but . . . *exceedingly unlikely.*"  *Id.*

First Marblehead had in essence a single business:  securitizing student loans.  (¶¶ 32-33.) Although the Company originated, serviced, and disbursed loan monies, the foundation of its model was securitization.  (¶¶ 33, 38.)  All of the Company's other functions merely facilitated this process.  (¶¶ 33, 38.)  The Company's profitability depended on its "ability to earn structural

---

[11] *See also Epstein v. Itron, Inc.*, 993 F. Supp. 1314, 1326 (E.D. Wash. 1998) (finding that "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers"); *Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 362 (S.D.N.Y. 2006) (adopting core business doctrine); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) (same).

advisory fees and residuals from facilitating securitizations of private label and GATE loans"
(¶ 39) and a significant portion of its revenues resulted from securitizations (¶ 40).[12]  In other
words, if First Marblehead could not securitize loans, its profits would dry up.  (¶ 39.)  In short,
the inference of scienter here is stronger because securitization was the primary source of First
Marblehead's profits.

> ### 4.    The Complaint's Insider Trading Allegations Also Contribute to the Strong Inference of Scienter

Insider trading contributes to a strong inference of scienter when trades are suspicious in
timing *or* amount.  *See Greebel*, 194 F.3d at 197.  Here, the Complaint alleges that Defendants
Alexander, Anbinder, and Berkley sold 13.81%, 24.95% and 12.90% of their holdings during the
Class Period for profits of $128,797,108, $41,152,254, and $38,692,851, respectively.  (¶ 193.)
There is no bright line rule for how much insider trading will support an inference of scienter,
and the Individual Defendants' trades here constituted significant (and thus suspicious) portions
of their holdings.  *See Boston Scientific*, 523 F.3d at 92 (sales of $ 40.82 million, $ 54.2 million,
$ 4.2 million, and $ 3.3 million supported inference of scienter); *Cabletron*, 311 F.3d at 40
(recognizing that $177 million gained from trading was a "power incentive that contributed to an
inference of scienter"; *Rubinstein v. Collins*, 20 F.3d 160, 169 (5th Cir. 1994) (sales of $760,599
during one month was suspicious); *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) (sale
of $1.3 million, representing 20% of stock).  Moreover, Defendants Anbinder and Berkley both

---

[12] The fact that First Marblehead is now experiencing severe financial difficulties because of its inability to securitize student loans only underscores the fact that the Company's core business is securitization.  For example, after the Complaint was filed on February 2, 2009 the Company announced that its revenues had decreased $86 million (or approximately 44%) as compared to the same period last year "principally as a result of not completing a securitization transaction during the first six months of fiscal 2009."  February 2, 2009 Press Release, "First Marblehead Second Quarter Fiscal 2009 Results," publicly available at http://phx.corporate-ir.net/phoenix.zhtml?c=147457&p=irol-newsArticle&ID=1250986&highlight=.

sold substantially more stock during the Class Period than they did prior to the Class Period. This too supports an inference of scienter. *See Greebel*, 194 F.3d at 198 (trading can contribute to an inference of scienter where it is "well beyond the normal patterns of trading"). Thus, the Complaint's insider trading allegations contribute to a strong inference of scienter. *See Boston Scientific*, 523 F.3d at 92 ("we think that the plaintiffs' allegations of insider trading, inasmuch as they are at least consistent with their theory of fraud, provide some support against the defendants' motion to dismiss" (quoting *Shaw*, 82 F.3d at 1224).

Defendants' arguments to the contrary fail. First, the law in the First Circuit does not require all Individual Defendants to trade in order to contribute to an inference of scienter. (Defs.' Br. 40.) The First Circuit has found that insider sales may contribute to a strong inference of scienter even when a single defendant makes the "overwhelming majority" of the sales and when some of the sales are made by non-defendants. *See Cabletron*, 311 F.3d at 40; *Shaw*, 82 F.3d at 1224 (finding that sales by two non-defendant insiders added to the inference of scienter). Second, the fact that Defendants Alexander, Anbinder, and Berkley were non-employee directors does not negate scienter. *See Cabletron*, 311 F.3d at 41 (finding scienter against outside directors who sold during the Class Period). Finally, Defendants concede (Defs.' Br. 42 n.54) that Defendant Anbinder's 10b-5 trading plan cannot defeat the inference of scienter at the pleadings stage, *see Boston Scientific*, 523 F.3d at 92. Even if this Court were to consider this innocent explanation for the trades, the inference of scienter is not negated. *See Cabletron*, 311 F.3d at 40 (finding that trades contributed to an inference of scienter despite "a plausible innocent explanation for large stock sales").

In sum, the Complaint's allegations – that Defendants were aware of negative information contradicting their public statements about the Company's core business and

engaged in profitable insider trading – when viewed as a whole present classic evidence that the First Circuit has repeatedly found supports a strong inference of scienter.  The Defendants' motion to dismiss should accordingly be denied.

### F.   Plaintiffs Have Sufficiently Pled Loss Causation

Relying upon inapposite authority[13] and ignoring applicable pleading standards, Defendants claim that Plaintiffs have failed adequately to allege "loss causation" under Section 10(b).  (*See* Defs.' Br. 43-48.)  But Defendants have overlooked directly applicable case law from courts in this Circuit that post-dates the Supreme Court's decision in *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336 (2005), which holds that loss causation is subject to notice pleading requirements.  Under *Dura,* Plaintiff's allegations are more than sufficient to provide Defendants with "some indication of the loss and the causal connection that the [P]laintiff has in mind." *Id*. at 347.[14]

---

[13] By way of example, Defendants rely heavily on the decision in *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co*., No. 3:02-CV-1152-M, 2008 U. S. Dist. LEXIS 89598 (N.D Tex. Nov. 4, 2008).  (*See* Defs.' Br. 45-46 & n.60.)  But in *Halliburton*, a class certification opinion applying the Fifth Circuit's widely-criticized decision in *Oscar Private Equity Invs. v. Allegiance Telecom, Inc*., 487 F.3d 261 (5th Cir. 2007), the sole issue in dispute was "the application of the requirement that, in a securities fraud class action, *loss causation must be proven at the class certification stage*." *See Halliburton*, 2008 U. S. Dist. LEXIS 89598, at *9, n.2 (citing *Oscar*) (emphasis added).  Since the *Halliburton* court did *not* address the standards for *pleading* loss causation, that decision has no bearing on the issues now pending before this Court.  District courts within the Fifth Circuit also have held that loss causation averments need only comply with the notice pleading standards of Federal Rule of Civil Procedure 8(a)(2). *See, e.g*., *Ryan v. Flowserve Corp.*, 444 F. Supp. 2d 718, 725 (N.D. Tex. 2006) (stating that *Dura* "renewed Rule 8(a)(2)'s 'short and plain statement' rule for [loss causation] pleadings").

[14] Courts frequently have found that issues of loss causation are factual matters that often require expert testimony and, therefore, are generally not proper to resolve on a Rule 12(b)(6) motion. *See, e.g.*, *Credit Suisse-AOL*, 465 F. Supp. 2d at 50 (denying motion to dismiss for failure to plead loss causation and stating "[a]s an initial matter, this is a factual issue more suited to summary judgment"); *In re Tyco Int'l, Ltd*., 236 F.R.D. 62, 71 (D.N.H. 2006) (holding that "disputes about loss causation turn primarily on questions of fact," and that defendant "remains free to develop the issue further during discovery and to renew its argument in a properly supported motion for summary judgment at the appropriate time"); *In re StockerYale Sec. Litig.,*

1.      **To Plead Loss Causation After** *Dura,* **Plaintiffs Need Only Provide a Short, Plain Statement Consistent with Fed. R. Civ. P. 8(a)(2)**

To support a Section 10(b) claim, a plaintiff need only plead "a causal connection between the material misrepresentation and the loss" it suffered.  *Dura*, 544 U.S. at 342.  In addition, it is the more liberal pleading requirements of Fed. R. Civ. P. 8(a)(2), rather than those of Rule 9(b), that "appl[y] to the pleading of . . . proximate causation" in a securities fraud case. *Brumbaugh v. Wave Sys. Corp*., 416 F. Supp. 2d 239, 256 (D. Mass. 2006); *see also Credit Suisse-AOL*, 465 F. Supp. 2d at 45-46; *Stumpf v. Garvey* (*In re TyCom Ltd. Sec. Litig*.), No. 03-CV-1352, 2005 U.S. Dist. LEXIS 19154, at *42-43 (D.N.H. Sept. 2, 2005).  Rule 8(a)(2), otherwise referred to as the "notice pleading" standard, requires nothing more than "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To satisfy this standard, a plaintiff need merely "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Sekuk Global Enters. v. KVH Indus., Inc.*, C.A. No. 04-306ML, 2005 U.S. Dist. LEXIS 16628, at *48 (D.R.I. Aug. 11, 2005) (quoting *Dura*, 544 U.S. at 347).

The allegations of the Complaint readily meet this standard.  Plaintiffs have pled that the price of the Company's stock fell significantly as the truth was revealed to the market through a series of partial disclosures.  (¶ 201.)[15]  Nothing more is required at this stage of the litigation.

---

453 F. Supp. 2d 345, 359 (D.N.H. 2006) (denying motion to dismiss on loss causation grounds when defendants raised factual questions that could be addressed "at later stages of this litigation").

[15] Defendants' reliance on *In re Gilead Sciences Securities Litigation*, 536 F.3d 1049 (9th Cir. 2008), is somewhat curious because that decision actually supports Plaintiffs' position.  (Defs.' Br. 43.)  In *Gilead*, the Ninth Circuit held that plaintiffs adequately alleged loss causation, agreeing with the position of the Second and Third Circuits that loss causation issues generally are not resolved on the basis of the pleadings alone.  536 F.3d at 1057.  Moreover, the Ninth Circuit held that loss causation allegations need only pass muster under a "plausibility" standard. *Id.* ("so long as the plaintiff alleges facts to support a theory that is not facially implausible, the

*See, e.g.*, *Brumbaugh*, 416 F. Supp. 2d at 256 ("in light of *Dura*'s acknowledgment that Fed. R. Civ. P. 8(a)(2) applies to the pleading of economic loss and proximate causation, this court must conclude that Plaintiffs have furnished Defendants with some indication of [their] loss and the causal connection that [they have] in mind") (citations and internal quotation marks omitted).[16]

### 2. A Plaintiff Need Not Allege That the Cause of the Stock Drop Was an Explicit Disclosure (Amounting to a Confession) That a Fraud Has Occurred

The Defendants claim that Plaintiffs have failed to identify the existence of a "corrective disclosure" expressly revealing the alleged fraud.  (*See, e.g.*, Defs.' Br. 44 ("Plaintiffs do not point to any language within any of these announcements that constituted a 'correction'"); *id.* at 45 ("Plaintiffs do not explain how the language in any announcement 'corrected' any prior false or misleading statement").)  However, this argument amounts to nothing more than a contention that the disclosure of the fraud must mirror the alleged misrepresentations in question.  That contention has no basis in the PSLRA, is not supported by the Supreme Court's decision in *Dura*, and has been repeatedly rejected in post-*Dura* decisions.[17]  Under *Dura*, there is no

---

court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds").

[16] Contrary to Defendants' suggestion, "a plaintiff is not required to plead that [its] economic loss was caused *solely* by the alleged fraudulent scheme."  *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 297 (S.D.N.Y. 2006).  Loss causation is not "negated by [plaintiff] having mentioned in the complaint other causes that could have contributed to the fall in the value of the [securities]. . . .  [I]t is possible for more than one cause to affect price of a security and, should the case survive to that point, a trier of fact can determine the damages attributable to the fraudulent conduct."  *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649-50 (7th Cir. 1997).

[17] For example, in *Ryan v. Flowserve Corp.*, defendants urged the court to interpret *Dura* as requiring securities class action plaintiffs "to allege that the precise topics of the alleged misrepresentations . . . were later one-by-one revised and revealed to the market in truthful terms."  444 F. Supp. 2d at 726-27.  But the court held that "*Dura* did not endorse or address [defendant's] proposed 'fact-for-fact' method of pleading loss causation."  *Id.* at 727 (internal citations omitted); *see also In re Bristol-Myers Squibb Sec. Litig.*, No. Civ.A. 00-1990 (SRC), 2005 U.S. Dist. LEXIS 18448, at *52, 56-57 (D.N.J. Aug. 17, 2005) (rejecting argument "that a

requirement that defendants admit to having committed fraud for a plaintiff to plead loss causation. Instead, a plaintiff need only plead "what the causal connection *might be*" to survive a motion to dismiss. *Dura*, 544 U.S. at 347 (emphasis added).

In *Dura*, the Supreme Court did not require that a plaintiff "show that the stock price declined due to a specific corrective disclosure or financial restatement." *In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 711 (S.D. Tex. 2006). Furthermore, the Supreme Court did not set a standard as to what constitutes a corrective disclosure. *See, e.g.*, *McCabe v. Ernst & Young, LLP*, Civ. No. 01-5747 (WHW), 2006 U.S. Dist. LEXIS 524, at *23 (D.N.J. Jan. 6, 2006) ("*Dura* itself does not define a pleading standard for loss causation; rather, it simply rejects the Ninth Circuit's standard as overly permissive") (citation and internal quotation marks omitted).[18] As one court explained:

> The *Dura* opinion did not specify what was required to adequately plead loss causation. The Supreme Court spoke in terms of the 'relevant truth' and the 'truth' making its way into the market place. *The Court did not address the means by which the information is imparted to the public. Specifically,* Dura *did not set forth any requirements as to who may serve as the source of the information, nor is there any requirement that the disclosure take a particular form or be of a particular quality.*

---

plaintiff must show that the loss was caused by a corrective disclosure that mirrors, with precision, the alleged fraud" because "[t]his theory of loss causation is flawed . . . it does not follow from the precedent cited, or any precedent of which the Court is aware"). Numerous other federal district courts have reached a similar conclusion. *See, e.g.*, *In re ICG Commc'ns, Inc. Sec. Litig.*, No. 1:00 CV 01864, 2006 U.S. Dist. LEXIS 6695, at *30 (D. Colo. Feb. 7, 2006) ("The law does not require plaintiff to allege that ICG disclosed every fine detail of the alleged manipulation of ICG's revenue to establish that those misrepresentations caused the plaintiffs' loss.").

[18] *Dura* rejected the Ninth Circuit precedent that allowed a Section 10(b) plaintiff to plead loss causation solely by alleging that stock was purchased at an inflated price. Here, Plaintiffs do not rely on this rejected pleading standard, but rather they allege corrective disclosures in addition to the alleged inflation. (*See* ¶ 201.)

*In re Winstar Commc'ns*, 01 CV 3014 (GBD), 01 CV 11522, 2006 U.S. Dist. LEXIS 7618, at

*45 (S.D.N.Y. Feb. 27, 2006) (emphasis added).[19] Thus, as the *Winstar* court concluded, it

would place a "prohibitively unreasonable burden on plaintiff" to require pleadings to establish

"that when word exposing the falsity of defendants' statements leaked into the market place, it

took the form of a factual revelation which was, at that time, verifiably truthful." *Id.* at *15.

However, this is precisely the sort of "unreasonable burden" Defendants have asked this Court to

place on the Plaintiffs.[20]

---

[19] The relevant truth need not be revealed by the subject company itself. *See, e.g.*, *In re Enron Corp. Sec., Derivative & "Erisa" Litig.*, No. MDL-1446, 2005 U.S. Dist. LEXIS 41240, at *59 (S.D. Tex. Dec. 22, 2005) ("the market may learn of possible fraud [from] a number of sources: e.g., from whistleblowers, analysts' questioning financial results, resignations of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc."); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 171 (S.D.N.Y. 2007) (same).

It also is well-established that loss causation does not require the pleading of a unitary disclosure. It is common for plaintiffs in securities fraud actions to allege that the fraud leaked out over the course of time. *See, e.g.*, *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006) (crediting allegations that "[t]he revelation of the 'truth' about the Deconamine sale did not take the form of a single, unitary disclosure, but occurred through a series of disclosing events"); *In re NTL, Inc. Sec. Litig.*, 02 Civ. 3013 (LAK) (AJP), 2006 U.S. Dist. LEXIS 5346, at *32-33 (S.D.N.Y. Feb. 14, 2006) (complaint adequately pled loss causation when it alleged that there were several "disclosing events" and "Lead Plaintiffs have made 'some showing' that these disclosing events slowly revealed the false information regarding [the company] and have tied some if not all of the dissipation in the value of [the company's] stock to those events"); *Greater Pa. Carpenters Pension Fund v. Whitehall Jewelers, Inc.*, No. 04 C 1107, 2005 U.S. Dist. LEXIS 376, at *14 (N.D. Ill. Jan. 10, 2005) (loss causation properly alleged when plaintiff claimed that information regarding defendants' price misrepresentations slowly became public through partial disclosures, and company's stock price gradually dropped as the partial disclosures became public).

[20] *See also Ong ex rel. Ong v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 729, 747 (N.D. Ill. 2006) (cautioning that the requirement of pleading loss causation "ought not to place unrealistic burdens on the plaintiff at the initial pleading stage") (citation and internal quotation marks omitted). As a practical matter, the Defendants' argument would effectively create a legal standard at the pleading stage that would improperly allow potential defendants to avoid liability completely by simply refusing to admit that the earlier fraudulent statements were incorrect. *See, e.g.*, *Freeland*, 233 F.R.D. at 47 ("Indeed, reading *Dura* to require proof of a complete, corrective disclosure would allow wrongdoers to immunize themselves with a protracted series of partial disclosures.").

In sum, to establish loss causation, the law does not require that a corporate defendant issue a corrective disclosure with an accompanying *mea culpa*. *See, e.g.*, *Brumbaugh*, 416 F. Supp. 2d at 256 ("Defendants contend that Wave's disclosure of the SEC investigation was not an admission that earlier statements were materially misleading.  While this may be so, *Dura does not require that a corrective disclosure precede a stock's decline*.") (emphasis added). Instead, all that is required is that the subject matter of an earlier disclosure be effectively corrected in the marketplace.  *See, e.g.*, *In re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338, 349 n.22 (E.D. Pa. Aug. 18, 2006) ("Courts have recently held that a plaintiff must explicitly show that the market reacted negatively to either a corrective event *or* a materialization of a concealed risk") (emphasis added).

Stated otherwise, when a risk or other fact is misrepresented or concealed and contrary information later enters into the marketplace, loss causation has been sufficiently pled provided the loss was a reasonably foreseeable result of the misrepresented or concealed fact.[21]  Here, the precipitous drop in First Marblehead's share price following November 26, 2007 would not have occurred had the new information entering the market not contradicted the earlier fraudulent reports and lofty expectations that the Defendants had published previously.  (*See, e.g.*, ¶ 2 ("Defendants reported quarter after quarter of seemingly strong financial results while touting the

---

[21] *See, e.g.*, *In re Cardinal Health Sec. Litig.*, 426 F. Supp. 2d 688, 760 (S.D. Ohio 2006) (upholding plaintiffs' allegations of loss causation and stating that "the Court agrees that where the Plaintiffs allege that the subject of the misrepresentations and omissions caused their losses, they need not specify 'corrective disclosures' causing the decline in stock value"); *Bombardier*, 2005 U.S. Dist. LEXIS 19506, at *57-58 ("The Complaint alleges that defendants' misrepresentations regarding rigorous underwriting concealed the fact that the collateral pool contained a substantial number of high risk loans.  The concealed risk materialized when the collateral pool experienced high delinquency rates and repossession on a sustained basis.  Not surprisingly, BCI's earnings expectations then fell.  BCI announced that it would write off the losses, rating agencies downgraded the Certificates, and the value of plaintiff's investment declined.  These allegations are sufficient to plead loss causation.").

Company's ability to complete additional securitizations despite a difficult operating

environment in the lending industry and emphasizing the Company's purportedly strict lending

standards. . . .").)[22]

---

[22] Defendants maintain that "Plaintiffs' loss causation theory crumbles when FMD's extensive disclosures are considered." (Defs.' Br. 46.)  In this regard, Defendants argue that, since the Trusts "disclosed their FICO scores, and FMD and the Trusts disclosed default rates" before any of the identified disclosures were disseminated to the market, Plaintiffs have failed to allege that any new information was revealed after November 26, 2007.  (*Id.* at 47.)

However, a defendant cannot unilaterally rewrite a complaint so as to narrow the scope of its allegations.  *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 333 (S.D.N.Y. 2003) ("Defendants must take the Complaints *as they are written*.") (emphasis added).  In this instance, the Defendants wholly ignore that Plaintiffs have averred that during the Class Period the Defendants failed to disclose that they had embarked on a fundamental shift in corporate philosophy by implementing secret programs that had the effect of lowering historically strict credit guidelines for the purpose of increasing loan volume.  (*See, e.g.*, ¶¶ 4, 181.)  In other words, the Company hid the fact that it had basically eliminated its historical credit criteria.  That concealed risk began to materialize publicly, beginning with the FBR downgrade in late November 2007.

But, even if the Defendants had properly characterized Plaintiffs' allegations, the issue of whether the market was fully and accurately apprised of the extent of the investment risk in First Marblehead stock prior to late November 2007 presents a question of fact that cannot be resolved at the pleading stage of the litigation.  As discussed above, Defendants' argument in this regard amounts to nothing more than a "truth on the market" defense – the principle that subsequently communicated information acts to counterbalance the effect of prior misrepresentations.  Of course, that defense is fact-specific and inappropriate for resolution on a Rule 12(b)(6) motion.  *See Mallozi v. Zoll Med. Corp.*, No. 94-11579, 1996 U.S. Dist. LEXIS 22953, at *31 (D. Mass. Mar. 5, 1996) (rejecting a "truth on the market" defense on a motion to dismiss); *see also Freeland v. Iridium World Commc'ns, Ltd.*, 545 F. Supp. 2d 59, 80 (D.D.C. 2008) (declining to permit defendant to inject a "truth on the market" defense as to loss causation and noting that "most of [the company's] loss causation argument rests on establishing that the disclosures revealed information already known to the market, and thus could not have negatively affected the market.  *The Court holds that this remains a factual determination to be decided by the jury.* . . .") (emphasis added); *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 560 (N.D. Ill. 2007) ("At the very least . . . the question of what risks the market had digested as of May 14, 2001 is a question of fact that a jury is entitled to resolve."); *Schaffer v. Timberland Co.*, 924 F. Supp. 1298, 1309 (D.N.H 1996) (the truth on the market defense is a "fact-intensive inquiry which is ill-suited to a motion to dismiss").

### 3.     The Court Should Not Entertain Defendants' Inappropriate Factual Arguments at the Motion to Dismiss Stage

Defendants further contend that it is appropriate for this Court to ascertain on a motion to dismiss whether or not other conditions or events actually were responsible for the stock price decline referenced by Plaintiffs in the Complaint.  (*See* Defs.' Br. 47 (asserting that, because First Marblehead's share price "already had dropped significantly" before the fraud was disclosed, the court should find that "other factors . . . caused the decline") (citation omitted); *see also id*. at 44 (promoting the "explanation" that investor losses were caused by "the downturn in the credit markets and the economy generally").)  It is not, however, the Court's job to partake in this kind of analysis at the pleadings stage.  *See, e.g.*, *Stumpf*, 2005 U.S. Dist. LEXIS 19154, at *42, 45-46 (rejecting, on a motion to dismiss, defendant's factual argument that the "decline in price during the class period was caused by the crash of the telecommunications market"); *Nathel v. Siegal*, No. 07 Civ. 10956 (LBS), 2008 U.S. Dist. LEXIS 86297, at *28 (S.D.N.Y. Oct. 20, 2008) ("The existence of intervening events that break the chain of causation . . . is a matter of proof for trial and not to be decided on a Rule 12(b)(6) motion to dismiss") (citation and internal quotation marks omitted); *In re IMAX Sec. Litig*., 587 F. Supp. 2d 471, 486 (S.D.N.Y. Sept. 16, 2008) (finding that Defendants' suggestion that the stock drop was caused by another reason was "inappropriate for resolution" on a Rule 12(b)(6) motion to dismiss); *StockerYale*, 453 F. Supp. 2d at 359 ("Defendants' reference to a wide range of economic and other factors that may have caused or contributed to a decline in [the] price of [their] shares raises issues that will be addressed at later stages of this litigation, but those possibilities do not warrant dismissal [now] . . . .").[23]

---

[23] Taken to its logical conclusion, Defendants' argument would mean that a plaintiff could never plead loss causation as long as general market conditions were negative, a proposition not supported by the case law.  *See, e.g.*, *Primavera Familienstiftung v. Askir*, 130 F. Supp. 2d 450,

In addition, Defendants assert that "the absence of any loss causation is compellingly demonstrated by FMD's stock price movements."  (*See* Defs.' Br. 47.)  However, as noted above, loss causation is a fact-based inquiry that often requires expert testimony.  *See, e.g.*, *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1264 (N.D. Okla. 2007) (loss causation is often determined "with the help of an expert witness").  In view of the foregoing, it is inappropriate on a motion to dismiss to attach conclusive meaning to a defendant's assertions concerning the state of the financial markets and the like.  *See, e.g.*, *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 832 (8th Cir. 2003) ("we decline to attach dispositive significance to the stock's price movements absent sufficient facts and expert testimony, which cannot be considered at this procedural juncture, to put this information in its proper context").  This is particularly true given that all factual inferences are to be drawn in favor of a plaintiff at this stage of the proceedings. *See EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 885 (3d Cir. 2000) (in evaluating loss causation allegations, all inferences must be drawn in the plaintiff's favor); *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 338 (D. Mass. 2002) ("this Court must draw all reasonable inferences from the facts pled in favor of the Plaintiffs").

### G.      Defendants' False And Misleading Statements And Omissions Were Not Accompanied By Meaningful Cautionary Language

Defendants claim First Marblehead "gave explicit warnings" during the Class Period concerning its model used to recognize revenue recognition, the effects delinquency and default rates would have on its financial well-being, what would happen if its relationship with TERI changed or TERI's status changed, and the Company's ability to securitize loans.  (*See* Defs.' Br. 18, 29 n.38; App. A at 1-3.)

---

504 (S.D.N.Y. 2001) ("the intervening factor of a real estate collapse [does] not of itself bar the claim for lack of causation").

But for a forward-looking statement to receive Safe Harbor protection, the accompanying "cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deception drops to nil.'"  *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005) (quoting *Va. Bankshares v. Sandberg*, 502 U.S. 1083, 1097 (1991)).  Also, it is misleading to present a risk as merely a contingency after the risk has materialized.  *See In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 515 (9th Cir. 1981); *see also Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."); *In re Prudential Sec. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

Here, First Marblehead's cautionary language was being given while its risk management department was raising concerns about lowering credit guidelines (¶ 65), loan cancellation rates were increasing (¶¶ 68-70), default rates were rising (¶¶ 71-73), and First Marblehead executives knew of TERI's solvency issues (¶¶ 84-85).  Therefore, First Marblehead's risk "warnings" are not protected by any safe harbor.

## H. The Complaint Adequately Pleads A Claim Of Control Person Liability Under § 20(a) Of The Exchange Act

To establish a *prima facie* case of § 20(a) liability, Plaintiffs must allege that there was a primary violation of the securities laws and that the defendant exercised actual power or control over the primary violator.  *See, e.g.*, *Winters v. Steinberg*, 529 F. Supp. 2d 237, 253 (D. Mass. 2008).  In the case at bar, Defendants only challenge whether a primary violation of the securities laws was adequately pled.  (*See* Defs.' Br. 48 (arguing that the control person claim must be

dismissed since Plaintiffs "have not adequately alleged an underlying violation of § 10(b)").)

Since the Complaint does allege a viable claim under Section 10(b), the motion to dismiss the

control person claim should be denied.  *See, e.g.*, *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 13

(D. Mass. 2004) ("Should Crowell successfully make out a primary violation of Rule 10b-5, the

parties do not dispute that he can make out control person liability against Goldstein and

Kuzmak under § 20 (a) of the Exchange Act.").

Dated: April 13, 2009

Joseph F. Rice
jrice@motleyrice.com
Ann K. Ritter
aritter@motleyrice.com
James M. Hughes
jhughes@motleyrice.com
**MOTLEY RICE LLC**
P.O. Box 1792
28 Bridgeside Boulevard
Mount Pleasant, SC  29465
Tel:  (843) 216-9000
Fax: (843) 216 9450

William H. Narwold
wnarwold@motleyrice.com
**MOTLEY RICE LLC**
One Corporate Center
20 Church St.
17th Floor
Hartford, CT 06103
Tel:  (800) 882-1681
Fax: (800) 882-1682

*Lead Counsel for Plaintiffs*

By: */s/ Joseph E. White III*
Joseph E. White III
jwhite@saxenawhite.com
BBO # 648498
**SAXENA WHITE P.A.**
2424 North Federal Highway, Suite 257
Boca Raton, FL 33431
Tel:  (561) 394-3399
Fax: (561) 394-3082

Peter A. Lagorio
plagorio@saxenawhite.com
**SAXENA WHITE P.A.**
BBO #567379
63 Atlantic Avenue
Boston, MA 02100
Tel:  (617) 367-4200
Fax: (617) 227-3384

## CERTIFICATE OF SERVICE

I certify that on April 13, 2009, I uploaded this document onto the CM/ECF system, which will serve all registered participants.


*/s/ Joseph E. White III*
Joseph E. White III


## SERVICE LIST

Jeffrey B. Rudman
jeffrey.rudman@wilmerhale.com
Sherry Hartel Haus
sherry.haus@wilmerhale.com
William H. Paine
william.paine@wilmerhale.com
Lauren G. Brunswick
Lauren.brunswick@wilmerhale.com
WilmerHale LLP
60 State Street
Boston, MA 02109
Tel:  617 526-6912
Fax:  617 526-6912


*Counsel for Defendants*