**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **IN RE THE FIRST MARBLEHEAD** | ) | **LEAD CASE NO. 08-10612-JLT** |
| **CORPORATION SECURITIES** | ) | **Judge Joseph L. Tauro** |
| **LITIGATION** | ) | |
| _____ | ) | |

**REPLY TO PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT**

# TABLE OF CONTENTS

I.   Plaintiffs Fail To Explain The Basis For Their Claim That FMD Made False Or Misleading Statements. ...................................................................................................2

II.  Plaintiffs Have Not Stated A Claim Under Section 10(b). .......................................3

     A.   The Robust Disclosures Concerning Credit Quality And Default Rates Fatally Undermine Plaintiffs' Claim...........................................................3

          1.   FMD Disclosed The Expanded Tier Program And The Trusts' Performance Data.........................................................................3

          2.   Throughout The Class Period, FMD Regularly Disclosed Extensive Detail Regarding Default Rates. .................................5

     B.   Defendants Have Not Asserted A "Truth on the Market" Defense. .......................6

          1.   Plaintiffs Fail To Identify An Actionable Misstatement Or Omission And A Strong Inference Of Scienter. ...........................6

          2.   Plaintiffs' "Truth On The Market" Argument Is A Straw Man.................7

III. Plaintiffs Fail To Plead A Basis For A Strong Inference Of Scienter. ............................10

     A.   The "Core Business Doctrine" Does Not Relieve Plaintiffs Of Their Obligation To Plead A Strong Inference of Scienter With Particularity ..............10

     B.   Plaintiffs Have Not Described Their Confidential Sources With Sufficient Particularity To Demonstrate Their Reliability. ....................................13

     C.   Plaintiffs' Insider Trading Allegations Do Not Support A Strong Inference Of Scienter. ........................................................................15

IV.  Plaintiffs Do Not Adequately Allege Loss Causation. .......................................16

     A.   Plaintiffs' Conclusory Loss Causation Allegations Are Insufficient....................17

     B.   Plaintiffs Do Not Plead Loss Causation Under Any Cognizable Theory..............18

          1.   Plaintiffs' Newly-Minted Hybrid Of Corrective Disclosure And "Materialization of Risk" Does Not Plead Loss Causation. ......................18

          2.   Plaintiffs' "Undue Burden" Claim Is Contrary To Law. ..........................21

          3.   Defendants Did Not Conceal Any Risks. .................................22

C.      Stock Price Movements Are Properly Considered At The Motion To Dismiss Stage. ................................................................................................23

V.    Defendants' Projections Regarding Future Payments And Related Disclosures Are Protected Under The PSLRA's "Safe Harbor" Provision And The "Bespeaks Caution" Doctrine. ...........................................................................................24

CONCLUSION ...........................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ABC Arbitrage Plaintiffs Group v. Tchuruk*,
291 F.3d 336 (5th Cir. 2002) ....................................................................13

*In re AOL Time Warner, Inc. Securities Litigation*,
503 F. Supp. 666 (S.D.N.Y. 2007)..............................................................19

*In re Apple Computer Securities Litigation*,
886 F.2d 1109 (9th Cir. 1989) ...................................................................8

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ......................................................8

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ........................................1, 17, 23

*In re Bally Total Fitness Securities Litigation*, Nos. 04 C 3530, 3634,
2006 WL 3714708 (N.D. Ill. July 12, 2006)................................................11

*In re Biogen Securities Litigation*, 179 F.R.D. 25 (D. Mass. 1997) ...................................8

*In re Boston Technology Securities Litigation*,
8 F. Supp. 2d 43 (D. Mass. 1998) ...........................................................2, 25

*Brumbaugh v. Wave System Corp.*, 416 F. Supp. 2d 239 (D. Mass 2006). .....................18

*In re Buca Inc. Securities Litigation*, No. 05-1762 (DWF/AJB),
2006 U.S.Dist. LEXIS 75224 (D. Minn. Oct. 16, 2006) .............................23

*In re Cabletron Systems, Inc.*, 311 F.3d 11 (1st Cir. 2002) .........................................13, 16

*Catton v. Defense Technical Systems*, No. 05 Civ. 6954 (SAS),
2006 U.S.Dist. LEXIS 205 (S.D.N.Y. Jan. 3, 2006) ...................................18

*In re Cigna Corp. Securities Litigation*, 459 F. supp. 2d 938 (E.D. Pa. 2006) ...........16, 17

*Cosmas v. Hassett*, 886 F.2d 8 (2d Cir. 1989) ...................................................12

*In re Countrywide Financial Corp. Securities Litigation*,
588 F. Supp .2d 1132 (C.D. Cal. 2008) .............................................8, 9, 10

*In re Credit Suisse-AOL Securities Litigation*,
465 F. Supp. 2d 34 (D. Mass. 2006) ........................................................18

*Day v. Staples, Inc.*, 555 F.3d 42 (1st Cir. 2009)...................................................6

*Debora v. WPP Group, P.L.C.*, No. 91 Civ. 1775 (KTD),
    1994 WL 177291 (S.D.N.Y. May 5, 1994) ................................................................6, 7

*In re Dell Inc., Securities Litigation*,
    591 F. Supp. 2d 877 (W.D. Tex. 2008)........................................................................18

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) .................................1, 17, 18

*In re eSpeed Inc. Securities Litigation*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006)...........................................................................11

*Elam v. Neidorff*, 544 F.3d 921 (8th Cir. 2008).................................................................11

*Epstein v. Itron*, 993 F. Supp. 1314 (E.D. Wash. 1998) ...................................................12

*Ferber v. Travelers Corp.*, 802 F. Supp. 698 (D. Conn. 1992) ...........................................7

*In re Forest Laboratories, Inc. Deriv. Litigation*,
    450 F. Supp. 2d 379 (S.D.N.Y. 2006)....................................................................12, 13

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) ............................................8

*Glover v. DeLuca*, No. 2:03-cv-0288,
    006 U.S. Dist. LEXIS 76093 (W.D. Pa. Sept. 29, 2006)..............................................13

*Greebel, v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 2006)...........................................15

*Guerra v. Teredyne, Inc.*, No. Civ. A. 01-11789-NG,
    2004 WL 1467065 (D. Mass. Jan. 16, 2004) ...............................................................12

*Hardin County Savingss Bank v. City of Brainerd*, No. 08-CV-38-LRR,
    2008 U.S. Dist. LEXIS 70596 (N.D. Iowa Sept. 18, 2008)....................................19, 20

*Higginbotham v. Baxter International, Inc.*, 495 F.3d 753 (7th Cir. 2007)......................16

*In re Ibis Tech. Securities Litigation*, 422 F. Supp. 2d 294 (D. Mass. 2006) ...................25

*In re Initial Public Offering Securities Litigation*,
    399 F. Supp. 2d 298 (S.D.N.Y. 2005).........................................................................19

*In re Keyspan Corp. Securities Litigation*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) ....................................................................6, 12

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)....................................................................21

*Lormand v. US Unwired, Inc.*, No. 07-30106,
  2009 U.S.App. LEXIS 7452 (5th Cir. Apr. 9, 2009) ..................................17

*Makor Issues & Rights Ltd. v. Tellabs, Inc.*,
  513 F.3d 702 (7th Cir. 2008) ...................................................................12

*In re Merrill Lynch & Co. Research Reports Securities Litigation*,
  2008 U.S.Dist. LEXIS 37993 (S.D.N.Y. May 8, 2008) ............................21

*In re Merrill Lynch & Co. Research Reports Securities Litigation*,
  No. 02 MDL 1484, 02 Civ. 9690 (JFK), 2008 U.S.Dist. LEXIS 44344
  (S.D.N.Y. June 4, 2008)......................................................................21, 22

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*,
  534 F.3d 1068 (9th Cir.), *as amended by* 540 F.3d 1049 (9th Cir. 2008) .............20, 21

*In re Moody's Corp. Securities Litigation*, No. 07 CV 8375 (SWK),
  2009 U.S.Dist. LEXIS 13894 (S.D.N.Y. Feb. 18, 2009)...........................23

*In re Northpoint Communications Group, Inc. Securities Litigation*,
  184 F. Supp. 2d 991 (N.D. Cal. 2001) ......................................................11

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) .................................................13

*In re Parametric Tech. Corp. Securities Litigation*,
  300 F. Supp. 2d 206 (D. Mass. 2001) .......................................................25

*Provenz v. Miller*, 102 F.3d 1478 (9th Cir. 1996)............................................15

*Raab v. General Physics Corp.*, 4 F.3d 286 (4th Cir. 1993)...............................8

*Rand v. Cullinet Software, Inc.*, 847 F. Supp. 200 (D. Mass. 1994)...................8

*Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003) ........................10, 11

*Rubin v. Trimble*, No. C-95-4353 MMC,
  1997 WL 227956 (N.D. Cal. Apr. 28, 1997) .............................................10

*Sable v. Southmark/Envicon Capital Corp.*,
  819 F. Supp. 324 (S.D.N.Y. 1993)...............................................................7

*In re Sawtek, Inc. Securities Litigation*, CA No. 03-294,
  2005 U.S.Dist. LEXIS 39223 (M.D. Fla. Oct. 6, 2005) ............................21

*South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008).....................................11

*In re Stac Electronics Securities Litigation*,
    89 F.3d 1399 (9th Cir. 1996) ........................................................................10

*Stone & Webster*, 414 F.3d 187 (1st Cir. 2005)...............................................................2

*Stumpf v. Garvey* (In re TyCom Ltd. Securities Litigation),
    No. 03-CV-1352, 2005 U.S. Dist. LEXIS 19154
    (D.N.H. Sept. 2, 2005) ................................................................................18

*Teachers Retirement System v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ........................................................................18

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier Inc.*, No. 05
    Civ. 1898 (SAS),  2005 U.S. Dist. LEXIS 19506
    (S.D.N.Y. Sept. 6, 2005)...............................................................................21

*In re Teco Energy Securities Litigation*, No. 8:04-cv-1948-T-27 EAJ,
    2006 U.S.Dist. LEXIS 18101 (M.D. Fla. Mar. 30, 2006) ...........................................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ........................15, 23

*In re Tellium , Inc. Securities Litigation*, No. 02-cv-5878 (FLW),
    2005 U.S.Dist. LEXIS 19467 (D.N.J. June 30, 2008) .................................................13

*Tricontinental Industrial, Ltd. v. PricewaterhouseCoopers, LLP*,
    475 F.3d 824 (7th Cir. 2007) ........................................................................17

*In re Vivendi Universal, S.A., Securities Litigation*, No. 02 Civ. 5571
    (RJA)(HBP), 2009 U.S.Dist. LEXIS 34563
    (S.D.N.Y. Apr.. 6, 2009)) .............................................................................19

*W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
    Civ. A. No. 05-cv-01265-WDM-MEH,
    2008 U.S.Dist. LEXIS 90278 (D. Colo. Nov. 6, 2008) ...............................................17

*Wallace v. Systems & Computer Technology Corp.*,
    No. Civ.A. 95-cv-6303, 1997 WL 602808 (E.D. Pa. Sept. 23, 1997) ........................10

*In re Wet Seal, Inc. Securities Litigation*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) ..............................................................7

*White v. Melton*, 757 F. Supp. 267 (S.D.N.Y. 1991) ...........................................................7

*In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407 (9th Cir. 1994).....................7

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...................................................................17

## FEDERAL STATUTES

15 U.S.C. § 78u-4(b).........................................................................................2

15 U.S.C. § 78u-5(c)(1)(A)..............................................................................25

Plaintiffs' Opposition ("Opp.") is an evasion, not an argument. Defendants' opening brief ("Mem.") showed that Plaintiffs' Class Action Complaint ("Complaint" or "CAC") did not identify any false or misleading statement, or plead facts necessary to support a strong inference of scienter. Plaintiffs' responses consist largely of a series of unilateral declarations that they have satisfied all pleading requirements, supported only by inapposite authority and unreliable witnesses. The Opposition thus confirms what Defendants said in their opening brief.

Defendants identified in their memorandum extensive public disclosures directly rebutting Plaintiffs' theory of fraud and scienter. Although Plaintiffs concede that this information is properly before the Court, they grapple with none of it. Instead, they pretend that (a) the source of all of this information was SEC filings made by trusts with limited connection to First Marblehead Corporation ("FMD"), and (b) Defendants' only purpose for including the information in the record is to support an affirmative defense (lack of reliance). To the contrary, these facts were disclosed by both FMD and the securitization trusts that it structured and administered ("Trusts"), and they were properly included in the record to show that the Complaint lacks a factual basis to assert that FMD made an actionable statement or acted with scienter.

Plaintiffs also seek to evade their responsibility to plead loss causation. They claim that a "short, plain statement" is enough. They ignore that their "statement" is the same kind of unsupported legal conclusion rejected by the Supreme Court in *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341 (2005), and that in light of the facts of record, their conclusory "statement" is not "plausible." *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2008).

## I.  Plaintiffs Fail To Explain The Basis For Their Claim That FMD Made False Or Misleading Statements.

Defendants explained in their opening brief that Plaintiffs engaged in prohibited "puzzle pleading" by failing to identify the precise language at issue or to explain why any particular statements were false or misleading.  Mem. at 15-16.

Plaintiffs' response is to boldly declare that "[t]he Complaint plainly identifies each of the alleged omissions and false and misleading statements and the reasons why the statements are false and misleading."  Opp. at 18.  Not so.  A blanket citation to block quotes comprising ninety-one paragraphs of the Complaint hardly specifies the language Plaintiffs claim is at issue.  Even more confusing is the assertion that somewhere within another fifty-eight paragraphs of the Complaint are the reasons for falsity.  *See* Opp. at 18 (*citing* CAC ¶¶ 90-180 and ¶¶ 32-89, respectively).  This does not comply with the PSLRA requirement that such a complaint "specify *each* statement alleged to have been misleading" and "the reason or reasons why *the* statement is misleading." [1]  15 U.S.C. § 78u-4(b)(1) (emphasis added).

Not surprisingly, Plaintiffs also do not attempt to distinguish the numerous authorities demonstrating that courts have condemned as "puzzle pleading" other complaints that, like this one, fail to adequately identify which statements are challenged and, *as to each*, why.  *See* Mem. at 15-16.  Plaintiffs' reliance on *Stone & Webster*, 414 F.3d 187 (1st Cir. 2005), typically substitutes edict for analysis.  Opp. at 19.  Plaintiffs note the conclusion that the complaint *in that*

---

[1]  This failure makes it very difficult for the Court to conduct the "statement-by-statement" analysis typically conducted in this Circuit with respect to complaints in securities fraud cases.  *See, e.g., In re Boston Tech. Sec. Litig.*, 8 F. Supp. 2d 43, 55-56 (D. Mass. 1998) (*citing Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1219-21 (1st Cir. 1986)), or to evaluate the claims against particular defendants. For example, the Complaint addressed only one statement alleged to have been made by FMD's former CFO, Donald Peck (made five days before he gave up the position on November 1, 2006), and contains no plausible basis to conclude that it was false.  *See* CAC ¶ 48 (quoting statement about  loan prepayment assumptions).  Plaintiffs do  not explain what they believe is false or misleading about this  statement, and the gravamen of their generalized theory of fraud is creditor quality (e.g., FICO scores and default assumptions), not prepayment assumptions.  Thus, Plaintiffs do not state a claim against Mr. Peck.

*case* was sufficiently particular and then just announce bravely that "[t]he Complaint here provides even greater detail." *Id.* This is no substitute for reasoned argument or analysis.

## II. Plaintiffs Have Not Stated A Claim Under Section 10(b).

Plaintiffs do not contest or even address FMD's detailed showing that there was detailed disclosure of what Plaintiffs allege was not disclosed. Mem. at 6-11, 17-19 and 25-30, and Appendix A to Mem. Nor do they dispute that the information submitted by Defendants may properly be considered by the Court on this motion. Instead, Plaintiffs rely entirely on a flawed legal argument to suggest (implausibly and incorrectly) that that the only possible reason for Defendants to submit this information would be to support an affirmative defense: "truth on the market." In fact, Defendants never mentioned that defense. Instead, Defendants rely on this information to show that Plaintiffs have failed to adequately plead the required elements for their purported claim: a false or misleading statement, scienter and loss causation.

### A. *The Robust Disclosures Concerning Credit Quality And Default Rates Fatally Undermine Plaintiffs' Claim.*

The theory of the Complaint is that, during the alleged Class Period, FMD secretly lowered credit quality standards for the student loans it securitized, which caused an undisclosed spike in default rates, credit rating downgrades, and eventually the bankruptcy of The Education Resources Institute, Inc. ("TERI") (the guarantor of the student loans whose securitization FMD facilitated). *See* CAC ¶¶ 61-77, 83-85, 181. Because none of the critical nondisclosure claims withstands scrutiny, Plaintiffs' entire theory of the case fails as a matter of law.

#### 1. *FMD Disclosed The Expanded Tier Program And The Trusts' Performance Data.*

Plaintiffs allege that FMD represented that it maintained strict lending criteria throughout the Class Period, including a requirement that any parent co-signing a student loan possess a FICO score above 700. They also allege that FMD embarked on a clandestine program to relax

credit criteria and originate student loans below this supposed limit without disclosing that fact to investors. *See* CAC ¶¶ 61-65, 87, 181. Plaintiffs have not pled any factual support for either assertion, and the facts in the record rebut both contentions.

First, FMD never said there was a hard FICO score floor at 700. According to the Complaint, FMD said that the "typical" borrower had an "average" score "in excess of 700." Mem. at 17 n.27. Plaintiffs also cite a snippet from a teleconference with securities analysts in which FICO scores were said to be "pretty consistent []in that 710 to 720 range." CAC ¶ 36. Neither statement announces a FICO score floor. Both are consistent with the detailed showing in the record that the *average* FICO score for the Trusts was above 700 and that there were also *numerous* loans in each trust below 700. *See* Mem. at 7 & n.11. Plaintiffs' only response is to blithely re-assert the unsupported conclusions of the Complaint, which is plainly insufficient.

Second, and more specifically, FMD has shown that it disclosed the changes it made to its FICO score underwriting standards over time, including the disclosure of expanded credit criteria beginning in May 2006, increases in the Trusts' projected default rates, and "static pool" data relating to the Trusts' assets and performance. The Trusts were even more explicit in their disclosures, indicating many loans with FICO scores below 700 among their assets; the number of loans with FICO scores between 600 and 800; the actual FICO score of the vast majority of loans within ten points; and the weighted average FICO score for each trust. *See* Mem. at 7-8, 8 n.12, 7 n.10, 16-22. Plaintiffs do not – and cannot – contest the fact that this information was disclosed. Nor can they wish away the fact that this disclosure was made during the Class Period not only in the Trusts' SEC filings, but also in FMD filings. *Id*. at 7-8 and 8 n. 12. Because every other element of Plaintiffs' theory of fraud, scienter and loss causation depends on the alleged failure to disclose that which actually was disclosed, Plaintiffs' claim fails.

Finally, Plaintiffs likewise fail to respond to Defendants' showing that any undisclosed change in credit quality was immaterial as a matter of law. That is, even if there had been an undisclosed change in underwriting standards, Plaintiffs have not pled a plausible factual basis for their claim that such a change in credit quality in 2005, relating to loans whose repayment would typically be deferred until at least 2009, would cause "skyrocketing" default rates in a $12 billion loan portfolio "beginning in 2007,"[2] or the TERI bankruptcy. *Compare* CAC ¶ 66 *with* Mem. at 23-25.

### 2. Throughout The Class Period, FMD Regularly Disclosed Extensive Detail Regarding Default Rates.

Plaintiffs also allege that FMD did not make proper disclosure about default rates. *See, e.g.*, CAC ¶¶ 72-74. This contention runs hard aground on the available record, which demonstrates abundant disclosure and the absence of any plausible basis to infer scienter.[3] *See* Mem. at 25-28.

Plaintiffs' default rate claims depend upon two conclusions shown by the record to be incorrect. First, Plaintiffs assert that what was disclosed in FMD's own filings (*i.e.,* an increase in defaults at the end of 2007) somehow was not disclosed. In fact, as the record makes clear, FMD in its own SEC filings prominently and repeatedly disclosed an increase in defaults with

---

[2]      Plaintiffs' implausible theory rests, in part, on an anonymous source that asserts that FMD permitted up to three 4,000 loans to borrowers with "bad credit." Opp. at 13. The allegation says nothing about whether such borrowers' FICO scores were within the underwriting criteria, nor does it say anything about how many such loans were made, default rates on the resulting loans, or the effect of such default rates on the multi-billion dollar loan portfolio.

[3]      For every single quarter during the Class Period, FMD filed (or caused to be filed) with the SEC a report containing comprehensive deferral, default and delinquency data about the loans securitized by the Trusts. Until the third quarter of 2007, the Trusts made such filings in connection with new securitizations. *See* Phair Declaration Ex. 18-23 (Prospectus Supplements for Trusts 2006-3, 2006-4, 2007-1, 2007-2, 2007-3 and 2007-4). Beginning in the third quarter of 2007, FMD provided this data in its own SEC filings on Form 8-K or Form 10-Q. Phair Declaration Ex. 12. In addition, during the Class Period, every press release announcing an FMD-facilitated securitization (all of which are incorporated by reference in the Complaint) directed investors to the trust disclosures, and specifically to the static pool data upon which defendants rely. *See* CAC ¶¶ 93, 100, 108, 116, 117-18, 126-27, 130, 141-43. During the Class Period, FMD also answered questions about and directed investors to this information during earnings calls, and posted it on its website. *See, e.g.*, Declaration of Taylor Washburn, Ex. 1 (Q2 2007 Earnings Call, Jan. 25, 2007) at 6 (analyst asking FMD's CEO, Mr. Kopnisky, about posted static pool information); Ex. 2 (Q4 2007 Earnings Call, Aug. 9, 2007) at 5 (FMD's CFO, Mr. Hupalo, noting that static pool data had been filed on FMD's Form 8-K).

respect to the same period in which Plaintiffs' source claims that such an increase occurred. *See* Mem. at 27. Second, Plaintiffs' conclusion that FMD made a false statement about default rates relies only upon their own misunderstanding (and that of a "confidential" witness) about the use of the term "default rate" in FMD's disclosures. Mem. at 9-11, 25-28. As disclosures in the record make clear, there is a difference between the disclosed estimated *net* default rate assumption (which is the difference, used for accounting purposes, between projected gross defaults and projected recoveries over the Trusts' twenty-four year life), and the actual gross default rate being experienced at a point in time. Mem. at 26-27. FMD's consistent disclosures accurately reflected this distinction. As a result, another critical element in Plaintiffs' theory falls (and their entire theory falls along with it).

### B. Defendants Have Not Asserted A "Truth on the Market" Defense.

Plaintiffs attempt to avoid addressing the defects in their Complaint by mischaracterizing Defendants' argument as a "truth on the market" defense. In fact, Defendants have not yet raised a "truth on the market" defense, and instead have pointed out that Plaintiffs have not pled a factual basis for three elements that they are required to plead in order to state a claim in the first instance: a false or misleading statement, scienter and loss causation. *See, e.g., Day v. Staples, Inc.*, 555 F.3d 42, 55-57 (1st Cir. 2009) (listing elements of securities fraud claim).

### 1. Plaintiffs Fail To Identify An Actionable Misstatement Or Omission And A Strong Inference Of Scienter.

A plaintiff fails to plead an actionable claim when the information it claims was not disclosed was, in fact, disclosed. *See, e.g., In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("Even at the pleading stage dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed"); *Debora v. WPP Group, P.L.C.,* No. 91 Civ. 1775 (KTD), 1994 WL 177291, at *5 (S.D.N.Y. May 5, 1994) ("A

complaint fails to state a § 10(b) claim when the alleged omission has actually been disclosed")
(*citing Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 116-17 (2d Cir. 1982)); *Sable v.
Southmark/Envicon Capital Corp.,* 819 F. Supp. 324, 333 (S.D.N.Y. 1993) ("The naked assertion
of concealment of material facts which is contradicted by published documents which expressly
set forth the very facts allegedly concealed is insufficient to constitute actionable fraud")
(*citation and quotation marks omitted*); *White v. Melton,* 757 F. Supp. 267, 272 (S.D.N.Y. 1991)
("The Court must dismiss a complaint founded on allegations of securities fraud if the allegedly
omitted or misrepresented information was in fact appropriately disclosed"). This is not a "truth
on the market" defense.

Nor is an attack on a plaintiff's scienter theory, based on the nature of the information
actually disclosed, a "truth on the market defense." *See* Opp. at 2. The clarity and depth of the
disclosures in the record are directly probative of – and inconsistent with – any inference of
scienter. The supposed scheme – dependent on supposed nondisclosure of FICO scores less than
700 and supposed false disclosure about default rates – is utterly implausible when the record in
full is considered. Thus, there can be no "strong inference" that Defendants intended to deceive.
*See, e.g., In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1425 (9th Cir. 1994) ("The
detailed risk disclosure in the Debenture Prospectus negates an inference of scienter"); *Ferber v.
Travelers Corp.,* 802 F.Supp. 698, 714 (D. Conn. 1992) ("[D]efendants' provision of adverse
information to the [public by way of disclosures] negates an inference that they acted with an
inten[t] to defraud"); *In re Wet Seal, Inc. Sec. Litig.,* 518 F. Supp.2d 1148, 1165 (C.D. Cal. 2007)
(holding that repeated disclosures of risks by defendant negated inference of scienter).

### 2. Plaintiffs' "Truth On The Market" Argument Is A Straw Man.

As Plaintiffs themselves acknowledge, *see* Opp. at 13, Defendants neither said nor hinted
that they were trying to assert an affirmative defense. Defendants do not argue that, despite a

misstatement or omission, truthful information later entered the market such that the market price of FMD would thereafter have taken it into account. *See, e.g., In re Biogen Sec. Litig.,* 179 F.R.D. 25, 36 -37 (D.Mass. 1997) (truth on the market defense "is intended to rebut the plaintiffs' presumption of reliance on the market by suggesting that *even if fraudulent statements were made in attempt to manipulate the market price of a security*, if corrective information credibly entered the market and dissipated the effects of the misstatements, those who traded defendant's shares after the corrective statements would have no direct or indirect connection with the fraud") (internal quotation omitted) (emphasis added).  Rather, Defendants have shown that Plaintiffs have failed to plead facts to show that there were any misstatements or scienter in the first place.[4]

Plaintiffs' argument is based on *In re Countrywide Financial Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008), which is inapplicable here.  *See* Opp. at 15-17.  As an initial matter, the court in *Countrywide* addressed an asserted truth on the market defense, not a failure to plead fraud or scienter in the first instance.  *Countrywide*, 588 F. Supp. 2d at 1160 (rejecting "truth on the market" defense that had been raised by Defendants).  The court concluded that the factual detail set forth in the complaint was so compelling that the use of vague adjectives that

---

[4] What Plaintiffs and some courts have called "truth on the market" is an affirmative defense to the reliance element of a Section 10(b) claim.  In *Basic Inc. v. Levinson*, the Supreme Court permitted plaintiffs in some circumstances to avoid proof of actual reliance for such claims arising from the purchase or sale of a security traded on an open and developed securities market.  485 U.S. 224, 241-44 (1988).  Instead, in such cases, plaintiffs enjoy a rebuttable presumption that they relied upon the integrity of the security's market price, which is presumed to reflect all publicly available information – including the alleged misrepresentation – therefore establishing the necessary causal connection between the defendants' alleged misconduct and the plaintiffs' decision to purchase or sell. *Id.* The presumption is rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Id.* at 248.  Where defendants show that sufficient information "credibly entered the market and dissipated the effects of the misstatements," such that those who traded after the corrective statement "would have no direct or indirect connection with the fraud," they rebut the presumption. *Id.* at 249; *see also Ganino v. Citizens Utilities Co*., 228 F.3d 154, 167 (2nd Cir. 2000) ("truth on the market" defense alleges that "a misrepresentation is immaterial if the information is already known to the market, because the misrepresentation cannot then defraud the market"); *Raab v. General Physics Corp.,* 4 F.3d 286 (4th Cir. 1993) ("[in] a fraud on the market case, the defendant's failure to disclose material information may be excused where that information has been made credibly available to the market by other sources") (*quoting In re Apple Computer Secs. Litig.*, 886 F.2d 1109, 1113-1114 (9th Cir. 1989)); *see also Rand v. Cullinet Software, Inc.*, 847 F. Supp. 200, 206 (D. Mass. 1994) ("[w]hile the Court of Appeals for the First Circuit has not addressed this issue, this court finds the truth on the market defense to be logical and compelling").

would be inactionable in almost any other case could be challenged as fraud. *Compare Countrywide*, 588 F. Supp. 2d at 1145 (Countrywide's underwriting standards "nearly abandon[ed]" by 2006) *with id.* at 1153 (defendants' reference to the existence of underwriting or quality control standards or processes – given facts in the complaint showing an utter absence of such standards or processes – actionable even though "[i]t cannot be emphasized enough that in the vast majority of cases such statements would be nonactionable puffery"). Having reached this conclusion (*see id.* at 1153-54), the Court considered whether prospectuses issued for purposes similar to the trust prospectuses in this case "put the truth on the market and thereby negate[d] the reliance element."[5] *Id.* at 1159-61.

In this case, there is no basis to conclude that there was a misstatement in the first place, and therefore no reason to argue that subsequent disclosures cured it. For example, nothing in the Complaint permits the conclusion that FMD utterly lacked underwriting standards. To the contrary, the Complaint asserts that there were standards, and that one of them (the FICO score standard) was changed without disclosure to permit loans to borrowers whose cosigners had scores less than 700. *See, e.g.,* CAC ¶ 66 ("new credit-lax initiatives"). This contention is plainly rebutted by Defendants' showing – on the face of publicly available SEC filings – that changes in FICO score standards, as well as the abundant number of loans with scores less than 700, were disclosed to investors.

Moreover, unlike in *Countrywide*, it is not necessary in this case for the Court to interpret complex data and reach a nuanced conclusion. *Compare id.* at 1153 n.16 (noting that static pool

---

[5] FMD's public disclosures, including statements made during earnings conference calls and every press release during the Class Period relating to a securitization, referred investors to the Trusts' SEC filings, which were also posted on FMD's website. *See supra* at 5 n. 3. FMD's management encouraged investors to review information relating to the Trusts' collateral and performance, even arranging an "investor day" in February 2007 to explain the information reported by the Trusts and how to access it. *Id.* Thus, Plaintiffs' attempt to suggest the trust disclosures are akin to information from third-parties that enters the market – as in a "truth on the market" defense – is misguided. FMD, itself, filed the same kind of information; FMD caused the Trusts to file the data plaintiffs seek to ignore; and FMD specifically referred its investors to the trust filings.

data presented by Countrywide was insufficient to "reveal the fact that Countrywide had performed little or no meaningful borrower verification, even for certain 'prime' loans." *Compare Countrywide,* 588 F. Supp. 2d at 1160 n. 32 (suggesting that for the truth to have penetrated the market, there would have had to have been "a hedge fund somewhere [with] a computer analyzing the loan detail tables in all these prospectuses"). Instead, the information at issue was presented plainly by FMD and the Trusts in charts and in text. These disclosures on their face show that the very information said to be concealed was in fact disclosed.[6]

**III. Plaintiffs Fail To Plead A Basis For A Strong Inference Of Scienter.**

**A.** ***The "Core Business Doctrine" Does Not Relieve Plaintiffs Of Their Obligation To Plead A Strong Inference of Scienter With Particularity***

Unable to plead actual facts showing scienter, Plaintiffs fall back on a few cases that, at best, reflect a rule that is both rarely applied and, in any event, inapplicable here. Some courts have concluded that it is reasonable to infer that particular facts that are so important that they go to the very "core" of a company's business must have been known to the company's top officials. From this narrow premise, Plaintiffs posit the nonsensical conclusion that "because securitization was the primary source of First Marblehead's profits," Defendants necessarily had scienter with respect to any (and every) spurious assertion relating to securitization. Opp. at 29.

Though this Circuit has not expressly addressed the "core business doctrine," several other courts have rejected it as impermissible status pleading. *See, e.g., Rosenzweig v. Azurix*

---

[6]     Of course, if the Court were to conclude that Plaintiffs have a factual basis for their claim of "truth on the market," then it is well-settled that any such defense "can be granted on a motion to dismiss where the company's SEC filings or other documents disclose the very information necessary to make their public statements not misleading." *Wallace v. Systems & Computer Technology Corp.*, no. 95-CV-6303, 1997 U.S. Dist. LEXIS 14677, at *43-44 (E.D. Pa. Sept. 23, 1997); *see also In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1410 (9th Cir. 1996) (affirming dismissal of fraud on the market claim because the prospectus disclosed some of the alleged omitted information, and the rest would have been obvious to the market even without disclosure); *Rubin v. Trimble*, 1997 U.S. Dist. LEXIS 14011, at *20 (N.D. Cal. Apr. 28, 1997) ("a truth-on-the-market defense can be granted on a motion to dismiss where the company's SEC filings disclose the very information necessary to make their public statements not misleading"). In other words, regardless of whether Defendants' argument is characterized as a failure to plead a necessary element of a securities fraud claim or as a truth on the market defense, the Complaint must be dismissed because FMD indisputably disclosed that which Plaintiffs allege was not.

*Corp*., 332 F.3d 854, 867 (5th Cir. 2003) (rejecting allegation that failure of company's core business evidences defendant's knowledge that they were misrepresenting company's prospects for success); *In re Bally Total Fitness Sec. Litig.*, Nos. 04 C 3530, 3634, 2006 WL 3714708, at *9 (N.D. Ill, July 12, 2006) (rejecting plaintiffs' theory as an "attempt [ ] at an end-run around the requirement that plaintiffs set forth particularized facts to suggest that defendants acted knowingly or recklessly").

Even courts applying the "core business doctrine" recognize that it only applies in "exceedingly rare" cases. *See, e.g., South Ferry LP, No. 2 v. Killinger,* 542 F.3d 776 at 758 n. 3 (9th Cir. 2008) ("[the] category of cases in which the core operations inference, without more, is sufficient under the PSLRA" is "exceedingly rare"). At a minimum, a plaintiff must first have built a foundation of detailed factual allegations showing management's general exposure to the type of information at issue and the critical importance of the particular fact. *See, e.g., Elam v. Neidorff*, 544 F.3d 921, 929-930 (8th Cir. 2008) ("Even if the proper factual allegations could warrant . . . application [of the core business doctrine], plaintiffs have not made such a showing . . . [W]e would at least require a showing that this information was known within the company at that time"), *In re ESpeed Inc Sec. Litig.*, 457 F. Supp. 2d 266, 294 (S.D.N.Y. 2006) ("To the extent that [the] 'core operations' method of pleading conscious misbehavior or recklessness is viable after the PSLRA, plaintiffs must provide more facts to support a strong inference that any misstatements by defendants . . . must have been made with scienter"); *South Ferry LP,* 542 F.3d 776 at 785 (same); *In re Northpoint Commc'ns Group, Inc. Sec. Litig.,* 184 F. Supp. 2d 991, 998 (N.D. Cal. 2001) (same).

Plaintiffs fail to lay this foundation, merely asserting that each Defendant knew about a scheme (involving FICO scores, changes in credit quality, default rates, TERI's financial

condition) merely because FMD's business was to securitize loans. Taken to its logical conclusion, Plaintiffs' argument is that there is no scienter requirement whatsoever in any case involving a lender. This is fallacious. Indeed, it makes no sense to assume that "everyone must know" something that is not true (*e.g.,* that FMD did not disclose changes in credit standards or had a hard FICO score floor).

To be sure, Plaintiffs cite a few cases applying "core business." But those cases do not presume (as Plaintiffs do) knowledge of a broad swath of information. Rather, they only presume knowledge of a single, specific, and compelling fact of fundamental importance to the issuer's business such that it truly would have been impossible for management not to have known. *See, e.g., Cosmas v. Hasset*, 886 F.2d 8 at 10-13 (2d Cir. 1989) (knowledge of Chinese import restrictions presumed where they "apparently eliminated a potentially significant source of income for the company"); *Epstein v. Itron, Inc.,* 993 F. Supp. 1314, 1317 (E.D.Wash. 1998) (inferring knowledge where corporate defendant made misrepresentations about a developing technology that was "essential to the survival" of the defendant's industry); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) (inferring knowledge where statement concerned products that "were to Tellabs as Windows XP and Vista are to Microsoft").[7]

Finally, under any formulation, the core business doctrine does not extend to non-employee directors not involved in day-to-day affairs. *See, e.g.*, *In re Forest Laboratories, Inc.*

---

[7]     *See also Keyspan*, 383 F.Supp. 2d at 387-388 (rejecting core business doctrine in case charging that defendants inflated stock by concealing the negative effects of acquisitions, explaining that "although the court might charge senior Keyspan officials with knowledge of a major contract dispute with the Company's largest customer, say, the problems at [the acquired company] are simply not of such a magnitude as to excuse plaintiff from the usual rule requiring specificity"); *Guerra v. Teradyne, Inc.*, No. Civ. A. 01-11789-NG, 2004 WL 1467065, at *27 (D. Mass. Jan. 16, 2004) ("Even assuming that [plaintiffs'] broad assertion [of the core business doctrine] is an accurate statement of the law, this principle has no application here. As the cases relied on by plaintiffs establish, courts have found scienter where there is an affirmative misrepresentation made about facts relating to significant parts of the company' business such that the defendants' allowance of such misinformation to stand must have been intentional and for the purpose of deceit").

*Deriv. Litig.*, 450 F. Supp. 2d 379, 390-392 (S.D.N.Y. 2006) (rejecting application of core business doctrine to outside directors, even as to drugs constituting 82 percent of sales, and noting that even cases charging top officers with knowledge of negative information by reason of their status "typically involved circumstances far more suggestive of their direct access to such information") (*quoting Keyspan*, 383 F.Supp.2d at 388 (internal quotations omitted)); *In re Tellium , Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 19467, at *79-81 (D.N.J. June 30, 2008) (rejecting application of core business doctrine to outside director); *Glover v. DeLuca*, 2006 U.S. Dist. LEXIS 76093 at *32-34 (W.D. Pa. Sept. 29, 2006) (similar).

    **B.**     ***Plaintiffs Have Not Described Their Confidential Sources With Sufficient Particularity To Demonstrate Their Reliability.***

Plaintiffs also protest that they need not identify confidential sources by name. Opp. at 20. This is a red herring, as Defendants never said they had to. The real issue that Plaintiffs cannot fix is that a plaintiff is legally excused from naming names only where the sources "are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F. 3d 300, 314 (2d Cir. 2000). *See also In re Cabletron Systems, Inc.* 311 F.3d 11, 20-30 (1st Cir. 2002) (holding that "sufficient particularity" depends on an "evaluation, *inter alia*, of the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia."); *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002) (adopting standard from *Novak*, 216 F.3d at 313-14).

Plaintiffs' emphasis on names is apparently intended to obscure their inability to meet this standard. They repeat the mantra that they have adequately described each of their sources'

positions and responsibilities, but that does not answer the question whether those positions and responsibilities make the witnesses reliable sources of the type of information they offer.  Given that Plaintiffs do not contend that any of those positions or responsibilities included credit quality, financial reporting, loan delinquencies or loan defaults, the answer is a resounding "no."  For example, Plaintiffs pointlessly assert that one witness produced irrelevant disbursement reports, which he then submitted to his "supervisor," who then submitted them to "upper management."  Opp. at 22.  This does not show that the witness knows anything about, for example, alleged secret changes in credit quality.  Similarly, the fact that the former CISO *reported* to Mr. Baumer hardly means that he knows anything about the matters at issue, particularly since he had no apparent responsibility for such matters.  For example, he apparently does not understand the difference between the net default rates used for accounting purposes to predict net defaults over the long life of the Trusts, and the gross default rates being experienced at a moment in time (*see supra* at 6); and he evidently confuses "commercial paper" (which FMD has never sold), with asset-backed securities issued by the Trusts.  Opp. at 26.

Plaintiffs also argue that that, in considering whether they have provided adequate source descriptions, the Court can look at the other "corroborating facts pled."  Opp. at 23.  But the vague "corroborating details" cited by Plaintiffs are actually the details attributed to these confidential sources or, worse, are totally unsourced speculation.[8]

---

[8]    For example, Plaintiffs' "corroborating details" regarding the Expanded Tier Program are all alleged to have been provided by the Former VP of Applications and the Former Process Analyst (CAC ¶¶ 61-65).  Similarly, "details" regarding default rates are supposed to have come from the Former CISO, the Former Output Supervisor, the Former Relationship Manager, and the Former VP of Applications (CAC ¶¶ 71-76), "details" regarding the FMD-TERI relationship are attributed to the Former Business Analyst, the Former VP for Applications, and the Former CISO (CAC ¶¶ 77-86).  It is far from obvious that anyone in those positions would actually know such "details."

### C.    *Plaintiffs' Insider Trading Allegations Do Not Support A Strong Inference Of Scienter.*

Plaintiffs rest their insider trading argument entirely on the vanilla proposition that there is no "bright line rule" that all defendants must trade or that a particular quantum of trading is necessary to support a strong inference of scienter.  But none of the cases they cite remotely support their suggestion that the sales here give rise to a strong inference of scienter.  In the case at hand, sales were made by only three of eight defendants, all of whom were non-employee directors not specifically alleged to have made any statement or received any adverse information.  Furthermore, those defendants who did sell stock sold relatively low percentages of their holdings, and only one of them (Anbinder) traded in the vicinity of any of the announcements alleged to be a "corrective disclosure"[9]  Once again, Plaintiffs' *modus operandi* is to cite cases for a general proposition and simply declare – rather than show – that they are factually analogous.

In two of Plaintiffs' cases, the court found there was *no* strong inference of scienter. *Greebel*, *v. FTP Software, Inc.,* 194 F.3d 185, 206 (1st Cir. 2006), *Provenz v. Miller,* 102 F.3d 1478, 1491 (9th Cir. 1996).  In *Miss. Pub. Emples. Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 92 (1st Cir. 2008), unlike here, the defendants sold shares throughout the months prior to the announcement resulting in a stock price drop.  Even then, the court found that the insider trading claims were "on the weaker end of the spectrum."  *Id.*  To the extent that *In re Cabletron Sys.*, 311 F.3d 11, 40 (1st Cir. 2002), found that trades contributed to an inference of scienter despite "a plausible innocent explanation," the decision must now be read in light of *Tellabs*' mandate to consider innocent inferences and only to credit adverse ones when they are at least as "cogent and compelling."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 324 (2007);

---

[9]    As to those sales, Mr. Anbinder was trading pursuant to a 10b5-1 trading plan put into place long prior to any alleged "corrective disclosures" at issue.  *See* Mem. at 42, nn. 54, 55.

*Higginbotham*, 495 F.3d at 759 (noting that under *Tellabs*, all plausible inferences explaining

trading must be considered in evaluating scienter). Here, as shown previously, any possible

adverse inference is strongly outweighed by circumstances suggesting the trades were innocent.[10]

Mem. at 39-43.

## IV.    Plaintiffs Do Not Adequately Allege Loss Causation.

Plaintiffs are so focused on disclaiming any pleading obligation that they fail to articulate

a coherent theory of loss causation. Even though the Complaint alleges purported "corrective"

disclosures, Plaintiffs now deny the need to identify any such disclosure, or to explain how any

announcement or event that resulted in a stock price decline connects to any prior

misrepresentation or omission on FMD's part. Similarly, although their losses indisputably

occurred during deteriorating market conditions due to the credit crisis, Plaintiffs deny their

obligation under *Dura* to distinguish between stock price declines caused by fraud and those

caused by market forces. Instead, they insist that the Court may not consider stock price

movements at all. Opp. at 38-39. Plaintiffs also attempt to distract attention from their empty

pleading by erecting and knocking down numerous straw men, including the propositions (never

raised by Defendants) that only a confession of fraud suffices for loss causation, that a "unitary"

disclosure is required, and that "truth on the market" negates loss causation here.

In the end, Plaintiffs rely on circular reasoning, not a demonstration of loss causation.

Plaintiffs appear to concede that they cannot – as they must – identify any actual disclosure,

series of disclosures, or event that either corrected a prior misrepresentation by FMD or reflected

the "materialization of a concealed risk." Opp. at 36 (*quoting In re Cigna Corp. Sec. Litig.*, 459

---

[10]    These facts contrast starkly with those in *Cabletron*, where trading took place just after an announcement
that increased stock price and just before the corrective disclosures at issue, and all but two defendants traded
between 1/3 and 90% of their stock. *Cabletron*, 311 F.3d at 20. Even then, it was still a "close call" with respect to
the outside directors. *Id.*

F. Supp. 2d 338, 349 n.22 (E.D. Pa. 2006)).  Instead, they are reduced to simply assuming their conclusion and pronouncing it sufficient: "the precipitous drop in First Marblehead's share price following November 26, 2007 would not have occurred had the new information entering the market not contradicted the earlier fraudulent reports and lofty expectations that the Defendants had published previously."  Opp. at 36.

## A.    *Plaintiffs' Conclusory Loss Causation Allegations Are Insufficient.*

Plaintiffs first deny that they must explain with any specificity how any fraud allegedly caused their loss.  Opp. at 32.  They contend that Rule 9(b) is inapplicable and that under Rule 8, they are required only to provide "a short and plain statement of the claim showing that the pleader is entitled to relief."

However, at least one Court of Appeals expressly has held that Rule 9(b) applies to the loss causation element. *Zucco Partners, LLC v. Digimarc Corp.*, 2009 U.S. App. LEXIS 7025, at *12-13 (9th Cir. Feb. 10, 2009).  Moreover, even Rule 8 requires a plaintiff to plead factual allegations sufficient to make their conclusions regarding loss causation "plausible." *Twombly*, 127 S. Ct. at 1974; *see Lormand v. US Unwired, Inc.*, No. 07-30106, 2009 U.S. App. LEXIS 7452, at *84 (5th Cir. Apr. 9, 2009) (concluding that Rule 8 "requires the plaintiff to allege, in respect to loss causation, a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss"); *W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, 2008 U.S. Dist. LEXIS 90278, at *21-22 (D. Colo. Nov. 6, 2008) (granting motion to dismiss with respect to loss causation where announcements identified by plaintiffs did not plausibly show "true facts" that had allegedly been covered up by defendants); *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 842-43 (7th Cir. 2007) (affirming dismissal of Section 10(b) and Rule 10b-5 claims and holding that *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) requires plaintiffs to plead loss causation with precision), *cert denied*,

138 S. Ct. 357 (2007); *Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162, 186 (4th Cir. 2007) (affirming dismissal of Section 10(b) and Rule 10b-5 claims and holding that loss causation must be pled "with sufficient specificity to enable the court to evaluate whether the necessary causal link exists").[11]

## B.    *Plaintiffs Do Not Plead Loss Causation Under Any Cognizable Theory.*

Plaintiffs fail to supply – as they must – any facts showing any plausible connection between the declines in FMD's stock price and any alleged fraud.  Post-*Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341 (2005), there are essentially only two ways for a plaintiff to plead loss causation: he or she may plead that a stock price drop resulted from a  "corrective" disclosure or from the "materialization of a [known] risk."  *In re Dell Inc., Secs. Litig.*, 591 F. Supp. 2d 877, 906-911 (W.D. Tex. 2008).[12]  Plaintiffs have done neither.

### 1.    *Plaintiffs' Newly-Minted Hybrid Of Corrective Disclosure And "Materialization of Risk" Does Not Plead Loss Causation.*

The Complaint expressly relies on a defective "corrective disclosure" theory.  *See* CAC ¶ 198 ("When Defendants' misrepresentations and fraudulent conduct were *disclosed* and became apparent to the market, the prices of First Marblehead's securities fell precipitously as the prior inflation came out of the Company's stock price") (emphasis added).  However, in the face of Defendants' showing that the announcements at issue were negative but not "corrective," *see* Mem. at 45-48, Plaintiffs now abandon that theory in favor of a vague hybrid of corrective

---

[11]    The District of Massachusetts cases cited by Plaintiffs (Opp. at 32) were decided several years ago, before any of these decisions. *See e.g., Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 256 (D. Mass. 2006); *In re Credit Suisse-AOL Sec. Litig.,* 465 F. Supp. 2d 34, 45-46 (D. Mass. 2006); *Stumpf v. Garvey (In re TyCom Ltd. Sec. Litig.*), 2005 U.S. Dist. LEXIS 19154, at *42-43 (D.N.H. Sept. 2, 2005).

[12]    *Catton v. Defense Tech. Sys.*, No. 05 Civ. 6954 (SAS), 2006 U.S. Dist. LEXIS 205, at *22 (S.D.N.Y. Jan. 3, 2006) reached the same conclusion: "In a [securities fraud] claim based on material misrepresentations and omissions, a plaintiff who cannot support an allegation of direct causation may do one of two things to sufficiently allege loss causation.  Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, a plaintiff may plead that it is the materialization of the undisclosed condition or event that causes the loss.  Alternatively, a plaintiff may identify particular disclosing events that reveal the false information, and the dissipation of artificial price inflation to those events."

disclosure and materialized risk. *See* Opp. at 36 ("when a risk or other fact is misrepresented or concealed and contrary information later enters into the market place, loss causation has been sufficiently pled provided the loss was a reasonably foreseeable result of the misrepresented or concealed fact"). However, Plaintiffs can no more show that a concealed risk materialized than they can identify a corrective disclosure.

Plaintiffs cannot simply allege in conclusory fashion that a risk was concealed and that it later materialized. Instead, as with corrective disclosure, they must point to concrete events or conditions that indicated to the market that the concealed risk had materialized, resulting in immediate stock price declines. *In re Vivendi Universal, S.A., Sec. Litig.*, No. 02 Civ. 5571 (RJA (HBP), 2009 U.S. Dist. LEXIS 34563, at *47 (S.D.N.Y. 2009) (holding that plaintiffs alleging materialization of risk must identify an event and "prove that their losses were caused by that event"); *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d at 911 ("To allege loss causation, allegations of materialization of the risk must identify some event or condition which causes a loss and which was concealed by the defendant's actions"); *In re Initial Public Offering Secs. Litig.*, 399 F. Supp. 2d 298, 302 (S.D.N.Y. 2005) (same).

Plaintiffs' newly-minted hybrid theory relies on the same announcements as their abandoned corrective disclosure theory– *i.e.,* downgrades by analysts, a dividend cut, and the TERI bankruptcy – without any explanation about *how* these announcements indicated to the market that a concealed risk had materialized, as opposed to simply reflecting deteriorating conditions in the credit markets. *See e.g., In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 666, 676-680 (S.D.N.Y. 2007) (article discussing company's advertising practices and lower than projected revenues did not reveal a concealed risk because the court could not identify the specific risk it had revealed); *Hardin County Savs. Bank v. City of Brainerd*, No. 08-CV-38-

19

LRR, 2008 U.S. Dist. LEXIS 70596, at *28 (N.D. Iowa Sept. 18, 2008) ("The absence of an event triggering the devaluation of the Bonds makes an inference of loss causation nearly impossible; without even a materialization of the fraud, it is unclear how the fraud, and not another factor, could have devalued the Bonds").

Rather than offering an explanation for their hybrid theory, Plaintiffs just assume their conclusion: "Here, the precipitous drop in First Marblehead's share price following November 26, 2007 would not have occurred had the new information entering the market not contradicted the earlier fraudulent reports and lofty expectations that the Defendants had published previously." [13]  Opp. at 36.  This "argument" is not only circular, it also is facially implausible in light of the clear and judicially-noticeable decline in the overall market, the lending industry, and indices of comparable stocks.  Mem. at 14, 47-48.

A nearly identical argument was rejected in *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* where the court rejected the plaintiffs' loss causation allegations as nothing more than "an undocumented assertion that [the] . . . stock drop was, *by necessity*, a result of this market 'realization'" of the supposed "widespread enrollment fraud."  534 F.3d 1068 (9th Cir.), *as amended by* 540 F.3d 1049, 1064 (9th Cir. 2008).  The court reasoned: "So long as there is a drop in a stock's price, a plaintiff will always be able to contend that the market 'understood' a defendant's statement precipitating a loss as a coded message revealing the fraud.  Enabling a

---

[13]    In an effort to disguise the absence of a coherent theory of loss causation, Plaintiffs erect and then tear down number of straw men, none of which was raised by Defendants and none of which has any bearing on the sufficiency of Plaintiffs' loss causation argument.

For one, Defendants do not contend that only a confession or *mea culpa* suffices for loss causation.  Opp. at 36.  Instead, Defendants merely assert that if Plaintiffs argue that disclosures revealed fraud on FMD's part, Plaintiffs must actually identify a disclosure that corrects a prior false or misleading statement.  Mem. at 13.  Plaintiffs fail to show how any of the disclosures identified in the Complaint correct any statement made by Defendants in any respect.

Nor do Defendants contend that only a "unitary" disclosure suffices to prove loss causation.  Opp. at 35.  Defendants address all five supposed corrective disclosures identified by Plaintiffs, and show that they do not – singly or collectively – "correct" any prior false or misleading statement by Defendants.

plaintiff to proceed on such a theory would effectively resurrect what *Dura* discredited – [namely,] that loss causation is established through an allegation that a stock was purchased at an inflated price." *Id.*[14]

## 2. *Plaintiffs' "Undue Burden" Claim Is Contrary To Law.*

Apparently recognizing that their allegations are only conclusory, Plaintiffs claim that requiring them to establish more at the pleading stage would be an "unreasonable burden." Opp. at 35. This argument is to no avail. *Dura* itself holds that on a motion to dismiss, Plaintiffs must distinguish the alleged fraud from the "tangle of [other] factors that affect a stock's price." 544 U.S. at 343. Thus, courts repeatedly have dismissed cases at the pleading stage where plaintiffs fail to differentiate between fraud- and market-caused losses. *Lentell,* 396 F.3d at 174 (holding that if "the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases," and a plaintiff's claim fails when "it has not adequately ple[d] facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events."); *In re Teco Energy Sec. Litig.,* No. 8:04-cv-1948-T-27EAJ, 2006 U.S. Dist. LEXIS 18101, at *22 (M.D. Fla. Mar. 30, 2006) (granting motion to dismiss because the complaint did almost nothing to distinguish losses due to company's actions from those due to market losses); *In re Merrill Lynch & Co. Research Reports Sec. Litig.,* No. 02 MDL 1484, 07 Civ. 6677 (JFK), 2008 U.S. Dist. LEXIS 37993, at *40 (S.D.N.Y. May 8, 2008) (same); *In re Sawtek, Inc. Sec. Litig.,* CA No. 03-294, 2005 U.S. Dist. LEXIS 39223, at *43-44 and n.5 (M.D. Fla. Oct. 6, 2005) (same).

---

[14]     To be sure, Plaintiffs cite some cases where courts have found loss causation adequately pleaded. *See* Opp. at 31-36. But Plaintiffs do not explain how the cases support their conclusory allegations and circular argument here. They cannot do so because the plaintiffs in those cases specifically identified corrective disclosures or pleaded that a concealed risk had materialized. *See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506, at *57-58 (S.D.N.Y. Sept. 6, 2005) (finding that concealed risk of delinquency rates among high risk loans materialized when collateral pool experienced high delinquency rates, which led to low earnings expectations and a decline in stock price).

Here, Plaintiffs' simple decree that the decline in FMD's stock price *must be* due to fraud coming to light fails to comport with these cases and principles.

### 3. *Defendants Did Not Conceal Any Risks.*

An equally compelling reason why Plaintiffs cannot proceed on a theory involving materialization of a concealed risk is that, as is clear from the face of the Complaint and documents properly considered, Defendants did not "conceal" any risks. Mem. at 17-21.

Plaintiffs do not take issue with FMD's argument that FMD and/or the Trusts fully disclosed changes in FICO scores, changes in credit criteria, default rates and risks associated with reliance on TERI. Plaintiffs' only response is to once again characterize the argument as a "truth on the market" defense in order to suggest that the disclosures raise factual issues inappropriate for resolution on a motion to dismiss. Opp. at 37. Plaintiffs mischaracterize Defendants' use of the disclosures. *See supra* 3-6**.** Even at the motion to dismiss stage, courts consider the disclosures actually made to assess a claim that losses resulted from materialization of *concealed* risks. *See e.g., Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 177 (2d Cir. 2005) (finding no loss causation because defendant revealed high-risk nature of investments in its reports, and holding that case was "sharply distinguishable from cases in which some or all of the risk that materialized was clearly concealed by a defendant's misstatements or omissions"); *In re Merrill Lynch & Co. Research Reports Secs. Litig.*, No. 02 MDL 1484, 02 Civ. 9690 (JFK), 2008 U.S. Dist. LEXIS 44344, at * 22 (S.D.N.Y. June 4, 2008) (holding that "express warnings, contained on the face of the reports that form the basis for Vale's claim of fraud, preclude him from pleading that the Defendants fraudulently concealed the risk that the company was not a good investment."). FMD provided extensive and apposite risk disclosures throughout the class period. *See* Appendix A to Mem.

C.       *Stock Price Movements Are Properly Considered At The Motion To Dismiss Stage.*

Defendants also show the failure to plead loss causation by showing that FMD's stock price declined dramatically for many months before any fraud allegedly was revealed, and that the decline continued unabated during the lengthy periods between the announcements that supposedly revealed the fraud.[15]  Mem. at 12-14.  This pattern shows that the price declines at issue resulted from market conditions, not company-specific disclosures of fraud.  Tellingly, Plaintiffs do not dispute this conclusion, and instead repeat the mantra that the Court may not consider the stock prices because they supposedly raise factual issues that must be addressed by experts.  Opp. at 38-39.  However, courts routinely take judicial notice of stock prices on a motion to dismiss when assessing the sufficiency of loss causation allegations.  *See, e.g., In re Moody's Corp. Sec. Litig.,* No. 07 CV 8375 (SWK), 2009 U.S. Dist. LEXIS 13894, at *42 n. 5 (S.D.N.Y. Feb. 18, 2009) ("[t]he Court takes judicial notice of the stock prices enumerated below when assessing the sufficiency of the Plaintiffs loss causation allegations"); *In re Buca Inc. Secs. Litig.*, Civ. No. 05-1762 (DWF/AJB), 2006 U.S. Dist. LEXIS 75224, at *28 (D. Minn. Oct. 16, 2006) (where stock price was trending downward throughout the class period and already had dropped significantly before the fraud allegedly "was gradually revealed," the court should conclude that "other factors had caused the decline").

---

[15]       While Plaintiffs suggest they are entitled to all favorable inferences on stock price movements, Opp. at 39, they offer no explanation of why the price of FMD declined dramatically well before any fraud came to light even by their reckoning, or why the price continued to drop just as before during the intervals between the announcements on which they rely.  To be entitled to a favorable inference, Plaintiffs must first offer one and, of course, it must be plausible.  *See e.g., Twombly*, 127 S. Ct. at 1965(requiring plausible grounds to infer facts necessary to make alleged conclusions); *Tellabs*, 551 U.S. at 324 (analyzing those inferences of fraud that could plausibly be drawn from plaintiffs' allegations).

## V. Defendants' Projections Regarding Future Payments And Related Disclosures Are Protected Under The PSLRA's "Safe Harbor" Provision And The "Bespeaks Caution" Doctrine.

Plaintiffs claim that FMD's projections regarding future payments and related disclosures are not protected under the PSLRA's "safe harbor" provision and the "bespeaks caution" doctrine because, according to Plaintiffs, what FMD described as future possibilities had already occurred. But just as Plaintiffs fail to explain why challenged statements were false, they also fail to identify any risk that had "materialized" by the time any warning was given.

Plaintiffs have their facts wrong in alleging that the risk that future securitizations might not occur had already been realized by the time FMD warned of such a risk. Indeed, they suggest that FMD did not complete a securitization in September 2007, when, in fact, it did. *See e.g.,* Mem. at 12. Thereafter, FMD began to warn even more specifically than it had previously about its possible inability to securitize going forward. *See* Appx. A, § 3. The Complaint contains no factual basis upon which to contend that further securitizations were impossible at any time before FMD announced it would be unable to do one.

Plaintiffs also assert that FMD's "cautionary language was being given while its risk management department was raising concerns about lowering credit guidelines (¶ 65), loan cancellation rates were increasing (¶¶ 68-75), default rates were rising (¶¶ 71-73), and First Marblehead executives knew of TERI's solvency issues (¶¶ 84-85)." Opp. at 40. But this string citation to theories that are irrelevant to this argument, in error, or not supported with facts does nothing to suggest that the risks of which FMD warned had already been realized. More specifically: (a) there was abundant disclosure about "credit guidelines" (FICO scores), and even if there were "concerns" in risk management, that hardly shows that the "concerns" were

realized;[16] (b) loan cancellations occur when an approved borrower decides not to borrow – they pose no credit or default risk;[17] (c) there also was abundant disclosure about default rates; (d) Plaintiffs' suggestion that credit changes caused a default spike and the TERI bankruptcy makes no sense (Mem. at 8, 9, 16 and 24); (e) and (once again) the future occurrence of these events does not amount to an earlier realization of a risk.  Furthermore, the "facts" to which Plaintiffs cite are not attributed to reliable sources.  *See supra* at 13-14; Mem. at 20-23.

As a result, the cautionary language in FMD's projections do fall under the PSLRA's "safe harbor" provision and the "bespeaks caution" doctrine.  15 U.S.C. § 78u-5(c)(1)(A)(i). Both insulate from liability those who make forward looking statements if accompanied by appropriate warnings that they may not come true.  *See, e.g., In re Ibis Tech. Sec. Litig*., 422 F. Supp. 2d 294 (D. Mass. 2006) (granting motion to dismiss based on safe harbor protection); *In re Parametric Tech. Corp. Sec. Litig.*, 300 F. Supp. 2d 206 (D. Mass. 2001); *In re Boston Tech, Inc. Sec. Litig.*, 8 F. Supp. 2d 43 (D. Mass. 1998) (same).  FMD did provide adequate (indeed, abundant) and explicit warnings in this regard.  See Appx. A, §§ 1-3.  Thus, the bespeaks caution doctrine and the "safe harbor" provision render FMD's statements inactionable.

## CONCLUSION

For all of these reasons, the Complaint should be dismissed with prejudice.


*/s/ William H. Paine*
Jeffrey B. Rudman (BBO# 433380)
William H. Paine (BBO# 550506)
Sherry Hartel Haus (BBO# 663777)
Lauren G. Brunswick (BBO# 660996)

---

[16]     The allegation that the "risk management department was raising concerns about lowering credit guidelines" is in fact no more than a colorful rumor sourced to a Former VP of Applications whose responsibilities were related to software – not credit quality, financial reporting, loan delinquencies and/or loan defaults.  *See* Mem. at 20-23; *supra* at 14 n. 9.

[17]     *See* Mem. at 21.

Taylor Washburn (BBO# 671857)
WILMER CUTLER PICKERING
    HALE and DORR LLP
60 State Street
Boston, MA 02109
Tel.: (617) 526-6000
Fax: (617) 526-5000

Ryan P. Phair (admitted *pro hac vice*)
WILMER CUTLER PICKERING
    HALE and DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363

Dated: May 15, 2009

# CERTIFICATE OF SERVICE

On May 15, 2009, I caused a copy of this Document to be served by electronic mail via the electronic filing system upon all counsel of record, and via first class mail to the following counsel:

Joseph E. White III (BBO# 648498)
SAXENA WHITE P.A.
2424 N. Federal Highway, Suite 257
Boca Raton, FL 33431
Tel:  (561) 394-3399
Fax:  (561) 394-3082

Peter A. Lagorio (BBO# 567379)
SAXENA WHITE P.A.
63 Atlantic Avenue
Boston, MA 02100
Tel:  (617) 367-4200
Fax:  (617) 227-3384

Joseph F. Rice
Ann K. Ritter
James M. Hughes
MOTLEY RICE LLC
28 Bridgeside Blvd.
P.O. BOX 1792
Mount Pleasant, SC 29464
Tel:  (843) 216-9000
Fax:  (843) 216-9450

William H. Narwold
MOTLEY RICE LLC
One Corporate Center
20 Church St., 17th Floor
Hartford, CT 06103
Tel: (800) 882-1681
Fax: (800) 882-1682

*/s/ William H. Paine*
William H. Paine