UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE THE FIRST MARBLEHEAD              *        Lead Case No. 08-10612-JLT
CORPORATION SECURITIES LITIGATION       *
                                        *

MEMORANDUM

August 5, 2009

TAURO, J.

I.      Introduction

Lead Plaintiffs Pembroke Pines Fire and Police Pension Fund, and Universal-Investment-Gesellschaft mbH bring this securities fraud action against Defendant The First Marblehead Corporation ("First Marblehead") and several of its former and current executives: Defendants Jack L. Kopnisky, John A. Hupalo, Peter B. Tarr, William Baumer, Donald R. Peck, Stephen E. Anbinder, Leslie L. Alexander, and William R. Berkley ("Individual Defendants").  The two-count Amended Class Action Complaint alleges violations of (1) § 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"),[1] and Securities and Exchange Commission ("SEC") Rule 10b-5,[2] against all Defendants; and (2) § 20(a) of the Exchange Act[3] against Individual Defendants. Presently at issue is Defendants' Motion to Dismiss both counts.  For the following reasons, Defendants' Motion is ALLOWED.

II.     Background

First Marblehead provides private student loan-related services, particularly with respect

---

[1] 15 U.S.C.A. § 78j(b) (West 2009).

[2] 17 C.F.R. § 240.10b-5 (2009).

[3] § 78t.

to structuring securitizations of such loans.  This action was filed on April 10, 2008 on behalf of

all individuals and entities who purchased First Marblehead common stock between August 10,

2006 and April 7, 2008 ("Class Period").  This court allowed consolidation on August 28, 2008,

and Lead Plaintiffs filed the Amended Class Action Complaint ("Complaint") on November 28,

2008.  The Complaint alleges that Defendants "failed to disclose material adverse facts" about

First Marblehead's "financial well-being and future prospects,"[4] which caused Plaintiffs to suffer

"significant losses and damages."[5]  The following background facts are taken from the Complaint

and various publicly filed documents.[6]

A.    First Marblehead

First Marblehead's student loan services include program design and marketing, borrower

inquiry and application, origination and disbursement, securitization, and servicing.  During the

Class Period, First Marblehead's profitability largely depended on its securitization services.  For

each securitization, First Marblehead would form a trust.  The trust would buy private student

loans from lenders and finance the purchases by issuing debt securities.  The debt securities would

in turn be "backed" by the student loans, meaning principal and interest from the student loans

would be used to repay the debt securities.

Compensation for First Marblehead's securitization services consisted of structural

advisory fees, residual interests, and administrative fees.  Structural advisory fees took two forms.

---

[4]Am. Compl. ¶ 9.

[5]Id. ¶ 10.

[6]Cf. In re Colonial Mortgage Bankers Corp., 324 F.3d 12, 19 (1st Cir. 2003) ("[M]atters of public record are fair game in adjudicating Rule 12(b)(6) motions, and a court's reference to such matters does not convert a motion to dismiss into a motion for summary judgment.").

First, "up-front" structural advisory fees entitled First Marblehead to payment when or soon after a trust purchased a pool of student loans. Second, "additional" structural advisory fees provided First Marblehead with rights to additional payments based on the amount of loans outstanding in a given trust. Residual interests entitled First Marblehead to receive proceeds contingent on the performance of the trusts to which the residual interests were assigned. Administrative fees provided First Marblehead with payments ranging from five to twenty basis points, per year, of the student loan balance in a given trust. For accounting purposes, First Marblehead was required to recognize the up-front structural advisory fees, and the "back-end" additional structural advisory fees and residual interests, at the time of securitization. Administrative fees were recognized when earned.

First Marblehead utilized a model to predict the value of future payments from its additional structural advisory fees and residual interests. The model was based on discounted cash flow techniques and the following "assumptions" relevant to estimating the value of First Marblehead's future payments: (1) the discount rate; (2) the annual rate of student loan prepayments; (3) the trend of interest rates over the life of the loan pool; (4) expected loan defaults; and (5) net of recoveries. To valuate these assumptions, First Marblehead consulted proprietary historical data, third-party data, and industry expertise. Other factors relevant to estimating the value of future payments included specific program and borrower characteristics, such as loan type and borrower creditworthiness, and trends in loan performance over time.

An important component of First Marblehead's profitability was First Marblehead's relationship with The Education Resources Institute, Inc. ("TERI"). TERI would "guarantee" student loans purchased by the trusts, agreeing to reimburse the trusts for unpaid principal and

interest resulting from defaults on the loans.  In return, TERI would receive fees based on the loan type and risk profile of the student borrowers.  TERI would pledge much of the capital from the fees toward securing TERI's guaranty obligations.  First Marblehead purchased TERI's operating assets in 2001, and TERI used First Marblehead's office space throughout the Class Period.

      B.    <u>The Alleged Fraudulent Scheme</u>

      Lead Plaintiffs claim that "Defendants engaged in a concerted effort to increase loan volume and maximize profits on its securitizations."[7]  To do this, Defendants "secretly lowered their credit guidelines to encompass a far greater swath of student loan applicants."[8]  Loan default rates began to "skyrocket" and TERI's impending failure "became readily apparent," but "Defendants remained silent and continued to mislead the investing public."[9]

      The Complaint avers that the fraudulent scheme began in 2005, when First Marblehead secretly adopted a more aggressive approach to student lending under Defendant Kopnisky, First Marblehead's Chief Executive Officer at the time.  Defendant Kopnisky allegedly "advocated the implementation of several programs, including an 'Expanded Tier Program,' that catered to students with lower credit ratings."[10]  Lead Plaintiffs contend that "prior to and during the Class Period," Defendants represented "that students and co-signers were required to possess a [Fair

---

[7]Am. Compl. ¶ 87.

[8]<u>Id.</u>

[9]<u>Id.</u>

[10]<u>Id.</u> ¶ 62.

Isaac Corporation ("FICO")] score above 700 in order to qualify for a private student loan."[11] First Marblehead allegedly then "embarked on a riskier approach through lower credit guidelines."[12]

According to the former Senior Vice President for Applications Development ("Former VP of Applications"), employed at First Marblehead from 2005 through 2007, First Marblehead began "'going downstream' . . . to expand loan volume and maximize securitization profitability."[13] A former Senior Process Analyst ("Former Process Analyst") employed at First Marblehead from 2004 through 2008 stated that Defendant Kopnisky implemented a program in 2006 by which First Marblehead permitted students with "bad credit" to "take up to three lifetime loans with a maximum of $4,000 granted per loan."[14] The Former Process Analyst stated further that First Marblehead's credit guidelines were being "bent" and that applicants were authorized to "take out excessive loans with terms beyond First Marblehead's historical criteria."[15] According to the Former VP of Applications, the risk management department's "alarm" at First Marblehead's new approach to credit guidelines "was generally overlooked by First Marblehead's management."[16] The Complaint alleges that "the focus at [executive] meetings was entirely on

---

[11] Id.

[12] Id.

[13] Id.

[14] Id. ¶ 63.

[15] Id.

[16] Id. ¶ 65.

'hitting numbers' and meeting Wall Street expectations."[17]

Lead Plaintiffs claim that First Marblehead's new lending initiative led to an undisclosed rise in cancellation and default rates. A former Loan Funding Division Manager ("Former Loan Manager") employed at First Marblehead from 2004 through 2008 stated that beginning in early 2007, disbursement volumes were "escalating" and cancellation rates were increasing "even faster."[18] The Former Loan Manager stated that cancellation rates went "off the charts" starting in the summer of 2007, "skyrocket[ing] 174%" between July 2006 and July 2007.[19] According to the Complaint, "[b]y September 2007, the problem was 'huge,' with 5,000 cancellations in that month alone."[20] The Former Loan Manager found cancellation predictions "extremely difficult to pin down and exceedingly unreliable in nature,"[21] and the Complaint alleges that this "volatility did not allow [the Former Loan Manager] to produce accurate predictions for cancellations."[22]

The "more ominous development" for First Marblehead began in 2007, when default rates started to "dramatically increase."[23] According to the former Chief Information Security Officer ("Former CISO"), employed at First Marblehead from 2004 through 2008, default rates were "soaring" because First Marblehead had "drastically lowered its credit guidelines in order to

---

[17]Id.

[18]Id. ¶ 68.

[19]Id. ¶ 70.

[20]Id.

[21]Id. ¶ 69.

[22]Id. ¶ 70.

[23]Id. ¶ 71.

increase loan volume."[24]  Defendant Baumer informed the Former CISO in November 2007 that First Marblehead was starting to experience a "real trend in loan defaults as a result of the lowered credit guidelines."[25]  According to the former Borrower Output Division Supervisor ("Former Output Supervisor"), employed at First Marblehead from 2004 through 2008, First Marblehead informed employees at an August 2007 meeting that default rates and fraud rates were "increasing."[26]  In addition, First Marblehead allegedly "announced that it was unable to auction off [its] paper on the market."[27]  According to a former Business Development Relationship Manager ("Former Relationship Manager") employed at First Marblehead from 2006 through 2008, "by late 2007, there was a growing awareness among employees in the Company that First Marblehead's forecasting models were no longer able to accurately predict default and cancellation rates."[28]  The Former Relationship Manager informed First Marblehead's clients in December 2007 that First Marblehead would need to "'tighten up' its credit criteria."[29]

According to the Former VP for Applications, First Marblehead was "intentionally concealing" its default rates in December 2007.[30]  The Complaint alleges that First Marblehead

---

[24]Id.

[25]Id. ¶ 83.

[26]Id. ¶ 72.

[27]Id.  The Complaint has "evidently confuse[d] 'commercial paper' (which [First Marblehead] has never sold), with asset-backed securities issued by the Trusts."  Defs.' Reply Mem. Supp. Dismissal 14.

[28]Am. Compl. ¶ 73.

[29]Id.

[30]Id. ¶ 74.

"publically disclosed default rates of 8%," but its "actual default rate was approaching double that—approximately 16%."[31] The Former CISO stated that by the beginning of 2008, default rates had "climbed as high as 14 or 15%" and "risk management employees [had] projected default rates as high as 18% in the short-term."[32]

The Complaint avers that rising default rates caused a deterioration in TERI's financial stability of which First Marblehead was aware and did not disclose. Lead Plaintiffs allege that "financial information flowed freely" between TERI and First Marblehead.[33] The Former VP for Applications described TERI and First Marblehead's relationship as "almost hostile" during the Class Period, and the Former CISO described it as a "bad marriage" with a "great deal of animosity."[34]

The Former CISO stated that TERI was able "to accommodate only a six to eight percent default rate," but "First Marblehead was experiencing double those figures."[35] He stated that these figures placed TERI "in the position of bankruptcy"[36] and that "it was clear to First Marblehead executives by November 2007 that TERI would have major solvency issues if the negative default trends continued."[37] The Complaint alleges that "First Marblehead executives,

---

[31] Id.

[32] Id.

[33] Id. ¶ 81.

[34] Id. ¶ 82.

[35] Id. ¶ 83.

[36] Id.

[37] Id. ¶ 84.

8

including Defendants Kopnisky and Tarr, were well aware of TERI's cash position many months

before TERI filed for bankruptcy in April 2008."[38]  According to the Former CISO, in December

2007, TERI Chief Executive Officer Willis Haullings informed Defendants Kopnisky and Tarr that

the TERI trust was "running out of funds due to a systematic increase in loan defaults."[39]  The

Complaint alleges that "Hullings asked Defendants Kopnisky and Tarr on behalf of TERI for a

cash infusion in order to maintain TERI's operations," and "Defendants completely ignored

Hullings' warnings and refused to offer TERI any assistance."[40]

     C.    The Securities Fraud Claims

The Complaint charges that during the Class Period, "Defendants repeatedly issued false

and misleading statements regarding First Marblehead's credit criteria, revenue from

securitizations, future growth prospects, default rates, and TERI's viability."[41]  Taken from

sources such as press releases, conference calls, and SEC filings, Lead Plaintiffs present the

allegedly false and misleading statements, in block quotation format, at pages thirty-one through

seventy-eight of the Complaint.[42]  In addition, the Complaint alleges that "Defendants omitted to

disclose the details of their clandestine arrangements in order to maximize short-term profits."[43]

Lead Plaintiffs claim that First Marblehead's statements during the Class Period were materially

---

[38]Id.

[39]Id. ¶ 85.

[40]Id.

[41]Id. ¶ 88.

[42]See id. ¶¶ 90–180.

[43]Id. ¶ 88.

false and misleading for the following reasons:

> they (1) misrepresented the true earnings and financial condition of the Company; (2) failed to disclose the material adverse non-public information that First Marblehead had lowered its credit guidelines and was experiencing significant problems with the Company's ability to securitize loans; (3) failed to disclose that First Marblehead was experiencing rising default rates in its securitized loans, and that neither the Company nor TERI could absorb such high default rates; ([4]) failed to disclose that the Company may be unable to securitize its loans in the near future; ([5]) failed to disclose that First Marblehead may forego the securitization of loans in 2008; ([6]) concealed First Marblehead's inability to manage TERI's risk, the Company's failure to consult with ratings agencies, TERI's inability to guarantee First Marblehead loans and the Company's true role in managing TERI's business and operations; and ([7]) failed to maintain adequate internal and financial controls.[44]

The Complaint alleges that Individual Defendants "participated in the fraudulent scheme" through their "receipt of information reflecting the true facts regarding First Marblehead," "control over, receipt and/or modification of First Marblehead's allegedly materially misleading statements and omissions," and "positions with the Company which made them privy to confidential information concerning First Marblehead."[45]  Specifically, the Class Action Complaint alleges that Defendant Kopnisky implemented the programs that catered to students with lower credit ratings;[46] Defendant Baumer received reports detailing rising cancellation rates,[47] supervised individuals responsible for monitoring and analyzing loan assumptions and default rates,[48] and was

---

[44]Id. ¶ 181.

[45]Id. ¶ 190.

[46]See id. ¶ 62.

[47]See id. ¶ 68.

[48]See id. ¶ 75.

aware of the rising default rates;[49] and Defendants Kopnisky and Tarr were aware of TERI's cash position.[50] Lead Plaintiffs allege that Individual Defendants "concealed . . . the truth of the Company's problems" to "personally profit from the fraud through compensation as a result of the inflated financial results."[51]

Lead Plaintiffs also claim that the alleged fraudulent scheme enabled certain Individual Defendants to profit from insider selling. During the Class Period, "Defendants Alexander, Anbinder, and Berkley sold approximately 4.7 million shares of First Marblehead stock for gross proceeds of approximately $208 million."[52] The shares sold during the Class Period constituted approximately 13.81% of Defendant Alexander's holdings, 24.95% of Defendant Anbinder's holdings, and 12.90% of Defendant Berkley's holdings.[53]

The Complaint alleges that as the "Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market,"[54] "First Marblehead's common stock price fell over 94% from the Class Period high of $57.56."[55] The Complaint avers that the fraudulent scheme was revealed to the market on the following dates: (1) "on November 26, 2007, following FBR's announcement that it was downgrading First Marblehead, the Company's stock declined

---

[49] See id. ¶ 83.

[50] See id. ¶¶ 84–85.

[51] Id. ¶ 192.

[52] Id. ¶ 193.

[53] Id.

[54] Id. ¶ 198.

[55] Id. ¶ 200.

11

by 10%"; (2) "[o]n December 5, 2007, after Moody's announced that it was performing a review of First Marblehead for possible downgrade, the Company's stock sank by over 20%"; (3) "[a]fter First Marblehead announced on December 7, 2007 that it was slashing its dividend, the Company's stock decreased an additional 11.5%"; (4) "[o]n March 27, 2008, after Moody's downgraded 18 classes of First Marblehead notes, the Company's stock dropped 10%"; and (5) "after TERI filed for bankruptcy on April [7], 2008, First Marblehead shares plunged over 36%."[56]

On February 9, 2009, Defendants moved for dismissal of the Complaint pursuant to Rules 9(b) and 12(b)(6) on the grounds that Lead Plaintiffs have engaged in proscribed "puzzle pleading" and have failed to plead adequately the following required elements of a § 10(b) claim: (1) a material misrepresentation or omission; (2) scienter; and (3) loss causation.

III.    Discussion

A.    Legal Standard for Motion to Dismiss

In addressing a motion to dismiss, the court must accept all well-pleaded facts as true and draw all reasonable inferences in the plaintiff's favor.[57]  This does not mean, however, that the court must "swallow the plaintiff's invective hook, line, and sinker."[58]  The court need not credit "bald assertions" or "unsupportable conclusions."[59]  Dismissal under Rule 9(b) is appropriate if

---

[56]Id. ¶ 201.  The Complaint also sets forth the other required elements of a § 10(b) claim—a connection with the purchase or sale of a security, reliance, and economic loss—which are not challenged by Defendants' Motion.

[57]Fantini v. Salem State Coll., 557 F.3d 22, 26 (1st Cir. 2009).

[58]Aulston v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).

[59]Id.

12

the plaintiff does not "state with particularity the circumstances constituting fraud or mistake."[60]
Dismissal pursuant to Rule 12(b)(6) will ensue if the plaintiff "fail[s] to state a claim upon which
relief can be granted."[61]

      B.    <u>Pleading Standard Under the PSLRA</u>

      In securities cases sounding in fraud, the complaint must satisfy the pleading standards of
both Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").[62]  The PSLRA
requires plaintiffs alleging securities fraud based on misstatements or omissions of material fact to
"specify each statement alleged to have been misleading, the reason or reasons why the statement
is misleading, and, if an allegation regarding the statement or omission is made on information and
belief, [to] state with particularity all facts on which that belief is formed."[63]  The PSLRA also
requires the complaint to "state with particularity facts giving rise to a strong inference" that the
defendant acted with scienter.[64]

      Defendants' first ground for dismissal is that Lead Plaintiffs have violated Rules 8, 9(b),
and the PSLRA by engaging in "puzzle pleading."  A puzzle-style complaint may fail to satisfy the
federal pleading standards due to its "evasive, non-committal style," which "significantly increases
the burdens to both the defendants and the court in evaluating a complaint's satisfaction of the

---

[60]Fed. R. Civ. P. 9(b).

[61]<u>Id.</u> 12(b)(6).

[62]<u>See</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 319–20 (2007).

[63]§ 78u-4(b)(1).

[64]<u>Id.</u> § 78u-4(b)(2).

PSLRA pleading requirements.'[65]  Defendants contend that Lead Plaintiffs have engaged in

puzzle pleading by reproducing blocks of text without specifying which portions are false or

misleading.  Though the Complaint might have identified with greater particularity the reasons

why each statement was allegedly false or misleading, Lead Plaintiffs set forth those reasons

categorically, in paragraph 181 of the Complaint.  With paragraph 181 as a guide,[66] this court

considers the Complaint on the merits.[67]

      C.      <u>Section 10(b)</u>

      Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection

with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance

in contravention of" an SEC rule.[68]  SEC Rule 10b-5, which was promulgated under § 10(b),

prohibits "mak[ing] any untrue statement of a material fact" or "omit[ting] to state a material fact

necessary in order to make the statements made . . . not misleading."[69]  To state a claim for

---

[65]<u>In re Cornerstone Propane Partners, L.P. Sec. Litig.</u>, 355 F. Supp. 2d 1069, 1081 (N.D. Cal. 2005).

[66]Acknowledging that courts generally approach § 10(b) cases using "a statement-by-statement analysis," <u>In re Boston Tech. Sec. Litig.</u>, 8 F. Supp. 2d 43, 55 (D. Mass. 1998), this court examines the allegations in the Complaint categorically, as Lead Plaintiffs do in paragraph 181.

[67]Defendants also challenge Lead Plaintiffs' confidential sources.  Confidential sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the sources would possess the information alleged."  <u>See</u> <u>In re Cabletron Sys., Inc.</u>, 311 F.3d 11, 29 (1st Cir. 2002) (citations and quotation omitted).  Because this court dismisses the Complaint on other grounds, it need not reach Defendants' challenges to the confidential sources.

[68]§ 78j(b).

[69]§ 240.10b-5.

securities fraud under § 10(b) and Rule 10b-5, a complaint must plead the following elements:
"(1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a
connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss
causation."[70]

Defendants seek dismissal of the Complaint for failure to plead a material
misrepresentation or omission, scienter, or loss causation.  This court addresses each ground for
dismissal in turn and concludes that Lead Plaintiffs have failed to state an actionable § 10(b)
claim.

1.    Material Misrepresentation or Omission

A complaint brought under § 10(b) must "specify each statement alleged to have been
misleading" and "the reasons why the statement is misleading."[71]  The complaint "must provide
factual support for the claim that the statements or omissions were fraudulent."[72]  A plaintiff fails
to plead an actionable § 10(b) claim predicated on the concealment of information if that
information was, in fact, disclosed.[73]

a.    Credit Guidelines

_____

[70]ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008) (citing Dura
Pharm., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005)).

[71]§ 78u-4(b)(1).

[72]In re Stone & Webster, Inc. Sec. Litig., 414 F.3d 187, 194 (1st Cir. 2005).

[73]See Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 116–17 (2d Cir. 1982); In re
Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("Even at the pleading
stage, dismissal is appropriate where the complaint is premised on the nondisclosure of
information that was actually disclosed."); White v. Melton, 757 F. Supp. 267, 272 (S.D.N.Y.
1991) ("The Court must dismiss a complaint founded on allegations of securities fraud if the
allegedly omitted or misrepresented information was in fact appropriately disclosed.").

Lead Plaintiffs charge Defendants with failing to disclose that "First Marblehead had lowered its credit guidelines."[74]  Because First Marblehead disclosed that borrowers were not required to have a FICO score above 700 and that it had lowered its credit criteria, this claim fails.[75]

First Marblehead's and the trusts' SEC filings during the Class Period disclosed the credit scores of the student loans owned by the trusts and demonstrated that First Marblehead did not set a strict FICO score requirement of 700.  One type of filing that was submitted to the SEC were the trust prospectuses, which provided information about each trust that First Marblehead helped form.  Each trust prospectus reported the number of loans in the trust with FICO scores ranging from 600 to 800, in ten point increments, and disclosed FICO scores below 700.[76]  The trust prospectuses also reported the weighted average FICO score, with the average FICO score

---

[74]Am. Compl. ¶ 181.

[75]Lead Plaintiffs mischaracterize Defendants as raising a "truth on the market" defense. See Pls.' Mem. Opp'n Dismissal 13.  The truth on the market defense is used to rebut a plaintiff's presumption of reliance on the market by arguing that even if fraudulent statements were made, truthful information later entered the market.  See In re Biogen Sec. Litig., 179 F.R.D. 25, 36–37 (D. Mass. 1997).  Defendants have not raised a truth on the market defense, but instead argue that "Plaintiffs have failed to plead facts to show that there were any misstatements or scienter in the first place."  Defs.' Reply Mem. Supp. Dismissal 8.

[76]See Defs.' Mem. Supp. Dismissal Exs. 18 at FMD 365–67, The National Collegiate Student Loan Trust 2006-3 ("2006-3 Trust") Prospectus Supplement, Sept. 26, 2006; 19 at FMD 540–42, The National Collegiate Student Loan Trust 2006-4 ("2006-4 Trust") Prospectus Supplement, Dec. 5, 2006; 20 at FMD 557–59, The National Collegiate Student Loan Trust 2007-1 ("2007-1 Trust") Prospectus Supplement, Mar. 7, 2007; 21 at FMD 574–76, The National Collegiate Student Loan Trust 2007-2 ("2007-2 Trust") Prospectus Supplement, June 12, 2007; 22 at FMD 592–94, The National Collegiate Student Loan Trust 2007-3 ("2007-3 Trust") Preliminary Prospectus Supplement, (subject to completion dated Sept. 17, 2007); 23 at FMD 610–12, The National Collegiate Student Loan Trust 2007-4 ("2007-4 Trust") Prospectus Supplement, Sept. 19, 2007.

above 700 for each trust.[77]  These disclosures support the statements, such as "the FICO scores

remain pretty consistently in that 710 to 720 range,"[78] that Lead Plaintiffs now challenge as

misleading.  Defendants' statements were not misleading because First Marblehead's disclosures

demonstrated that the average FICO score was above 700, but there were student loans in the

trust pools with FICO scores below 700.

        In addition, First Marblehead disclosed its changes in credit criteria.  In 2004, for example,

and prior to the Class Period, First Marblehead disclosed that

> approximately three percent of the loans securitized in NCSLT 2004
> and four percent of the loans securitized in NCSLT 2003 represent a
> new product line . . . .  [The new line] includes co-signed loans for
> which the co-signer has a lower . . . FICO . . . score . . . than [First
> Marblehead's] other tiered products . . . .  Although the inclusion of
> these new loans resulted in estimated overall default rates for NCSLT
> 2004 and NCSLT 2003 that are . . . higher . . . than what [First
> Marblehead] estimated for NCMSLT, the average FICO score for
> loans in each of the trusts remained above 700.[79]

In 2005, First Marblehead disclosed that "[i]n fiscal 2003, some of [First Marblehead's] private

label clients introduced a new product line which includes co-signed loans for which the co-signer

has a . . . FICO . . . score that is lower than the FICO score required for [First Marblehead's]

---

[77]See 2006-3 Trust Prospectus Supplement FMD 365–67 (disclosing the weighted average available FICO score for all loans, 712, cosigned loans, 714, and noncosigned loans, 706); 2006-4 Trust Prospectus Supplement FMD 540–42 (714, 715, 705); 2007-1 Trust Prospectus Supplement FMD 557–59 (714, 715, 706); 2007-2 Trust Prospectus Supplement FMD 574–76 (713, 714, 707); 2007-3 Trust Preliminary Prospectus Supplement FMD 592–94 (711, 712, 707); 2007-4 Trust Prospectus Supplement FMD 610–12 (711, 712, 707).

[78]Am. Compl. ¶ 36.

[79]Defs.' Mem. Supp. Dismissal Ex. 1 at FMD 4, First Marblehead Form 10-K, Sept. 15, 2004.

17

other tiered products."[80]  In May 2006, First Marblehead disclosed that it "recently began

facilitating loans under a new program for borrowers who have . . . FICO[] scores within [First

Marblehead's] current program parameters, but have information on their credit reports which

indicate a higher risk of delinquency and default."[81]  During the Class Period, First Marblehead

informed the investing public of similar changes in credit criteria and warned, for example, that

"the inclusion of these loans in future securitizations [would] result in slightly higher overall

default rate assumptions for the trusts used to securitize these loans."[82]  First Marblehead's SEC

filings before and during the Class Period demonstrate that First Marblehead disclosed changes in

credit criteria that had resulted in securitizations of student loans with lower credit scores.[83]

> b.    Default Rates

The Complaint alleges that Defendants failed to disclose that "First Marblehead was

experiencing rising default rates in its securitized loans, and that neither the Company nor TERI

---

[80]Id. Ex. 2 at FMD 14, First Marblehead Form 10-K, Sept. 7, 2005.

[81]Id. Ex. 6 at FMD 226, First Marblehead Form 10-Q, May 10, 2006.

[82]Id. Ex. 7 at FMD 235, First Marblehead Form 10-Q, Nov. 8, 2006.

[83]Moreover, Lead Plaintiffs have failed to show that any undisclosed change in credit
criteria would have been material.  The crux of the Complaint is that during the Class Period,
concealed changes in credit criteria caused an undisclosed spike in default rates, which in turn led
to TERI's bankruptcy.  The Class Period lasted less than twenty months, but the weighted
average deferral period for the trusts exceeded twenty-five months from the date of securitization.
See 2006-4 Trust Prospectus Supplement FMD 538 (exceeded twenty-seven months); 2007-1
Trust Prospectus Supplement FMD 555 (twenty-six); 2007-2 Trust Prospectus Supplement FMD
572 (twenty-two); 2007-3 Trust Preliminary Prospectus Supplement FMD 590 (twenty-seven);
2007-4 Trust Prospectus Supplement FMD 608 (twenty-seven).  A student loan could not be in
default if it was still in the deferral period.  Because most of the student loans securitized during
the Class Period carried deferral periods that extended beyond the length of the Class Period, the
Class Period did not span enough months to allow for a substantial spike in default rates.

18

could absorb such high default rates."[84]  Because First Marblehead disclosed its increasing default rates and warned of the consequences that could result from such an increase, Lead Plaintiffs' default rate allegations fail.

During the Class Period, First Marblehead and the trusts filed quarterly reports with the SEC that provided deferment, delinquency, and default data about the student loans owned by the trusts.[85]  Each trust reported its actual cumulative default rate in the requisite Form 10-D filings.[86] The actual cumulative default rate for each trust also could be calculated from First Marblehead's static data pool.[87]  Finally, First Marblehead disclosed expected default rates over time, using a default rate assumption of expected loan defaults net of recoveries.[88]

─────────────────

[84]Am. Compl. ¶ 181.

[85]Defs.' Mem. Supp. Dismissal Ex. 12 at FMD 280–303, First Marblehead Form 8-K/A, Jan. 30, 2008 (providing static pool data as of December 31, 2007); see also 2006-3 Trust Prospectus Supplement FMD 363–64 (providing trust deferment and delinquency data); 2006-4 Trust Prospectus Supplement FMD 538–39 (same); 2007-1 Trust Prospectus Supplement FMD 555–56 (same); 2007-2 Trust Prospectus Supplement FMD 572–73 (same); 2007-3 Trust Preliminary Prospectus Supplement FMD 590–91 (same); 2007-4 Trust Prospectus Supplement FMD 608–09 (same).

[86]See, e.g., Defs.' Mem. Supp. Dismissal Exs. 27–32 (Forms 10-D for the 2006-3 Trust filed December 28, 2006, January 29, 2007, March 27, 2007, May 1, 2007, June 29, 2007, and July 31, 2007, respectively).

[87]See First Marblehead Form 8-K/A, Jan. 30, 2008 at FMD 280–303.  "[T]he cumulative default rate as a percentage of the original pool balance could be calculated by dividing 'Cumulative Claims, Net of Cancellations' (included in the Cumulative Loss Data) by the 'Aggregate Pool Balance' (included in the Original Pool Characteristics)."  Defs.' Mem. Supp. Dismissal 10 n.17.

[88]See First Marblehead Form 10-Q, May 10, 2006 at FMD 226 (gross default rate as of March 31, 2006); Defs.' Mem. Supp. Dismissal Ex. 3 at FMD 71, First Marblehead Form 10-K, Sept. 12, 2006 (gross default rate as of June 30, 2006); First Marblehead Form 10-Q, Nov. 8, 2006 at FMD 234 (gross default rate as of September 30, 2006); Defs.' Mem. Supp. Dismissal 10 (gross default rate as of December 31, 2006); Defs.' Mem. Supp. Dismissal Ex. 9 at FMD 254,

First Marblehead's default rate disclosures revealed an increase in defaults that was proportionate to Lead Plaintiffs' allegations. During the Class Period, First Marblehead disclosed gross default rates of 8.77% as of March 31, 2006,[89] 8.95% as of June 30, 2006,[90] 9.16% as of September 30, 2006,[91] 9.29% as of December 31, 2006,[92] 10.33%/8.93% as of March 31, 2007,[93] 9.38% as of June 30, 2007,[94] 9.68% as of September 30, 2007,[95] 14.76% as of December 31, 2007,[96] and 14.77% as of March 31, 2007.[97] In other words, First Marblehead reported a default rate increase from 8.77% to 14.77% during the Class Period. The disclosure of long-term default rate assumptions as high as 14.77% refutes Lead Plaintiffs' allegations that First Marblehead failed to disclose default rates of "approximately 16%" or "as high as 14 or 15%."[98] First

---

First Marblehead Form 10-Q, May 10, 2007 (gross default rates as of March 31, 2007); Defs.' Mem. Supp. Dismissal 10 (gross default rate as of June 30, 2007 and September 30, 2007); Defs.' Mem. Supp. Dismissal Ex. 10 at FMD 267, First Marblehead Form 10-Q, Feb. 11, 2008 (gross default rate as of December 31, 2007); Defs.' Mem. Supp. Dismissal 10 (gross default rate as of March 31, 2007).

[89]First Marblehead Form 10-Q, May 10, 2006 at FMD 226.

[90]First Marblehead Form 10-K, Sept. 12, 2006 at FMD 71.

[91]First Marblehead Form 10-Q, Nov. 8, 2006 at FMD 234.

[92]Defs.' Mem. Supp. Dismissal 10.

[93]First Marblehead Form 10-Q, May 10, 2007 at FMD 254 (providing two values due to a change in the structure of securitizations that occurred during that quarter).

[94]Defs.' Mem. Supp. Dismissal 10.

[95]Id.

[96]First Marblehead Form 10-Q, Feb. 11, 2008 at FMD 267.

[97]Defs.' Mem. Supp. Dismissal 10.

[98]Am. Compl. ¶ 74.

Marblehead's disclosures are consistent with the "approximate" allegations of the Complaint.

In addition to disclosing default rates, First Marblehead warned the investing public of the risks that rising default rates posed.[99]  For example, First Marblehead cautioned:

> Increases in our estimates of defaults . . . as well as decreases in default recovery rates . . . would have a negative effect on the value of [First Marblehead's] additional structural advisory fees and residuals. . . .  If defaults increase beyond the level of expected third-party reimbursement, then these changes will have an additional negative effect on the value of [First Marblehead's] additional structural advisory fees and residuals.[100]

### c.    TERI

Lead Plaintiffs claim that Defendants were aware of TERI's financial problems that resulted from the increasing default rates and that Defendants failed to disclose those problems to First Marblehead's investors.  Particularly, the Complaint charges that Defendants concealed First Marblehead's "true role in managing TERI's business and operations," "First Marblehead's inability to manage TERI's risk" and "failure to consult with ratings agencies," and "TERI's inability to guarantee First Marblehead loans."[101]  Because First Marblehead disclosed the nature of its relationship with TERI and warned of the risks associated with that relationship, these

---

[99]See Romani v. Shearson Lehman Hutton, 929 F.2d 875, 879–80 (1st Cir. 1991) ("Documents such as this, which clearly 'bespeak caution,' are not the stuff on which securities fraud claims are made." (citations and internal quotation omitted)); Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986) ("We are not inclined to impose liability on the basis of statements that clearly 'bespeak caution.'"); In re No. Nine Visual Tech. Corp. Sec. Litig., 51 F. Supp. 2d 1, 21–22 (D. Mass. 1999) ("When a forward-looking statement is 'accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently,' the statement is nonactionable." (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1213 (1st Cir. 1996))).

[100]First Marblehead Form 10-Q, Nov. 8, 2006 at FMD 236.

[101]Am. Compl. ¶ 181.

21

allegations fail.  Moreover, nothing in the Complaint alleges that anyone at First Marblehead was aware that TERI was experiencing problems sufficiently detrimental to require disclosure to the investing public.

First Marblehead disclosed the extent of its relationship with TERI in its SEC filings.  First Marblehead's Form 10-K for the period ending June 30, 2006, for example, demonstrated that First Marblehead and TERI had a close, mutually beneficial business relationship:

> In June 2001, [First Marblehead] purchased the loan processing operations of TERI and entered into a series of agreements to govern future securitizations of TERI-guaranteed loans.  TERI continues to provide private student loan guarantee[s], education information and counseling services for students, and is the exclusive third-party provider of borrower default guarantees for [First Marblehead's] clients' private label loans. [First Marblehead] ha[s] entered into an agreement to provide various services for TERI and received fees from TERI for services performed of $106.1 million, or 19% of total service revenue, for fiscal 2006, and $78.2 million or 19% of total service revenue, for fiscal 2005. . . . [First Marblehead] also ha[s] entered into an agreement to receive from TERI updated information about the performance of the student loans it has guaranteed, to allow [First Marblehead] to supplement [its] database.  Each of these agreements with TERI had an initial term through June 2006. In October 2004, [First Marblehead] exercised [its] option to renew each agreement for an additional five-year term, through June 2011.[102]

First Marblehead in no way concealed or minimized its close business relationship with TERI.

First Marblehead also provided adequate warnings of the risks associated with its relationship with TERI and the consequences that would ensue if such risks materialized.  For example, First Marblehead warned that if its "agreements with TERI terminate for any reason, or if TERI fails to comply with its obligations, [First Marblehead's] business would be adversely affected and the value of [its] intangible assets could be impaired."[103]  Under the heading "[First

---

[102]First Marblehead Form 10-K, Sept. 12, 2006 at FMD 49.

[103]Id.

Marblehead's] business could be adversely affected if TERI's ratings are downgraded,"[104] First

Marblehead warned of the following:

> In its role as guarantor in the private education lending market, TERI agrees to reimburse lenders for unpaid principal and interest on defaulted loans. TERI is the exclusive provider of borrower default guarantees for [First Marblehead's] clients' private label loans. As of June 30, 2006, TERI had a Baa3 counterparty rating from Moody's Investors Service, which is the lowest investment grade rating, and an insurer financial strength rating of A+ from Fitch Ratings. If these ratings are lowered, [First Marblehead's] clients may not wish to enter into guarantee arrangements with TERI. In addition, [First Marblehead] may receive lower structural advisory fees because the costs of obtaining financial guarantee insurance for the asset-backed securitizations that [First Marblehead] structure[s] could increase. Finally, the inability of TERI as student loan guarantor to meet its guaranty obligations could reduce the amount of principal or interest paid to the holders of asset-backed securities, which could adversely affect [First Marblehead's] residual interests in securitization trusts or harm [First Marblehead's] ability to structure securitizations in the future. In each such case, [First Marblehead's] business would be adversely affected.[105]

Given that Defendants disclosed the relevant risks posed by First Marblehead's relationship with

TERI, Lead Plaintiffs' TERI allegations fail to state a cognizable claim.[106]

In addition, the Complaint's TERI allegations are insufficient to state an actionable claim

because Lead Plaintiffs fail to allege that anyone at First Marblehead knew of TERI's intentions to

file for bankruptcy protection under Chapter 11. At most, the Complaint avers that First

Marblehead was "well aware of TERI's cash position many months before TERI filed for

---

[104]Id.

[105]Id. at FMD 50.

[106]See Romani, 929 F.2d at 879–80; Luce, 802 F.2d at 56; In re No. Nine Visual Tech., 51 F. Supp. 2d at 21–22.

bankruptcy in April 2008."[107]  The Complaint does not state whether Defendants knew that TERI had any intentions of filing for bankruptcy "many months" before April 2008, nor does it allege how bad TERI's cash position was or how long it would take before bankruptcy became a reality. This was not a situation in which First Marblehead presented a risk as a contingency after the risk had already materialized.[108]  "'[I]n the absence of any factual allegations from which one can infer that defendants had actually settled upon the details' of the bankruptcy plan in advance of the filing, Plaintiffs' allegations fail to evince any hint of fraudulent intent."[109]  If anything, Lead Plaintiffs' TERI allegations amount to "fraud by hindsight, essentially inferring earlier knowledge based only on the situation that later came to pass," which the First Circuit has "consistently rejected."[110]

          d.     Internal Controls and Management

Lead Plaintiffs charge that First Marblehead "failed to maintain adequate internal and

---

[107]Am. Compl. ¶ 84; see also id. ¶ 83 (stating that rising default rates placed TERI "in the position of bankruptcy"); id. ¶ 84 (stating that "it was clear to First Marblehead executives by November 2007 that TERI would have major solvency issues if the negative default trends continued"); id. ¶ 85 (stating that the TERI trust was "running out of funds due to a systematic increase in loan defaults"); id. (stating that TERI asked "for a cash infusion in order to maintain TERI's operations").

[108]Cf. In re Apple Computer Sec. Litig., 886 F.2d 1109, 1115 (9th Cir. 1989) ("There is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed problems so significant as to require months of delay.").

[109]In re Tower Auto. Sec. Litig., 483 F. Supp. 2d 327, 348 (S.D.N.Y. 2007) (quoting Fant v. Perelman, Nos. 97 CIV. 8435(LAP), 97 CIV. 8436(LAP), 1999 WL 199078, at *15 (S.D.N.Y. Apr. 9, 1999)).

[110]See Rodríguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 97 (1st Cir. 2007) (internal quotation omitted).  Fraud by hindsight is generally viewed as a failure to plead a strong inference of scienter.  See id.

financial controls" and concealed its "inability to manage TERI's risk."[111]  In particular, the Complaint states that First Marblehead's new approach to credit guidelines "was generally overlooked by First Marblehead's management,"[112] the Former Loan Manager believed that the cancellation predictions were "extremely difficult to pin down and exceedingly unreliable in nature,"[113] there was a "growing awareness" that First Marblehead's "forecasting models were no longer able to accurately predict default and cancellation rates,"[114] and First Marblehead ignored TERI's warnings and refused to offer TERI financial assistance.[115]  Lead Plaintiffs' internal controls and mismanagement allegations fail to state a cognizable claim because they are too vague and mismanagement is not actionable in securities law.

Lead Plaintiffs fail to identify a false statement regarding First Marblehead's internal controls or specify which internal controls were inadequate.  To the extent that the internal controls claim is predicated on rising default rates and volatile cancellation rates, this claim fails. First Marblehead disclosed the default rates,[116] and the Complaint has not alleged a material misstatement or omission with respect to the cancellation rates.[117]  The remainder of Lead Plaintiffs' internal controls allegations amounts to "generalizations regarding integrity, fiscal

---

[111]Am. Compl. ¶ 181.

[112]Id. ¶ 65.

[113]Id. ¶ 69.

[114]Id. ¶ 73.

[115]See id. ¶ 85.

[116]See supra subsection III.C.1.b.

[117]See Am. Compl. ¶ 181.

discipline and risk management," which are not actionable.[118]  Finally, generalized claims of

mismanagement are not recognized under the securities laws.[119]

e.    Future Securitizations

Lead Plaintiffs claim that First Marblehead failed to disclose that it "was experiencing

signficant problems with [its] ability to securitize loans," it would be "unable to securitize its loans

in the near future," and it "[would] forego the securitization of loans in 2008."[120]  Because First

Marblehead disclosed that it would not be structuring any securitizations around the same time

period that default rates began to spike, this claim fails.  For example, "on December 7, 2007,

First Marblehead issued a press release announcing that . . . the Company would not securitize

any loans during the quarter."[121]  Lead Plaintiffs contend specifically that First Marblehead made a

misrepresentation by stating that it would structure a securitization in September 2007.[122]  But

this could not have been a misrepresentation given that First Marblehead's final securitization

closed in that very month.[123]

---

[118]In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005); cf. In re
NTL, Inc. Sec. Litig., 347 F. Supp. 2d 15, 24 (S.D.N.Y. 2004) (holding that the complaint failed
to plead an actionable securities claim given that the allegations were of an "indeterminate
meaning" and contained "little or no hard information concerning the extent or prevalence of the
subsidiary 'facts' relied upon").

[119]See Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 477–80 (1977).

[120]Am. Compl. ¶ 181.

[121]Id. ¶ 160.

[122]See Pls.' Mem. Opp'n Dismissal 18–19.

[123]See Defs.' Mem. Supp. Dismissal 12; 2007-4 Trust Prospectus Supplement (to the
prospectus dated September 17, 2007).

26

f.    <u>True Earnings and Financial Condition</u>

Finally, the Complaint alleges that First Marblehead "misrepresented the true earnings and financial condition of the Company."[124]  Lead Plaintiffs claim as causes of the false and misleading financial results the alleged misstatements regarding changes in credit guidelines,[125] rising default rates,[126] and inadequate internal controls.[127]  The Complaint alleges that as a result, First Marblehead incorrectly valued its rights to future payments for the "back-end" additional structural advisory fees and residual interests.[128]  Lead Plaintiffs' true earnings and financial condition claim fails because First Marblehead's projections regarding future payments are subject to the PSLRA's "safe harbor" provision and Lead Plaintiffs have not pleaded facts demonstrating that Defendants had actual knowledge of falsity.

First Marblehead's future payments projections are entitled to the PSLRA's safe harbor. The safe harbor provision shields from liability "any forward-looking statement" made by issuers of securities such as First Marblehead.[129]  The PSLRA defines "forward-looking statements" to include "projection[s] of revenues, income . . . , [and] earnings," and "any statement of the assumptions underlying" such projections.[130]  First Marblehead's projections of revenues from the

---

[124]Am. Compl. ¶ 181.

[125]<u>See</u> <u>id.</u> ¶¶ 182, 184.

[126]<u>See</u> <u>id.</u> ¶ 182.

[127]<u>See</u> <u>id.</u> ¶ 184.

[128]<u>See</u> <u>id.</u> ¶ 183.

[129]§ 78u-5(c)(1).

[130]<u>Id.</u> § 78u-5(i)(1).

additional structural advisory fees and residual interests satisfy this definition and therefore qualify as "forward-looking statements."[131]

To qualify for the safe harbor, the forward-looking statements must be accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."[132]  First Marblehead's financial projections were accompanied by just such cautionary statements.  For example, First Marblehead qualified its revenue projections with the following warning:

> If the actual performance of some or all of the securitization trusts varies from the key assumptions [First Marblehead] use[s], the actual additional structural advisory fees and residuals that [First Marblehead] receive[s] from the trusts could be significantly less than reflected in [First Marblehead's] current financial statements, and [First Marblehead] may incur a material negative adjustment to [its] earnings in the period in which [its] assumptions change. . . .  In particular, economic, regulatory, competitive and other factors affecting prepayment, default and recovery rates on the underlying securitized loan portfolio, including full or partial prepayments as a result of loan consolidation activity, could cause or contribute to differences between the actual performance of the securitization trusts and [First Marblehead's] key assumptions.[133]

The PSLRA provides an exception to the safe harbor if the statement was made "with actual knowledge . . . that the statement was false or misleading."[134]  Lead Plaintiffs have not pleaded facts showing that First Marblehead's statements were false or misleading and, if so, that

---

[131]First Marblehead's use of a discounted cash flow methodology supports this conclusion. See Little Gem Life Scis. LLC v. Orphan Med., Inc., No. 06-1377 ADM/AJB, 2007 WL 541677, at *6 (D. Minn. Feb. 16, 2007) ("[A] discounted cash flow analysis is forward looking for the purposes of the bespeaks caution doctrine.").

[132]§ 78u-5(c)(1)(A)(i).

[133]First Marblehead Form 10-K, Sept. 12, 2006 at FMD 46.

[134]§ 78u-5(c)(1)(B)(ii)(II).

First Marblehead had actual knowledge of their falsity.  Lead Plaintiffs' allegations of actual

knowledge of falsity are predicated on their credit guidelines, default rates, and internal controls

claims.[135]  As already discussed, each of these allegations fails to state an actionable claim.[136]  In

any event, Lead Plaintiffs' financial projection allegations are inadequate for having failed to plead

the approximate amount by which the financial projections were inaccurate.[137]

        2.    <u>Scienter</u>

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."[138]

Plaintiffs may satisfy the scienter requirement by showing "either conscious intent to defraud or a

high degree of recklessness."[139]  The PSLRA requires plaintiffs to "state with particularity facts

that give rise to a strong inference of scienter rather than merely a reasonable inference."[140]  A

court should evaluate scienter "with reference to the complaint as a whole," and "competing

inferences should be weighed against plaintiffs' preferred interpretation of the facts."[141]  But

"where there are equally strong inferences for and against scienter, <u>Tellabs</u> now awards the draw

---

[135]<u>See</u> Am. Compl. ¶¶ 182, 184.

[136]<u>See</u> <u>supra</u> subsections III.C.1.a. (credit guidelines), III.C.1.b. (default rates), III.C.1.d. (internal controls).

[137]<u>See</u> <u>In re Polaroid Corp. Sec. Litig.</u>, 134 F. Supp. 2d 176, 186 (D. Mass. 2001) ("In order to plead adequately financial fraud based on improper revenue recognition, the complaint must describe the violations at issue with sufficient particularity, setting forth such basic details as . . . the approximate amount by which revenues and earnings were overstated . . . .").

[138]<u>Ernst & Ernst v. Hotchfelder</u>, 425 U.S. 185, 193 n.12 (1976).

[139]<u>ACA Fin.</u>, 512 F.3d at 58 (citation and internal quotation omitted).

[140]<u>In re Cabletron</u>, 311 F.3d at 28 (citations and internal quotation omitted).

[141]<u>ACA Fin.</u>, 512 F.3d at 59.

29

to the plaintiff."[142]

Lead Plaintiffs have failed to plead sufficient facts giving rise to a strong inference of scienter because First Marblehead disclosed that which the Complaint alleges it concealed. During the Class Period, First Marblehead disclosed that it did not require borrowers to have a FICO score above 700,[143] it had lowered its credit criteria,[144] default rates had risen to 14.77%,[145] it had a close relationship with TERI,[146] various risks accompanied its relationship with TERI,[147] and changes in various factors could undermine its financial projections.[148]  These disclosures went to the heart of Lead Plaintiffs' theory that Defendants instituted a clandestine program to reduce credit guidelines, which led to an undisclosed rise in default rates and TERI's eventual bankruptcy.  First Marblehead's detailed disclosures negate any inference of scienter.[149]

In addition, the Complaint's insider trading allegations are not sufficient to establish a strong inference of scienter.  "Insider trading cannot establish scienter on its own, but it can be used to do so in combination with other evidence" if the trading is "in suspicious amounts or at

---

[142]Id. (citing Tellabs, 551 U.S. at 324).

[143]See supra subsection III.C.1.a.

[144]See id.

[145]See id. subsection III.C.1.b.

[146]See id. subsection III.C.1.c.

[147]See id.

[148]See id. subsection III.C.1.f.

[149]See, e.g., In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1425 (9th Cir. 1994) ("The detailed risk disclosure in the Debenture Prospectus negates an inference of scienter.").

suspicious times."[150]  The insider trading by the three Individual Defendants detailed in the

Complaint[151] was not in suspicious amounts or at suspect times.  Defendants Alexander,

Anbinder, and Berkley all served as nonemployee directors during the Class Period,[152] and the

Complaint does not identify any of them as having particularized knowledge of the alleged

fraudulent scheme.  Defendant Alexander sold only 13.81% of his holdings,[153] and his last sale

occurred on December 14, 2006, approximately eleven months before the first partial disclosure

of the alleged fraudulent scheme.[154]  A "broad temporal distance between stock sales and a

disclosure of bad news defeats any inference of scienter."[155]  Defendant Anbinder sold only

24.95% of his holdings,[156] and the sales were pursuant to trading plans already in place on

December 9, 2005 and December 5, 2006.[157]  Defendant Berkley sold only 12.90% of his

holdings,[158] and his last sale occurred on February 9, 2007, approximately nine months before the

---

[150]Miss. Pub. Employees' Ret. Sys. v. Boston Sci. Corp., 523 F.3d 75, 92 (1st Cir. 2008).

[151]See Am. Compl. ¶ 193 (identifying Defendants Alexander, Anbinder, and Berkley).  The Complaint also mentions three nondefendant insider sellers, but does not aver that they were involved in or were beneficiaries to the alleged fraudulent scheme.  See id.

[152]See id. ¶¶ 23–25.

[153]See id. ¶ 193.

[154]See id. ¶ 201.

[155]In re Party City Sec. Litig., 147 F. Supp. 2d 282, 313 (D.N.J. 2001).

[156]See Am. Compl. ¶ 193.

[157]See Defs.' Mem. Supp. Dismissal Exs. 13 at FMD 307, First Marblehead Form 4, Nov. 22, 2006 (disclosing the December 9, 2005 trading plan); 17 at FMD 319, First Marblehead Form 4, Oct. 22, 2007 (disclosing the December 5, 2006 trading plan).

[158]See Am. Compl. ¶ 193.

first partial disclosure of the alleged fraudulent scheme.

        3.    <u>Loss Causation</u>

To state an actionable § 10(b) claim, a complaint must plead "a causal connection between the material misrepresentation and the loss" suffered by the plaintiff.[159]  In other words, the plaintiff must allege "proximate causation and economic loss."[160]  To do this, the complaint must plead that the defendant company's "share price fell significantly after the truth became known."[161]

Lead Plaintiffs' loss causation allegations fail because First Marblehead provided adequate disclosures.  First Marblehead's detailed disclosures regarding credit criteria[162] and default rates,[163] and the risks associated with First Marblehead's relationship with TERI[164] and the projected financial results,[165] negate any theory that there was a concealed fraud or risk to be disclosed to the market.  Instead, First Marblehead's drop in share price coincided with a

---

[159]<u>Dura Pharm.</u>, 544 U.S. at 342; <u>see</u> § 78u-4(b)(4).

[160]<u>Dura Pharm.</u>, 544 U.S. at 346.

[161]<u>Id.</u> at 347.

[162]<u>See</u> <u>supra</u> subsection III.C.1.a.

[163]<u>See</u> <u>id.</u> subsection III.C.1.b.

[164]<u>See</u> <u>id.</u> subsection III.C.1.c.

[165]<u>See</u> <u>id.</u> subsection III.C.1.f.; <u>cf.</u> <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 177 (2d Cir. 2005) ("This case is . . . sharply distinguishable from cases in which some or all of the risk that materialized was clearly concealed by a defendant's misstatements or omissions.").

significant downturn in the credit markets[166] and its own preexisting pattern of stock declines.[167] As the Second Circuit stated in the context of a RICO suit, "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases."[168]  Defendants' detailed disclosures, the deterioration in the credit markets, and First Marblehead's preexisting pattern of stock declines negate Lead Plaintiffs' theory of loss causation.

       D.      Section 20(a)

       Lead Plaintiffs' § 20(a) "controlling person" claim fails because they have not pleaded adequately an underlying § 10(b) violation.[169]

IV.    Conclusion

       For the foregoing reasons, Defendants' Motion to Dismiss is ALLOWED.  This case is DISMISSED.

AN ORDER HAS ISSUED.


                                       /s/ Joseph L. Tauro
                                   United States District Judge

---

[166]See Am. Compl. ¶¶ 121, 159, 160, 168.

[167]See Defs.' Mem. Supp. Dismissal 12–14.  A court may take judicial notice of stock prices at the motion to dismiss stage to assess a plaintiff's loss causation allegations.  See In re Moody's Corp. Sec. Litig., 612 F. Supp. 2d 397, 401 n.3 (S.D.N.Y. 2009) ("The Court takes judicial notice of Moody's historical stock prices.").

[168]First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir. 1994) (affirming that proximate cause had not been adequately alleged for purposes of a RICO suit).

[169]See ACA Fin., 512 F.3d at 67–68 ("The plain terms of section 20(a) indicate that it only creates liability derivative of an underlying securities violation.").